# ORAL DEPOSITION OF AMALIA PEREZ

## October 14, 2004



CONDENSED TRANSCRIPT AND CONCORDANCE
PREPARED BY:

## Sunbelt Reporting & Litigation Services
### (713) 667-0763 Houston
### (214) 747-0763 Dallas



A

### ORAL DEPOSITION OF AMALIA PEREZ

**Page 1**

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

AMALIA PEREZ          *
                      *
VS.                   * CASE NO. B-04-068
                      *
SEARS, ROEBUCK AND    *
COMPANY               *

* * * * * * * * * * * * * * * * * * * * *
ORAL DEPOSITION OF
AMALIA PEREZ
TAKEN ON OCTOBER 14, 2004
* * * * * * * * * * * * * * * * * * * * *

ORAL DEPOSITION OF AMALIA PEREZ, produced as a
witness at the instance of the Defendant, and duly
sworn, was taken in the above-styled and numbered cause
on the 14th day of October, 2004, from 10:43 a.m. to
5:41 p.m., before SYLVIA KERR, CSR, RPR, CRR in and for
the State of Texas, reported by machine shorthand, at
the Plaza 700 Properties, 700 Paredes Avenue, Suite 112,
Brownsville, Cameron County, Texas, pursuant to the
Texas Rules of Civil Procedure and the provisions
attached hereto.

Reported by: Sylvia Kerr
Job No. 47967

---

**Page 2**

1
2         A P P E A R A N C E S

COUNSEL FOR THE PLAINTIFF:
3  MR. RICHARD E. ZAYAS
   Attorney At Law
4  3100 East 14th Street
   Brownsville, Texas 78521
5
6

COUNSEL FOR THE DEFENDANT:
7  MR. MARK J. OBERTI
   Seyfarth Shaw LLP
8  700 Louisiana Street, Suite 3700
   Houston, Texas 77002-2797
9
10

ALSO PRESENT:
11 MR. DAVE GREBB
12
13
14
15
16
17
18
19
20
21
22
23
24
25

---

**Page 3**

1              I N D E X
2
                                    PAGE
3
   Appearances                        2
4  AMALIA PEREZ
      Examination by Mr. Oberti       6
5
6              EXHIBITS
7  NUMBER   DESCRIPTION             PAGE
8  1 -- Sears Application for Employment   6
9  2 -- Driver's License and Social Security Card   6
10 3 -- Sears Interview Guide             6
11 4 -- Auto Center Final Interview Rating Form   6
12 5 -- Orientation Summary              67
13 6 -- Borg-Warner Final Report        69
14 7 -- Job Data Sheets                  6
15 8 -- Service Technician II Job Description   20
16 9 -- Worker's Comp Files             73
17 10 -- Chapter 13 Wage Earner Plan    6
18 11 -- Phone Call Complaint, 2-18-02   6
19 12 -- Associate Witness Statement, 5-25-02   92
20 13 -- Associate Witness Statement, 5-25-02   104
21 14 -- Ethics/Policy Violation Notice   105
22 15 -- Release of All Claims          102
23 16 -- Performance Plan for Improvement   111
24 17 -- Associate Witness Statement, 7-21-02   119
25 18 -- Associate Witness Statement, 11-13-02   121

---

**Page 4**

1  NUMBER   DESCRIPTION             PAGE
2  19 -- Memo of Interview            133
3  20 -- Documentation of Performance Issues   6
4  21 -- Documentation of Performance Issues   6
5  22 -- Documentation of Performance Issues   6
6  23 -- Associate Information        6
7  24 -- Employee Status Report      150
8  25 -- Associate Information        150
9  26 -- Charge of Discrimination    151
10 27 -- Open File Request            6
11 28 -- Letter to Mr. Klein Dated 4-11-03   152
12 29 -- Letter to Mr. Davies from EEOC   6
13 30 -- Letter to Ms. Jimenez Dated 6-18-03   153
      Tab 1 -- Release of Associates
14    Tab 2 -- Enclosure #2
      Tab 3 -- Personnel File of Miguel Guerrero
15    Tab 4 -- Enclosure #4
16 31 -- Letter to Mr. Davies Dated 8-7-03   6
17 32 -- Letter to Mr. Davies Dated 8-28-03   6
18 33 -- Letter to Ms. Jimenez Dated 9-3-03   159
      Tab 1 -- Technicians Between 9-30-01 to 12-14-02
19    Tab 2 -- Sears Invoices
      Tab 3 -- Performance Plan for Improvement
20
21 34 -- Letter to Ms. Bartlett Dated 9-17-03   6
22
23 35 -- EEOC Determination Dated 11-21-03   6
24
25 36 -- Letter to Ms. Bartlett Dated 11-26-03   6
   37 -- Notice of Right to Sue        6
   38 -- Plaintiff's Original Complaint   181

## ORAL DEPOSITION OF AMALIA PEREZ

### Page 5

| NUMBER | DESCRIPTION | PAGE |
|--------|-------------|------|
| 39 -- | Freedom of Information Act Request to EEOC | 192 |
| 40 -- | Texas Workforce Commission File | 217 |
| 41 -- | Plaintiff's Original Complaint | 6 |
| 42 -- | Records from Liberty Mutual Insurance Group | 70 |
| 43 -- | Bankruptcy Voluntary Petition | 34 |
| 44 -- | Amended Schedule 1 & Schedule J | 34 |
| 45 -- | Order Dismissing Chapter 13 Case | 35 |
| 46 -- | Performance Plan for Improvement, 7-21-02 | 245 |
| 47 -- | Associate Witness Statement, 7-27-02 | 249 |

(Exhibits Retained by Mr. Oberti)

Requested Information
  By Mr. Oberti                                          261

Signature and Changes                                    277
Reporter's Certificate                                   279

### Page 6

1      (Exhibit Nos. 1 to 42 were marked.)
2                 AMALIA PEREZ,
3 having been first duly sworn, testified as follows:
4                  EXAMINATION
5 BY MR. OBERTI:
6    Q.   Could you state your name, please.
7    A.   Amalia Perez.
8    Q.   Ms. Perez, my name is Mark Oberti, and I
9 represent Sears in this case. Have you ever given a
10 deposition before?
11   A.   No.
12   Q.   Just a couple of the basic rules. Since the
13 court reporter can only take down what we say, will you
14 do your best to verbalize your answer rather than say
15 uh-huh or nuh-huh?
16   A.   Yes.
17   Q.   And I'll try to let you finish your answer
18 before I butt in with a question. In return, I'll ask
19 you to try and let me finish my question before you
20 start to answer, that way the court reporter gets down a
21 nice clean record. Fair enough?
22   A.   Yes, sir.
23   Q.   And then if you don't understand one of my
24 questions, let me know and I'll clarify it; otherwise,
25 I'll assume you understood. Fair enough?

### Page 7

1    A.   Yes.
2    Q.   And finally, if you need a break some time,
3 feel free to let me know, and we'll take a break.
4    A.   Yes, sir.
5    Q.   What's your date of birth?
6    A.   September 17, 1954.
7    Q.   So that means you just turned 50?
8    A.   Yes, sir.
9    Q.   And where were you born?
10   A.   Edinburg.
11   Q.   Texas?
12   A.   Texas.
13   Q.   Have you lived here all your life in Texas?
14   A.   Yes, sir.
15   Q.   And have you ever been married?
16   A.   No, sir.
17   Q.   Any children?
18   A.   No, sir.
19   Q.   And where were you working before you went to
20 work -- as I understand it, you went to work for Sears
21 in 1995, correct?
22   A.   Correct.
23   Q.   And you actually worked for Sears one time
24 before that?
25   A.   Three times.

### Page 8

1    Q.   Three different times?
2    A.   Yes, sir.
3    Q.   All in Harlingen?
4    A.   Harlingen and McAllen.
5    Q.   And what positions did you hold the three times
6 that you worked for Sears before January of '95?
7    A.   Tire installer.
8    Q.   Each time?
9    A.   Yes, sir.
10   Q.   Okay. And obviously you never knew Richard
11 Ascevedo during those times that you worked for Sears?
12   A.   No, sir.
13   Q.   Did you have any complaints about your
14 employment from those three times that you worked for
15 Sears?
16   A.   Complaints?
17        MR. ZAYAS:  Objection, form.
18   A.   No, sir.
19   Q.   And were you fired from Sears any of those
20 times?
21   A.   No, sir.
22   Q.   You voluntarily resigned?
23   A.   Yes, sir.
24   Q.   Okay. I assume for better jobs?
25   A.   Yes, sir.

ORAL DEPOSITION OF AMALIA PEREZ

## Page 9

1    Q.   Okay.  You were fired from Sears in November of
2 2002, correct?
3    A.   Yes, sir.
4    Q.   Have you ever been fired from another job in
5 your life?
6    A.   Once for no license; it was suspended.
7    Q.   What job was that?
8    A.   Montgomery Ward's.
9    Q.   Do you remember roughly what year that was?
10   A.   In 1986.
11   Q.   And they fired you for having a suspended
12 driver's license?
13   A.   Yes.
14   Q.   And it was suspended because?
15   A.   I got a DWI.
16   Q.   Was that a misdemeanor or a felony?
17   A.   A misdemeanor.
18   Q.   Have you ever been convicted of a felony?
19   A.   With a DWI, yes.
20   Q.   That DWI or another one?
21   A.   I got two other DWI's.
22   Q.   What year did you get the one that was a
23 felony?
24   A.   In 1992.
25   Q.   Who were you working for then?

## Page 10

1    A.   With General Dynamics.
2    Q.   Did they let you keep your job?
3    A.   Yes, sir.
4    Q.   Did you have to go to jail off of the felony?
5    A.   No, sir.
6    Q.   What did you get in terms of punishment?
7    A.   Probation.
8    Q.   How long?
9    A.   For five years.
10   Q.   So that's done?
11   A.   Yes, sir.
12   Q.   Any other felonies that you've been convicted
13 of?
14   A.   No, sir.
15   Q.   And no other jobs that you've been fired from
16 other than Sears and then the Montgomery Ward's in '86?
17   A.   That's correct.
18   Q.   Now, since you were terminated by Sears, who
19 have you worked for?
20   A.   Gilead Delivery Service.
21   Q.   Okay.  Who else?
22   A.   And now Jabil.
23   Q.   J-A-B-E-L?
24   A.   J-A-B-I-L.
25   Q.   And initially you got to Jabil through

## Page 11

1 Spherion?
2    A.   Yes.
3    Q.   Which is a contract company?
4    A.   Yes, sir.
5    Q.   And after some length of period, Jabil decided
6 to hire you as their direct employee?
7    A.   Yes, sir.
8    Q.   Do you have benefits?
9    A.   Like insurance or --
10   Q.   Yeah, medical insurance?
11   A.   No.
12   Q.   At some point did you become eligible for
13 medical insurance?
14   A.   Not until December 1st.
15        MR. ZAYAS:  What year?
16   A.   This year.
17   Q.   So as of December 1st, 2004, assuming you're
18 still working at Jabil, you'll be eligible to enroll in
19 their medical insurance program?
20   A.   Yes, sir.
21   Q.   Do you intend to do so?
22   A.   Yes, sir.
23   Q.   And do you know what insurance company they
24 use?
25   A.   I believe it's Aetna.

## Page 12

1    Q.   They're like an HMO, PPO?
2    A.   PPO.
3    Q.   Do you know what your copay would be, your
4 monthly deductible?
5    A.   No, I don't.
6    Q.   What did you have at Sears?
7    A.   I think it was a PPO also.
8    Q.   Do you remember which insurance company?
9    A.   With the same company.
10   Q.   Aetna?
11   A.   Yes, sir.
12   Q.   Did you -- the whole time you worked at Sears
13 from '95 to November 2002, did you have the Aetna health
14 insurance?
15   A.   Well, when it was offered to me, I purchased
16 it, yes.
17   Q.   You still had it when you were terminated?
18   A.   Yes.
19   Q.   And since you were terminated, have you had any
20 medical health insurance?
21   A.   No, sir.
22   Q.   Have you had any bills that you had to pay for
23 medical costs out of your own pocket since you left
24 Sears, or were they all covered by the workers' comp
25 people?

## ORAL DEPOSITION OF AMALIA PEREZ

### Page 13

1    A.   Some was covered by workman's comp.  Now
2  workman's comp has been taken away, so I had to purchase
3  my medicine.
4    Q.   Okay.  How much have you had to spend for
5  medical treatment or prescriptions out of your own
6  pocket that would have been covered by Sears health
7  insurance if you still had that?
8    A.   Well, since I can't afford it, I don't see the
9  doctors.
10    Q.   So rather --
11    A.   The only thing I get is the Ibuprofen on a
12  monthly basis.
13    Q.   How much is that?
14    A.   It's about $27 a month.
15    Q.   Is that Advil?
16    A.   Ibuprofen.
17    Q.   It's just called Ibuprofen?
18    A.   800 milligrams.
19    Q.   Would that -- do you know whether that would
20  have been covered under Sears' PPO with Aetna?
21    A.   It would be under workman's comp.  I don't know
22  what -- yeah, I think it would be Aetna.
23    Q.   Okay.  So you've been spending about $27 a
24  month for Ibuprofen out of your own pocket, but other
25  than that, since you don't have the money, you haven't

### Page 14

1  incurred any other medical bills since you left Sears
2  that otherwise would have been covered under Sears'
3  health insurance, correct?
4    A.   That's correct.
5    Q.   And the $27 a month that you've had to pay, is
6  that every month since you left Sears or just since they
7  cut off the workers' comp?
8    A.   Since they cut it off.
9    Q.   When did they cut that off?
10    A.   A little after I was terminated, which would
11  have been in March, I believe.
12    Q.   Of '03?
13    A.   Yes, sir.
14    Q.   So it's been, it looks like, about a year and a
15  half that you've been paying the $27 a month for the
16  Ibuprofen?
17    A.   Yes.
18    Q.   Now, at the time you were terminated from
19  Sears, was your title Service Tech II?
20    A.   Yes, sir.
21    Q.   And you had been promoted to that job in June
22  2001, correct?
23    A.   Yes, sir.
24    Q.   And who promoted you that job title?
25    A.   Juan Rodriguez, which was automotive manager at

### Page 15

1  the time.
2    Q.   Right.  He was replaced by this Richard
3  Ascevedo?
4    A.   Yes, sir.
5    Q.   And Juan is still over there at the Brownsville
6  store now?
7    A.   Yes, sir.
8    Q.   Have you talked to him since you were
9  terminated?
10    A.   I think twice.
11    Q.   Did you tell him you had been terminated?
12    A.   Yes, sir.
13    Q.   What did he say?
14    A.   That it was handled wrong.
15    Q.   Did he say why?
16    A.   Because on previous occasions, anything that
17  went wrong in automotive, it was taken care of in
18  automotive.  And that's as far as it went.
19    Q.   For instance, in your case it went to, what,
20  store general manager?
21    A.   Yes, sir.
22    Q.   Was Juan involved in your termination or was he
23  already at the Brownsville store then?
24    A.   He was at the Brownsville store.
25    Q.   So as far as you know, he only knows about it

### Page 16

1  through what you and he discussed?
2    A.   And I believe Mr. Ascevedo talked to him.
3        MR. ZAYAS:  Objection, form.
4    Q.   (By Mr. Oberti)  What makes you think that?
5    A.   Mr. Rodriguez told me.
6    Q.   Did he tell you what Mr. Ascevedo told him?
7    A.   No.  And I told him I didn't want to know.
8    Q.   And prior to Mr. Ascevedo coming on as the auto
9  center manager, had you ever received any sort of
10  written discipline while you were a Sears employee?
11    A.   No.
12    Q.   So up until the time Mr. Ascevedo became the
13  manager, your disciplinary file was clean as a whistle?
14    A.   One exception.
15    Q.   What was that?
16    A.   There was some theft involved, and I reported
17  it.  I got suspended for a week, but it was cleared up.
18    Q.   You reported a theft and then you got
19  suspended?
20    A.   Yes.  There was a lot of --
21    Q.   He said/she said?
22    A.   -- people involved.  No.  The automotive
23  manager, assistant manager, one of the salespersons.
24    Q.   What year was that, do you remember, roughly?
25    A.   About '96, I believe, '97.

ORAL DEPOSITION OF AMALIA PEREZ

### Page 17

1    Q.    What was the basis for suspended you, do you
2 remember?
3    A.    Because I didn't report it that same day; I
4 reported it the next day in the morning.
5    Q.    Okay. And who was the auto center manager,
6 I'll call him ACM, at the time?
7    A.    Gordon Woodward.
8    Q.    You're saying eventually it got all cleared up
9 and you didn't have any discipline from that, right?
10    A.    Right.
11    Q.    Did you ever have any supervisory authority
12 over other employees when you worked at Sears?
13    A.    Yes, sir.
14    Q.    Was that only after you became a Service Tech
15 II?
16    A.    No, sir. I got the title of crew chief.
17    Q.    When did you get that title?
18    A.    When Mr. Woodward was manager.
19    Q.    Some time in --
20    A.    '96, '97.
21    Q.    And crew chief means you're like a working
22 foreman?
23    A.    Yes, sir.
24    Q.    Over the other workers in the shop?
25    A.    Yes, sir.

### Page 18

1    Q.    And just for the record, you were working in,
2 what, tire and battery shop?
3    A.    Automotive, tire, batteries, front-ends.
4    Q.    Mechanical work?
5    A.    Yes, sir.
6    Q.    And when you were the crew chief, were you the
7 only crew chief in the shop?
8    A.    Yes, sir.
9    Q.    Was there other -- how long were you the crew
10 chief?
11    A.    About eight, nine months. They did away with
12 the position.
13    Q.    Okay. So it's nothing against you, it's just
14 the position was eliminated?
15    A.    Yes, sir.
16    Q.    And then you went -- so other than that eight
17 to nine months, did you ever have any supervisory
18 authority over other employees? Like when you were a
19 Service Tech II, for example, did that give you any sort
20 of formal authority over other people?
21    A.    Well, what I can tell you, the guys there, they
22 would look for me. They would ask for my opinions.
23    Q.    Because of your experience and knowledge?
24    A.    Yes, sir.
25    Q.    And how long you had been there?

### Page 19

1    A.    Yes, sir.
2    Q.    Right. But I'm just getting at, did you ever
3 have actual -- anything formal where the company gave
4 you like a supervisory position other than the eight to
5 nine months you worked as crew chief?
6    A.    No, sir, just Mr. Rodriguez gave me some type
7 of authority when he was manager also.
8    Q.    Jose Rodriguez?
9    A.    Yes.
10    Q.    And he was the manager from -- I'm sorry, Juan
11 Rodriguez?
12    A.    Yes, sir.
13    Q.    And he was the manager from October 1998 to
14 October 2000?
15    A.    Yes, sir.
16    Q.    What kind of authority did he give you?
17    A.    Trying to resolve some minor customer
18 complaints, a customer's vehicle. I would tell the
19 customer to get the vehicle cleaned and bring us a
20 receipt.
21    Q.    Did you get like a new title or extra money for
22 that?
23    A.    No, no.
24    Q.    Now, do you know why you got promoted to
25 Service Tech II in June 2001? Did you have to pass a

### Page 20

1 test or something? Or how did that happen?
2    A.    The company wanted people to advance. They
3 didn't want them in one certain area.
4    Q.    Do you know if other employees in the shop that
5 had the title of Service Tech II, or do you know?
6    A.    Not while I was there.
7    Q.    Let me ask you to turn to Exhibit No. 8 of the
8 exhibit book there. We'll have to number the -- but
9 anyway, that's Exhibit 8. You've got the right tab. Do
10 you see that says: Job title, Service Technician II?
11    A.    Yes, sir.
12    Q.    Have you ever seen this job description before?
13    A.    Yes.
14    Q.    And is it accurate? Go ahead and take your
15 time and look at it. But it's actually one, two --
16 basically two pages. There's a couple lines on the
17 third page. Take your time and read it and just tell me
18 if you agree that, you know, generally it's an accurate
19 description.
20    A.    Yes, sir.
21    Q.    Yes, it's generally accurate?
22    A.    Yes, sir.
23    Q.    Where it says commitment to safety, use of
24 appropriate personal protective equipment, back belt,
25 safety glasses and safety shoes at all times, did you

## ORAL DEPOSITION OF AMALIA PEREZ

### Page 21

1 use that sort of stuff?
2    A.  Yes, sir.
3    Q.  Why would you need safety glasses and safety
4 shoes?
5    A.  Safety shoes for the purpose if anything should
6 fall, protect your toes, I believe.
7    Q.  About how many people worked in the shop there
8 at a time?
9    A.  When I was there?
10    Q.  Yeah.
11    A.  It was --
12    Q.  I'm just looking for a rough number, a rough
13 estimate. Are we talking about 50 or ten or what?
14    A.  Well, there used to be 12, and then it got down
15 to three. And I believe there's four right now.
16    Q.  Okay. So anywhere from three to 12?
17    A.  When I started, it was about 12.
18    Q.  And how many shifts are there? Just one shift?
19    A.  Yes. It depends on what time the technician
20 goes in because they're open until 7:00, I believe.
21    Q.  What time do they -- what time do they open in
22 the morning?
23    A.  When I was there, it was 8:00.
24    Q.  8 a.m.?
25    A.  Yes.

### Page 22

1    Q.  And then they closed at?
2    A.  At 7:00.
3    Q.  And how many days a week are they open?
4    A.  They're open seven days a week. On Sundays
5 it's 12:00 to 5:00, or it was then.
6    Q.  So when you worked there, the shop was open
7 every day 8 a.m. to 7 p.m., except for Sunday it was
8 open from 12:00 to 5:00?
9    A.  That's correct.
10    Q.  When you would go in, would you usually work
11 all the way from 8 a.m. to 7 p.m.? Or how would that
12 work?
13    A.  Well, it varied because sometimes if I was
14 busy, we were shorthanded, so we had to pick up the
15 slack.
16    Q.  Who made your schedule?
17    A.  I did.
18    Q.  You made your own schedule?
19    A.  I made everybody's schedules when I was there.
20    Q.  Oh, the whole time you were there?
21    A.  Until Mr. Ascevedo removed me from that
22 position.
23    Q.  When did he do that?
24    A.  I think we got on the wrong foot, and he took
25 away a lot of duties that I did.

### Page 23

1    Q.  Including the scheduling?
2    A.  The scheduling, the ordering, the shipping, the
3 inventory counts.
4    Q.  And who did --
5    A.  He took all that away from me.
6    Q.  And who did he give them to?
7    A.  Well, he said he was going to do it, but then
8 he had a favorite technician.
9    Q.  Who?
10    A.  He's no longer there either. Mr. Aranda.
11    Q.  What was his first name?
12    A.  Gabriel.
13    Q.  Do you know where Gabriel Aranda is now?
14    A.  Unemployed.
15    Q.  He's in Santa Rosa somewhere?
16    A.  His parents live there, so I don't -- I haven't
17 talked to him since two months.
18    Q.  Was he -- was he still working at Sears when
19 you were fired?
20    A.  He was fired the same day I was.
21    Q.  Really?
22    A.  Yes, sir.
23    Q.  What do you know about his termination, what
24 the basis was?
25    A.  From what he told me, it was something

### Page 24

1 pertaining to a discount that he supposedly gave to his
2 father-in-law or something or other. I wasn't too sure
3 about that.
4    Q.  Okay. Do you know who fired him?
5    A.  Mr. Grebb.
6    Q.  Dave Grebb?
7    A.  Yes, sir.
8    Q.  As far as the chain of command goes, when you
9 were working there, was it always from you to the auto
10 center manager?
11    A.  No.
12    Q.  There was somebody in between?
13    A.  It was always the automotive manager.
14    Q.  That's what I'm saying, that the workers would
15 report directly to the auto center manager, meaning like
16 Mr. Rodriguez and Mr. Ascevedo; is that correct?
17    A.  It would be to Mr. Rodriguez, and the employees
18 would come to and when Mr. Ascevedo was there.
19    Q.  But that's not -- I mean, technically
20 Mr. Ascevedo was over the auto center?
21    A.  Yes, sir, but they really didn't look to him.
22    Q.  Right. I'm just getting down formally what the
23 chain of command was.
24    A.  Yes, sir.
25    Q.  And then from the auto center manager it would

ORAL DEPOSITION OF AMALIA PEREZ

## Page 25

1  go to, what, the store general manager?
2     A.    I believe so.
3     Q.    And the time you were terminated, Mr. Dave
4  Grebb was the store general manager?
5     A.    Yes, sir.
6     Q.    Who was the store general manager before him,
7  do you know?
8     A.    I believe it was Julio -- I don't know his last
9  name.
10    Q.    The Sears store you worked at, was that in
11 Harlingen?
12    A.    Yes, sir.
13    Q.    And the whole time you worked there, you were
14 in the auto center, correct?
15    A.    Correct.
16    Q.    And the auto center is connected to the store?
17    A.    Not until Mr. Ascevedo was manager. We
18 never --
19           MR. ZAYAS: Answer the question.
20    Q.    (By Mr. Oberti) I mean physically connected to
21 the store?
22    A.    Physically, yes.
23    Q.    And then the rest of the store has a full line
24 retail shop in it?
25    A.    Yes, sir.

## Page 26

1     Q.    Now, what were you saying about some change
2  when Mr. Ascevedo became manager?
3     A.    Change?
4     Q.    Yeah. I asked you was the shop connected to
5  the store, and I meant physically, which it is, but you
6  said not until Mr. Ascevedo became manager, so I was
7  trying to understand what you were saying there.
8     A.    Well, Mr. Ascevedo always ran to Mr. Grebb when
9  there was something wrong.
10    Q.    Oh, you're saying before that, everything was
11 handled internally?
12    A.    Yes.
13    Q.    Okay. Now, as far as the job description goes,
14 it says "prolonged standing and walking." Is that true?
15    A.    Yes, sir.
16    Q.    What, customers would come in with their cars
17 and then you oftentimes would have to lift the cars up?
18    A.    Yes, sir.
19    Q.    On -- what are they called, hydraulic --
20    A.    A rack.
21    Q.    -- rack?
22    A.    Uh-huh.
23    Q.    And then you'd be standing there working
24 underneath it; is that correct?
25    A.    Yes, sir.

## Page 27

1     Q.    The whole time you worked there at Sears in the
2  auto shop, was there any other woman who ever worked in
3  the shop other than you?
4     A.    Not while I was there.
5     Q.    There's some salespeople in the shop, too,
6  correct?
7     A.    Yes.
8     Q.    But they're not mechanics; they don't work on
9  the cars, correct?
10    A.    That's correct.
11    Q.    But some of the salespeople were women,
12 correct?
13    A.    Yes.
14    Q.    Do you know their names?
15    A.    Yes, sir.
16    Q.    What are their names?
17    A.    Norma Garcia, Matilda Booth, Yolanda McCormick,
18 and that's it.
19    Q.    Do you know if any of them have been fired by
20 Sears?
21    A.    No. They're still employed.
22    Q.    All of them?
23    A.    Yes.
24    Q.    And the salespeople in the auto shop, would
25 they report to the auto center manager as well?

## Page 28

1     A.    Yes.
2     Q.    Now, like how physical a job is this, the job
3  you had there as service tech, Service Tech II? Is it
4  physically demanding?
5     A.    Yes, sir.
6     Q.    The reason I'm asking, apparently you got hurt
7  on-the-job about nine times, correct --
8     A.    Yes, sir.
9     Q.    -- between 1995 and when you got fired?
10    A.    Yes, sir.
11    Q.    And so is there something about the job that's
12 dangerous or stressful on your body that would cause you
13 to get hurt this many times?
14    A.    No, it wasn't dangerous. It was just
15 accidents.
16    Q.    I guess -- do you know anybody else who worked
17 in the shop who got injured on-the-job, say, more than
18 two times?
19    A.    Yes, but they didn't report it.
20    Q.    Okay. Anybody got injured on-the-job more than
21 five times?
22    A.    I'm not aware.
23    Q.    I guess what I'm trying to get at is: Do you
24 have any opinion as to why you got hurt so many times,
25 about nine times during the about seven years or so that

## ORAL DEPOSITION OF AMALIA PEREZ

### Page 29

1  you worked at Sears? Is there -- was it just
2  coincidence?
3     A.  I don't know. I couldn't -- I don't know what
4  to tell you there.
5     Q.  If you don't know, that's fine.
6     A.  All I was told is if you ever had an accident,
7  no matter how minor, you were to report it.
8     Q.  Who told you that?
9     A.  The managers.
10    Q.  Did anyone ever tell you not to report an
11 accident, no matter how minor -- or an injury, no matter
12 how minor?
13    A.  Just some of the coworkers.
14    Q.  Any manager?
15    A.  No.
16    Q.  Did any manager tell you not to report an
17 injury or an accident?
18    A.  No.
19    Q.  Okay. Now, it says here "lifting up to 50
20 pounds." Is that part accurate for the job description?
21    A.  Yes.
22    Q.  What sort of things would you have to lift that
23 might be up to 50 pounds?
24    A.  The big truck tires.
25    Q.  You mean, like if somebody came in with a big

### Page 30

1  truck?
2     A.  Uh-huh.
3     Q.  Yes?
4     A.  We have to take them off to balance them and
5  rotate them.
6     Q.  Okay. Now, so taking the tires off would be
7  like lifting the tire off, pushing, pulling?
8     A.  Uh-huh.
9     Q.  Yes?
10    A.  Yes.
11    Q.  Okay. So the work is actually stressful on
12 somebody's body?
13    A.  Yes.
14    Q.  Now, you produced some documents in this case.
15 I was going to ask you to turn to No. 149. I've
16 numbered them down at the -- no, your attorney numbered
17 them down at the bottom. Do you remember going for this
18 functional capacity?
19    A.  Yes, sir.
20    Q.  I guess it was -- it looks like February 18,
21 2003?
22    A.  Yes, sir.
23    Q.  Which was, what, about three months after you
24 were fired?
25    A.  Yes, sir.

### Page 31

1     Q.  And the recommendation says, "Consider a
2  different type of employment while maintaining
3  flexibility with daily stretches and regular strength
4  and cardiovascular fitness program." Did I read that
5  correctly?
6     A.  Yes, sir.
7     Q.  And then it says -- under the section that says
8  reasons for the recommendations, it says, "Evaluation
9  results indicate that the patient has made significant
10 strength coordination and functional endurance gains.
11 She is improved in the ability to weight shift across
12 planes of motion while maintaining eye/hand coordination
13 skills. The presence of symptoms of previous injuries
14 is a factor that will interfere with long-term
15 employment possibilities. Therefore, it was recommended
16 to the patient to consider a different type of
17 employment that is less stressful on the body." Did I
18 read that correctly?
19    A.  Yes, sir.
20    Q.  And did, in fact, the rehabilitation center
21 recommend that you consider a different type of
22 employment other than in the mechanical field so that it
23 would be less stressful to your body?
24    A.  Yes, sir.
25    Q.  Has any doctor recommended that -- or changed

### Page 32

1  that recommendation?
2     A.  Dr. Sweeney.
3     Q.  Who?
4     A.  Dr. Sweeney.
5     Q.  What did he say?
6     A.  That I should change my field of employment.
7     Q.  Right. I'm saying has any doctor since
8  February 18th, 2003 told you, no, it's fine, go ahead
9  and continue in your field as a service technician or
10 mechanic?
11    A.  No.
12    Q.  Do you agree with that recommendation there
13 that I just read?
14    A.  Yes and no.
15    Q.  Okay. What do you mean?
16    A.  Well, yes, if I had to, I would do it; and, no,
17 because my body feels it.
18    Q.  Feels what?
19    A.  The stress.
20    Q.  Did you tell -- remember when the Equal
21 Employment Commission or the EEOC was investigating your
22 charge of discrimination?
23    A.  Yes, sir.
24    Q.  And then ultimately they found probable cause
25 to believe that you've been discriminated against based

ORAL DEPOSITION OF AMALIA PEREZ

### Page 33

1  on your sex?
2     A.   Yes, sir.
3     Q.   And then they tried to see if they could get
4  the parties to settle?
5     A.   Yes, sir.
6     Q.   Do you recall telling the EEOC that you did not
7  want your job back?
8     A.   Yes, sir.
9     Q.   And why don't you?  Because of the medical
10  issue?
11     A.   No.
12     Q.   Why?
13     A.   Because if I were to return, I feel that they
14  would find a reason to terminate me again.
15     Q.   That's why you said that?
16     A.   Yes, sir.
17     Q.   Had you ever seen somebody who sued Sears and
18  then got their job back and then saw how Sears treated
19  them after that?
20     A.   No.
21     Q.   So are you just speculating that they would
22  find a way to get back at you if you came back to work?
23     A.   Yes, sir.
24     Q.   Do you like the job that you have now?
25     A.   It's good.  The pay is not too good, but --

### Page 34

1     Q.   What's the pay?
2     A.   $8.50.
3     Q.   Per hour?
4     A.   Yes, sir.
5     Q.   Do you have 401(k)?
6     A.   No, sir.
7     Q.   Do you qualify for that on December 1?
8     A.   Yes, sir, but I'm not allowed to get 401
9  because I'm in a bankruptcy.
10     Q.   I thought your bankruptcy was dismissed earlier
11  this year?
12     A.   I had to refile again.
13     Q.   You filed a second bankruptcy?
14     A.   I was going to lose my house.
15     Q.   I guess while we're on the bankruptcy, I'm
16  going to show you -- I guess I'll mark this Exhibit 43.
17              (Exhibit No. 43 was marked.)
18     Q.   (By Mr. Oberti)  Is this the first bankruptcy
19  you filed back in November of 2001?
20     A.   Yes, sir.
21     Q.   And obviously that's when you were still
22  working there, correct, at Sears?
23     A.   Yes, sir.
24              (Exhibit No. 44 was marked.)
25     Q.   (By Mr. Oberti)  Let me show you what's been

### Page 35

1  marked as Exhibit 44.  Was your lawyer in that case
2  William Csabi?
3     A.   Yes, sir.
4     Q.   Is he still your lawyer?
5     A.   Yes, sir.
6     Q.   And this is where you filed an amended Schedule
7  I and J in December -- late December 2001 because there
8  had been some changes to your budget and your expenses
9  and your planned payment, or just your budget, your
10  monthly expenses; is that correct?
11     A.   I don't understand.
12     Q.   I'm just saying, is Exhibit No. 44 something
13  that was filed by you at the end of December of '01?
14     A.   Yes.
15              (Exhibit No. 45 was marked.)
16     Q.   (By Mr. Oberti)  Then let me show you what's
17  been marked as Exhibit No. 45.  Is this the order
18  dismissing the bankruptcy you filed in November 2001?
19     A.   Yes, sir.
20     Q.   And this Exhibit 45, the dismissal of that
21  bankruptcy, that bankruptcy was a Chapter 13, correct?
22     A.   Yes, sir.
23     Q.   And it was dismissed in January of this year,
24  2004, correct?
25     A.   Yes, sir.

### Page 36

1     Q.   And now you're saying that you've opened up
2  another bankruptcy?
3     A.   Yes, sir.
4     Q.   What month did that happen?
5     A.   In July, I believe.
6     Q.   Of 2004?
7     A.   Yes, sir.
8     Q.   Is it a Chapter 7 or Chapter 13?
9     A.   13.
10     Q.   And do you know whether or not you listed this
11  lawsuit on that bankruptcy filing?
12     A.   No, sir.
13     Q.   You didn't?  Or you don't know?
14     A.   I didn't enter it.
15     Q.   Do you -- you may not know, but do you know why
16  you didn't?
17     A.   I didn't know I could.
18     Q.   Let me go over some other questions with you.
19  Would you agree that safety was of high importance at
20  Sears in the auto shop?
21     A.   Yes, sir.
22     Q.   Do you know anybody who got seriously injured
23  there at the Harlingen shop?
24     A.   When I was there?
25     Q.   Yes.

ORAL DEPOSITION OF AMALIA PEREZ

### Page 37

1    A.    I know Augustine Cortez got injured.
2    Q.    What happened to him?
3    A.    The compressor for the springs for the struts
4    slipped, and the spring went and hit him.
5    Q.    What happened to him, do you know?
6    A.    He didn't report it.
7    Q.    Well, how bad was he hurt?
8    A.    The spring hit his groin area. I remember he
9    was in constant pain.
10   Q.    What year did that happen around about?
11   A.    About '96.
12   Q.    Anybody else that -- not minor injuries, but
13   serious injuries that you know of there in the shop?
14   A.    Nicolas Reyes, he injured his back.
15   Q.    How did he do that?
16   A.    I really don't recall.
17   Q.    Okay. Would you agree that if an employee
18   makes a mistake in the shop, a mistake that compromises
19   safety, is more serious than one that doesn't?
20         MR. ZAYAS:  Objection, form.
21   A.    Could you repeat the question again?
22   Q.    Yeah. I'm saying if you commit a mistake in
23   the shop working on a car, a mistake that causes an
24   unsafe condition, is a more serious mistake than one
25   that doesn't; do you agree with that?

### Page 38

1    A.    Yes.
2    Q.    Now, were you doing basically the same type of
3    work out there in the shop from 1995 until you got
4    fired?
5    A.    No.
6    Q.    How did the job change? Or how did your work
7    change?
8    A.    When I became a Tech II.
9    Q.    In June 2001?
10   A.    Yes.
11   Q.    Okay. Just tell me in a nutshell what you were
12   doing before then and then what you did after that on a
13   day-to-day basis sort of thing.
14   A.    Mounted, dismounted tires, installed batteries.
15   Q.    This is before?
16   A.    Yes.
17   Q.    Okay. Go ahead. I'm sorry.
18   A.    Alternators, starters, some shocks, did
19   inventory counts, put up merchandise on the sales floor,
20   tire displays, unload the trailers, put up merchandise
21   in the stockroom. And I built some tire racks.
22   Q.    Meaning the actual racks that they put the
23   tires on?
24   A.    Yes, sir.
25   Q.    The ones in inventory?

### Page 39

1    A.    In the stockroom, yes.
2    Q.    All right. And then what about after June 2001
3    when you became a Service Technician II?
4    A.    I continued to do basically the same with the
5    addition of alignments and installation of struts, rack
6    and pinions, and U joints.
7    Q.    Was there anything -- when a customer came in
8    and needed work on a car, was there anything you didn't
9    know how to do and, therefore, you'd have to give the
10   work to somebody else?
11   A.    There were certain struts that I didn't know,
12   and I passed on the work to somebody else.
13   Q.    Anything else that comes to mind?
14   A.    No.
15   Q.    Now, how did you learn to be a -- basically you
16   were a mechanic, correct?
17   A.    Yes.
18   Q.    How did you learn to be a mechanic?
19   A.    One of the other techs trained me.
20   Q.    Who's that?
21   A.    Gabriel Aranda.
22   Q.    The guy who trained you is the one who got
23   fired the same day as you?
24   A.    Yes, sir.
25   Q.    It's kind of ironic, huh?

### Page 40

1    A.    Yes, sir.
2    Q.    So when did he train you, back when you first
3    started in '95?
4    A.    No. He trained me when I became Tech II.
5    Q.    Oh, in June of '01?
6    A.    Yes, sir.
7    Q.    Well, I mean, how did you know how to do the
8    work that you did before then, like when you first
9    started in '95? Just growing up, you were around cars
10   or --
11   A.    Yes, sir.
12   Q.    -- did you go to school? That's what I'm
13   trying to get at.
14   A.    I went to school for two quarters, just the
15   basics.
16   Q.    Where was that at?
17   A.    TSTC.
18   Q.    What does that stand for?
19   A.    Texas State --
20         MR. ZAYAS:  Technical College.
21   A.    -- Technical College.
22   Q.    And that was specifically for auto mechanics?
23   A.    Yes.
24   Q.    And what year was that?
25   A.    Back in 1980.

ORAL DEPOSITION OF AMALIA PEREZ

## Page 41

1    Q.    What year did you graduate high school?
2    A.    '72.
3    Q.    Do you have any formal college or, you know,
4  schooling after high school other than the two semesters
5  in mechanics?
6    A.    I have one year at Pan American University.
7    Q.    Okay.  What did you study there?
8    A.    It was just the basics.
9    Q.    Liberal arts and so forth.  Okay.  So you went
10  to mechanic school for two semesters in 1980?
11    A.    Yes, sir.
12    Q.    Was that like part of a program?
13    A.    I was going to go for automotive, but my mom
14  passed away, so I had to quit.
15    Q.    Okay.  But -- and then after that, is there
16  some other way you learned how to work on cars other
17  than two semesters?
18    A.    Just tinkering with vehicles.
19    Q.    Right.  How early in your life did you start
20  tinkering with vehicles meaning, you know, doing
21  mechanical work on vehicles?  Teenager or --
22    A.    Teenager, yes, sir.
23    Q.    Are you kind of a mechanically inclined type
24  person?
25    A.    Somewhat.

## Page 42

1    Q.    Do you work on your own cars?
2    A.    Yes.
3    Q.    So what I'm getting at is, by the time you went
4  to work for Sears -- well, the previous work at Sears
5  was just tire changer, correct?
6    A.    Yes.
7    Q.    Not mechanic?
8    A.    No, sir.
9    Q.    Had you worked as a mechanic before 1995, an
10  actual job as doing mechanic work?
11    A.    No, sir.
12    Q.    So when you got the job in 1995 at Sears
13  working as a mechanic, did you feel like you knew what
14  you were doing?
15    A.    From '95?
16    Q.    Yeah.
17    A.    Yes.
18    Q.    As a result of the two semesters, plus all the,
19  you know, tinkering and just work you'd done yourself?
20    A.    Yes.
21    Q.    Okay.  At any point that you worked at Sears
22  from '95 until you got fired, did you feel like, whoa, I
23  really don't know what I'm doing here; I'm not competent
24  to do this work?
25    A.    No.

## Page 43

1    Q.    Did you feel like you were one of the more
2  competent people in the shop?
3    A.    Not more; just competent.
4    Q.    Was Mike Guerrero already working there when
5  you got the job at Sears in '95?
6    A.    I believe he was already there.
7    Q.    Did you -- did you get along with Mike Guerrero
8  very well?
9    A.    Nobody got along with Mike Guerrero.
10    Q.    That's what I heard.  But basically nobody
11  really liked -- none of the other workers ever really
12  liked Mike Guerrero, correct?
13    A.    Correct.
14    Q.    Because he was kind of a greedy type?
15    A.    Yes, sir.
16    Q.    Meaning -- at Sears you were paid, what, so
17  much an hour?
18    A.    Plus commission.
19    Q.    Right.  How much per hour?
20    A.    It depended on what title you had.
21    Q.    At the time you were terminated?
22    A.    $7.01.
23    Q.    $7.01 an hour?
24    A.    Yes, sir.
25    Q.    And then you said "plus commission"?

## Page 44

1    A.    Yes, sir.
2    Q.    What was the commission aspect of the job?  So
3  much per car?
4    A.    Depended on the type of work you did.
5    Q.    Okay.  On the car?
6    A.    On the car, yes.
7    Q.    So in other words, the more tickets you did,
8  meaning the more cars you did, the higher your
9  commission possibly?
10    A.    Yes, sir.
11    Q.    And so Mike was perceived as somebody who was
12  always trying to hoard tickets so that way he could earn
13  more?
14    A.    He would work on two vehicles at the same time.
15    Q.    Now, how are the -- who distributes the
16  tickets?
17    A.    They were placed on like a bulletin board.  One
18  said tires, the other said batteries, alignments, and
19  one said brakes.  And --
20    Q.    And in what order would you get them?  Or was
21  it just first come, first served?
22    A.    I believe the tickets had the time on there
23  when the customer arrived.
24    Q.    But how would they be assigned to the
25  technician?  In other words, can he just go up there and

ORAL DEPOSITION OF AMALIA PEREZ

## Page 45

1 grab all the tickets he wants, and that's okay? Or is
2 there supposed to be a rotating order?
3    A.   Well, there was supposed to be a rotating
4 order, but Mike would never follow it.
5    Q.   So did he have any friends out there, as far as
6 you could tell?
7    A.   No.
8    Q.   Are you aware that Mike is no longer employed
9 by Sears?
10   A.   Yes, sir.
11   Q.   What do you know about that?
12         MR. ZAYAS:  What's the question?
13         MR. OBERTI:  That Mike is no longer
14 employed by Sears.
15         MR. ZAYAS:  No.  What was the question
16 after that?
17         MR. OBERTI:  Oh, what do you know about
18 that?
19   Q.   (By Mr. Oberti)  Come on, you're connected to
20 the Sears grapevine.  What have you heard about Mike
21 Guerrero getting separated from Sears employment?
22   A.   He was terminated.
23   Q.   Who told you that?
24   A.   Norma Garcia.
25   Q.   Did she tell you what the circumstances were

## Page 46

1 surrounding his separation?
2    A.   Yes, she did.
3    Q.   In a nutshell, what did she communicate to you?
4    A.   She just told me that she wanted him fired for the
5 reason the way he treated a customer's vehicle.
6    Q.   And this was within the last month or so?
7    A.   Yes, sir.
8    Q.   Okay.  Did that surprise you to hear he'd been
9 fired?
10   A.   For something minor like that, yes.
11   Q.   Now, does Sears have any formal training for
12 service technicians or mechanics?
13   A.   Well, it used to, and they started after I
14 left, but not while I was there.
15   Q.   You're saying they did have it for a while when
16 you were at Sears?
17   A.   Yes, sir.
18   Q.   When did it stop?
19   A.   It stopped when Gordon Woodward was manager.
20   Q.   About '95, '96?
21   A.   Yes, sir.
22   Q.   What had it consisted of, just on-the-job
23 training?
24   A.   Trainees, training the trainees.
25   Q.   Did you ever get an explanation as to why that

## Page 47

1 was stopped?
2    A.   No.
3    Q.   Are you aware of any customers whose cars --
4 who got into a car wreck because of poor work that had
5 been done on their vehicle at Sears Harlingen?
6    A.   There was one customer that had a wreck, but it
7 was pertaining to a battery exploding.
8    Q.   So that wasn't the technician's fault; that was
9 just a defective battery?
10   A.   I believe so.  That's the only thing I ever
11 heard.
12   Q.   When you were working there, did you realize
13 that it's possible that if you did the work the wrong
14 way, this could possibly lead to a customer getting into
15 an accident and getting hurt?
16   A.   Yes, sir.
17   Q.   So you have to be super -- as careful as you
18 can be, correct?
19   A.   Yes, sir.
20   Q.   And obviously if a customer got --
21 hypothetically here -- got hurt or because of shotty
22 work done by Sears, they could sue Sears, right?
23   A.   Yes, sir.
24   Q.   Had you ever heard about Sears getting sued
25 for -- as a result of poor quality work that an employee

## Page 48

1 had done on a customer's car?  Had you ever heard of
2 something like that happening?
3    A.   Yes.
4    Q.   How many times?  Once?  Twice?
5    A.   I think twice.
6    Q.   Who supposedly did the shoddy work, do you
7 know?
8    A.   I think Mike was the one that worked on a
9 vehicle.
10   Q.   Okay.  And how do you know about this lawsuit?
11 Both vehicles, both different suits, Mike?
12   A.   No, there was somebody else.  I don't remember
13 who it was.
14   Q.   Okay.  What do you know about the situations?
15   A.   As far as Mike working on the vehicle, I'm not
16 too sure if the lawsuit went through or they settled or
17 something.
18   Q.   How do you know that there was a lawsuit?
19   A.   There was talk.
20   Q.   Do you know anything about the Mike situation
21 other than just hearsay and gossip?  Do you have any
22 personal knowledge yourself about the situation?
23   A.   As far as --
24   Q.   About Mike and supposedly doing shoddy work and
25 there being potentially a lawsuit?  Do you just know

## ORAL DEPOSITION OF AMALIA PEREZ

### Page 49

1  about that through gossip or do you actually --
2  personally were you involved?
3      A.  The guy nearly killed me.
4      Q.  Who?
5      A.  Mike.
6      Q.  Killed you how?
7      A.  The shaft flew on a vehicle that he was working
8  on, and it came towards me when I was doing an oil
9  change.
10     Q.  On the car that later on ended up with this
11 lawsuit possibly?
12     A.  No.  No, no.  This was another time.
13     Q.  I'm just focusing --
14         MR. ZAYAS:  Hold on.  Answer his question.
15 He wants to know.
16     A.  Well, about the lawsuit, I don't -- it was just
17 hearsay.
18     Q.  I understand.  You haven't been through a
19 deposition before, but that's what we're trying to do,
20 is just stay on track here.
21         And what about the other one who you don't
22 remember the person involved in that one?  So I imagine
23 that was just hearsay, too?
24     A.  No.  This was like a couple of months after I
25 started working for Sears.

### Page 50

1      Q.  Okay.  Like in '95 or '96 then?
2      A.  Yes.
3      Q.  Okay.  Do you actually know there was a lawsuit
4  filed in that one or --
5      A.  No.  Like I said, it was just hearsay.
6      Q.  Okay.  Now, this Richard Ascevedo, when he took
7  over as manager, up until that point for the last couple
8  of years, Juan Rodriguez had been the manager, correct?
9      A.  Yes.
10     Q.  You got along with him fine?
11     A.  Yes.
12     Q.  And then Richard Ascevedo, when he came on
13 board, do you recall at some point you called the Sears
14 1-888 assist line to make a complaint about him?
15     A.  Yes, sir.
16     Q.  And that's Exhibit 11.  In fact, I'd ask you to
17 turn to Exhibit 11 here.  Have you seen this document
18 before?
19     A.  No, sir.
20     Q.  I wouldn't guess that you did.  But do you see
21 up at the top where it says, "Caller, Amalia Perez"?
22     A.  Yes, sir.
23     Q.  It says, "Unit name, Harlingen-SAC," right?
24     A.  Yes, sir.
25     Q.  Date opened, 2-18-2002.  Does that sound right

### Page 51

1  to you, that it was about -- on or about February 18th,
2  2002 that you called Sears 1-888 assist?
3      A.  Yes, sir.
4      Q.  And then it says here, "Concern:  The caller
5  states that the associates are having problems with the
6  new manager, Richard."  Is that what you were calling --
7  is that one of the things you said?
8      A.  Yes, sir.
9      Q.  And then it says, "The caller has been with
10 Sears for eight years."  Then underneath that it says,
11 "The caller states that the associates are having
12 numerous problems with the new ACM.  The caller states
13 that she has a bad back, states that she missed a day,
14 and when she returned to work that night, the ACM walked
15 her to her car and told her that she might want to think
16 about looking for another job because of her back.  The
17 caller states the next day he passed her and said, 'Do
18 need an alignment for your back?'  The caller states
19 that a few days later another associate, Gabriel, told
20 her that the ACM told him that he was going to be hiring
21 another Tech II -- what the caller is -- because he
22 didn't think the caller would be there much longer.
23         The caller states that Richard also tries
24 to cut hours even though they have 233 hours a week.  He
25 makes associates take two-hour lunches, etcetera, and

### Page 52

1  keeps the hours down to about 213.  However, once the
2  associate is punched out for lunch or to go home,
3  Richard will try to get them to do a job for him.  When
4  an associate refuses, Richard threatens their job by
5  telling them that he can stay -- telling them that he
6  can terminate them or have them transferred to another
7  unit further away.  If an associate has to stay over
8  their eight hours because they are working on a car,
9  they are told to come in later the next day.  He tells
10 the associates all the time that he can send them home
11 if he wants to.
12         Request by caller:  The caller is very
13 upset and feels that the ACM is quote 'out to get her.'
14 The caller states that this makes it very hard to come
15 to work -- come to work every day.  She would like to
16 know what can be done about this."  Did I read that
17 correctly?
18     A.  Yes, sir.
19     Q.  And is that what you told the person you
20 called?
21     A.  Yes, sir.
22     Q.  And do you know if other people called, too,
23 from your shop?
24     A.  Yes, sir.
25     Q.  How did you know about this 1-888 assist

**ORAL DEPOSITION OF AMALIA PEREZ**

### Page 53

1  number?  Is it posted in the shop?
2      A.    When I started work, there was a card handed
3  out to me, and I held on to it.
4      Q.    And it said call this number if you've got a
5  problem for employment issues?
6      A.    Yes, sir.
7      Q.    Okay.  Had you called before?  Or was this the
8  first time you had ever called?
9      A.    It was the first time.
10     Q.    And so was everything that she said there true?
11     A.    Yes, sir.
12     Q.    And it says here that "the associates are
13  having problems with the new manager," meaning more than
14  just you?
15     A.    Yes, sir.
16     Q.    Were you nominated by the other associates to
17  make the call?
18     A.    No, sir.
19     Q.    Did you tell the other associates that you were
20  going to make this call or that you had done it?
21     A.    I informed one of the guys that I had called
22  the 1-800 number.
23     Q.    And when you said that, you know, there's
24  associates having problems with the new manager,
25  Richard, meaning not just you, what other associates

### Page 54

1  were you talking about?
2      A.    Humberto Vargas.
3      Q.    Humberto Vargas?
4      A.    Yes, sir.
5      Q.    Okay.
6      A.    Eddie Salinas.
7      Q.    Who?
8      A.    Eddie Salinas.
9      Q.    Okay.
10     A.    Norma Garcia.
11     Q.    Okay.
12     A.    I believe Mike Guerrero.
13     Q.    All right.  Who else?
14     A.    I think that's all.
15     Q.    Okay.  What sort of problems was Vargas --
16  Vargas is a male?
17     A.    Yes, sir.
18     Q.    And Norma Garcia is female, correct?
19     A.    Yes, sir.
20     Q.    Eddie Salinas, male or female?
21     A.    Male.
22     Q.    And then Mike is male?
23     A.    Yes.
24     Q.    What sort of problems was Vargas having with
25  Richard?

### Page 55

1      A.    Humberto doesn't very well know English, and I
2  believe that Mr. Ascevedo took advantage of that; you
3  know, made him feel small, and Mr. Vargas got offended.
4      Q.    What, did he like make fun of him for not
5  speaking English very well?
6      A.    Kind of like treated him like --
7      Q.    Inferior?
8      A.    Yes.
9      Q.    Like he's just a little helper or something?
10     A.    And he could tell him what to do, and he
11  couldn't say anything.
12     Q.    What about Mr. Salinas, what sort of problems
13  was he having with Mr. Ascevedo?
14     A.    Richard was telling him to do certain tasks.
15  Mr. Salinas said that he didn't feel that was his job,
16  and Mr. Ascevedo told him "that's why you should have
17  gotten an education," and if he didn't like it, he could
18  go get a job at 7-11.
19     Q.    Did you hear Ascevedo say that, or this is what
20  Salinas told you?
21     A.    Mr. Salinas told me.
22     Q.    Okay.  Does that sound like something that
23  Mr. Ascevedo would say?
24     A.    Definitely.
25     Q.    You're saying he wasn't one of these warm and

### Page 56

1  fuzzy loving, careful, compassionate conservative types?
2      A.    No.
3      Q.    He was like a hard ass?
4      A.    He was the type of person that in the morning
5  he got there, he looked a new word in the dictionary,
6  and then he would throw it to you in a sentence and
7  sarcastic, just --
8      Q.    Unpleasant?
9      A.    -- exaggerated a lot of things like, "oh, I got
10  a beautiful wife and" --
11     Q.    Did you see his wife?
12     A.    Yes.  Forget it.
13     Q.    That was an exaggeration by a long shot?
14     A.    Yes.
15     Q.    Okay.  All right.  So you found him to be a
16  quite unpleasant manager?
17     A.    Yes.
18     Q.    Worse than any other manager you've had in your
19  life?
20     A.    The only manager.  I adored all the other
21  managers that I had.
22     Q.    Okay.  What sort of problems was Norma Garcia
23  having with him, in a nutshell?
24     A.    Gosh, I can't really -- I think it was about --
25     Q.    If you don't remember, just say you don't

## ORAL DEPOSITION OF AMALIA PEREZ

### Page 57

1 remember, but your attorney probably doesn't want you to
2 speculate.
3    A.    No, I really don't remember.
4    Q.    That's fine. What about Mr. Guerrero, what
5 sort of problems was he having with Richard?
6    A.    I didn't even want to know.
7    Q.    Who else was -- you say here about Richard, you
8 know, basically threatened people's jobs if they -- if
9 he doesn't follow their orders and manipulating their
10 hours and not giving them -- cutting their hours. Who
11 was he doing that to, everybody, or just a couple of
12 people? Or who?
13    A.    Just a couple of people, I believe.
14    Q.    Who was he making those type of comments to
15 about cutting their hours?
16    A.    I believe he cut -- he cut my hours for sure
17 and Eddie's and Mr. Vargas.
18    Q.    Okay. And then you're saying that he tried to
19 make some people work off the clock?
20    A.    Yeah, I think it was Eddie.
21    Q.    Anybody else?
22    A.    If he told anybody else, they didn't do it.
23    Q.    Okay. Then it says, "If an associate refuses,
24 Richard threatened their job."
25    A.    Yes.

### Page 58

1    Q.    Was that Eddie?
2    A.    Yes.
3    Q.    Anybody else where he threatened their job if
4 they refused to do what he said as far as working?
5    A.    I don't know.
6    Q.    Okay. In any event, did somebody -- if you
7 look on the second page, it looks like eventually your
8 call was routed to a guy named Mark Brown. Do you
9 remember anybody named Mark Brown calling you to
10 follow-up on this complaint?
11    A.    I remember I talked to a lady that I first
12 called, and then I talked to a gentleman, but I don't
13 remember the name.
14    Q.    Did he call you?
15    A.    No, I don't think so.
16    Q.    Was it a follow-up to get more information from
17 you --
18    A.    Yes.
19    Q.    -- about your complaint?
20    A.    They gave me -- they told me to wait two weeks,
21 to call back.
22    Q.    Okay. It says right here, "3-7-02, the caller
23 has called for the resolution. Provided caller with
24 resolution." Do you see that on the entry for 3-7-02?
25    A.    3-7-02.

### Page 59

1    Q.    Right there.
2    A.    Okay.
3    Q.    So that would have been about three weeks after
4 you called to begin with. It says you called for a
5 resolution. Is that true?
6    A.    Yes, sir.
7    Q.    And it says they provided you with a
8 resolution. What do you recall them telling you that
9 they had done, if anything?
10    A.    Okay. The first one is I called back to find
11 out what was going to be done, the first paragraph. The
12 3-7, I did call on this day.
13    Q.    Let me break it down. We've already
14 established that you first called to complain about
15 February 18th, 2002. You made your complaint, correct?
16    A.    Yes.
17    Q.    And then some time between that date and March
18 7th, 2002, you spoke with some guy on the phone who
19 asked you more questions about your complaint, correct?
20    A.    Yes.
21    Q.    And then on 3-7-02, you called up and asked,
22 okay, now that this has all been investigated, what's
23 the resolution, correct?
24    A.    Yes.
25    Q.    And what did they tell you the resolution was;

### Page 60

1 do you remember?
2    A.    No, I don't remember.
3    Q.    Do you know -- I mean, did you walk away from
4 the phone call on 3-7-02 feeling like they had handled
5 it properly or dropped the ball? Or how did you feel at
6 the time?
7    A.    I think I remember that it was a waste of time
8 to have an ethics line.
9    Q.    So you felt like they hadn't handled it
10 properly?
11    A.    Correct.
12    Q.    Because, what, Mr. Ascevedo is still there?
13    A.    Yes.
14    Q.    I mean, you felt that he should have been
15 terminated?
16    A.    Yes.
17    Q.    Okay. Did they give you any sort of positive
18 feedback or did they just tell you --
19    A.    I remember they told me that he was going to
20 apologize. And in a meeting, since there were several
21 calls to the ethics, he told us if there were anymore
22 calls, he was going to come down hard on all of us.
23    Q.    So that was the apology?
24    A.    Yes.
25    Q.    So he never apologized?

ORAL DEPOSITION OF AMALIA PEREZ

### Page 61

1   A.   No.
2   Q.   Okay.  So his way of dealing with the ethics
3   calls was to tell people that if there is anymore calls
4   to ethics, he was going to come down hard?
5   A.   Yes.
6   Q.   Who else called ethics on him other than you?
7   A.   Just like I said, Eddie, Humberto Vargas, and
8   Norma Garcia.
9   Q.   Did Mike?
10  A.   Mike was always calling the 800 number.
11  Q.   Do you know if he ever called on Richard?
12  A.   I think he did.
13  Q.   Did you ever listen in on anybody else's call?
14  A.   No.
15  Q.   So you just know because they told you about
16  it?
17  A.   Yes.
18  Q.   Was this all about the same time?
19  A.   No.
20  Q.   At different times?
21  A.   Different times.
22  Q.   When was it that Mr. Ascevedo had the meeting
23  and said that if anybody else called ethics, he would
24  come down hard?
25  A.   I don't remember the --

### Page 62

1   Q.   It was after your call?
2   A.   That was after all of us called.
3   Q.   Okay.  And who was in the meeting?  Everybody?
4   A.   Everybody.
5   Q.   Everybody in the auto shop?
6   A.   Plus additional employees, Jesse Garcia.
7   Q.   Where is he from?
8   A.   He's from -- well, he lives in Combes.
9   Q.   No.  I mean, what department?
10  A.   He's in automotive.  He's a tech there now.
11  Q.   Oh, okay.  All right.  Mr. Humberto Vargas, do
12  you know about how old he is?
13  A.   41, 42, somewhere around there.
14  Q.   Now?
15  A.   (Witness nods her head affirmatively.)
16  Q.   And then Mr. Salinas, Eddie Salinas, do you
17  know about how old he is?
18  A.   27, 28.
19  Q.   And Ms. Norma Garcia, do you know about how old
20  she is?
21  A.   She never tells her age.  I don't know.
22  Q.   Is she above 40 or under 40?  Can you tell?
23  A.   I think above 40.
24  Q.   And then Mike, would he be above 40 or under
25  40?

### Page 63

1   A.   Under.
2   Q.   Okay.  Do you know anybody else who worked in
3   the Harlingen shop who filed a workers' comp claim, any
4   workers' comp claim other than you?
5   A.   While I was there or --
6   Q.   Yeah, while you were there.
7   A.   Nick Reyes.
8   Q.   Anybody else?  What about since you left: do
9   you know about people who filed them since you left?
10  A.   Mike Guerrero.
11  Q.   How do you know he filed one?
12  A.   Well, no, I'm not sure, but he had an injury.
13  Q.   Okay.  Anybody else?
14  A.   Matilda Booth.
15  Q.   Anybody else?
16  A.   No.
17  Q.   Now, Matilda still works there?
18  A.   Yes.
19  Q.   At Sears?
20  A.   Yes.
21  Q.   And Nick Reyes, does he still work there?
22  A.   No.
23  Q.   Do you know, was he fired or did he quit?
24  A.   He retired.
25  Q.   Do you know -- was that voluntary or

### Page 64

1   involuntary?
2   A.   I don't know.
3   Q.   What year did Reyes file his workers' comp
4   claim, if you know?  In the '90s or --
5   A.   '96, '97.
6   Q.   What year did he retire, if you know?
7   A.   '98.
8   Q.   When did Matilda file her workers' comp claim,
9   if you know?  What year?
10  A.   It was this year.  No, it was 2000 --
11       MR. ZAYAS:  We're in 2004 right now.
12  A.   It was 2002 because I was still working.
13  Q.   And then Mike, when did he -- when did he have
14  his injury that you were talking about?
15  A.   This year.
16  Q.   How did you hear about it?
17  A.   Norma told me.
18  Q.   Did he miss work because of it?
19  A.   Yes.
20  Q.   So in a nutshell, what would an average day on
21  the job be at Sears after you became a service tech?
22  What would your day consist of?  Just working on cars
23  mostly?
24  A.   Basically everything, tires, batteries.
25  Q.   On average in one shift -- your shifts were

## ORAL DEPOSITION OF AMALIA PEREZ

### Page 65

1  eight hours?
2    A.  Yes.
3    Q.  An hour for lunch?
4    A.  Yes.
5    Q.  So in one eight-hour shift with an hour for
6  lunch, about how many cars on average would you work on?
7    A.  Maybe three.
8    Q.  Now, is somebody supposed to check your work
9  before the customer leaves, or are you responsible for
10  it?
11   A.  I was responsible.
12   Q.  Okay.  So each individual worker is responsible
13  to make sure the car is properly done before they leave?
14   A.  Yes.
15   Q.  Okay.  All right.  Let's go over just some of
16  the chronology here.  It looks like -- is Exhibit No. 1
17  your application for employment at Sears?
18   A.  Yes.
19   Q.  And you were hired initially in January 1995,
20  the end of January 1995 as a part-time tire installer
21  earning $4.49 an hour?
22   A.  Yes, sir.
23   Q.  And you were hired -- so you were 40 years old
24  when you were hired, correct?
25   A.  (Witness nods her head affirmatively.)

### Page 66

1        MR. ZAYAS:  You have to say something.
2    A.  Yes.
3    Q.  And then is it true that in late September 1996
4  you were made a full-time regular employee?
5    A.  Yes, sir.
6    Q.  And how is it that you became -- went from
7  part-time to a full-time regular employee, if you know?
8    A.  How?
9    Q.  How or why?  Why were you made, you know, from
10  part-time to full-time, if you know?
11   A.  I was a hard worker.
12   Q.  So it was kind of like a promotion, so to
13  speak?
14   A.  Yes, sir.
15   Q.  Is that when you became eligible for benefits?
16   A.  Yes, sir.
17   Q.  Okay.  And you participated in the Sears -- did
18  you participate in a 401(k) at Sears?
19   A.  Yes, sir.
20   Q.  And have you withdrawn that money?
21   A.  Yes, sir.
22   Q.  How much did you have in the 401(k) at the time
23  you left Sears, roughly?  You think it was about $5,000,
24  was it?
25   A.  I believe so.

### Page 67

1    Q.  Did you also have a pension plan that Sears set
2  up for you?
3    A.  Well, there's where I'm confused, whether there
4  was a pension plan or the 401.
5    Q.  Well, did you take part of your paycheck each
6  week and put the money aside into a plan, or was it just
7  Sears that put the money in?
8    A.  I put some money in.
9    Q.  Okay.  And was it just one plan or two plans?
10   A.  I believe it was only one.
11   Q.  Okay.  All right.  Exhibit No. 5, is that your
12  signature there down at the bottom dated 1-31-95?
13   A.  Yes, sir.
14   Q.  And did you get all -- here it says that you've
15  got all these different policies, including the
16  employment policy and the affirmative action policy and
17  a bunch of other policies.  Did you get all those when
18  you first started?
19   A.  Yes, sir.
20   Q.  Did you have like a little orientation when
21  they gave you those?
22   A.  Yes, sir.
23   Q.  Did you know at the time you worked for Sears,
24  that it was against Sears policy and the law to
25  discriminate against employees because of their sex or

### Page 68

1  because of their age?
2    A.  Yes, sir.
3    Q.  During the time that you actually worked for
4  Sears, did you ever make any complaints to Sears
5  about -- internally within Sears, either the 1-888
6  assist or HR department, anybody, did you ever complain
7  within Sears about that you were being discriminated
8  against because you were a woman or because of your age?
9    A.  No.
10   Q.  Did you all have an HR department at any time
11  in Harlingen there, if you know?
12   A.  Yes.  An HR, yes.
13   Q.  Was that in the store itself?
14   A.  Yes, sir.
15   Q.  Okay.  And who is over HR, meaning human
16  resources?
17   A.  Elida Pardu.
18   Q.  Was she still there when you got terminated?
19   A.  Yes.
20   Q.  And was that a female?
21   A.  Yes.
22   Q.  Eli?
23   A.  Elida, E-L-I-D-A, Pardu, P-A-R-D-U, I believe.
24   Q.  Okay.  And how did you get along with her?
25   A.  She was all right.

ORAL DEPOSITION OF AMALIA PEREZ

### Page 69

1    Q.    Do you know if she's still there?
2    A.    I believe so.
3    Q.    Okay.  Did you have much interaction with her?
4    A.    No.
5    Q.    Okay.  And then Exhibit 6, do you see there on
6    the second page it says driving while intoxicated,
7    guilty conviction, to serve four weekends in Cameron
8    County jail, five years probation; is that correct?
9    A.    Yes.
10   Q.    Okay.  So the probation ended in '95?
11   A.    Yes.
12   Q.    And so Sears hired you even though you had been
13   convicted of this, huh?
14   A.    Yes.
15   Q.    Okay.  Did you actually have to do the four
16   weekends in Cameron County jail?
17   A.    Yes.
18   Q.    Now, did you get an annual performance review?
19   A.    The last one I got was when Mr. Woodward was
20   there.
21   Q.    Oh, really?  Sometime in the 1990's?
22   A.    '96.  '96.
23   Q.    Now, I'm trying to track all the injuries that
24   you had on-the-job.  It looks like your first injury
25   on-the-job, if I'm correct, was January 23rd, 1998; is

### Page 70

1    that correct?  I'm at Exhibit No. 42, page No. 1, but
2    you have to go up a little bit and you'll see the number
3    on the lower right-hand corner.
4          The question was:  Was your first injury
5    on-the-job at Sears January 23rd, 1998?
6    A.    Okay.
7    Q.    Does that look accurate to you?
8    A.    Strain, yes.
9    Q.    What was -- the strained thigh?
10   A.    Uh-huh.
11   Q.    Yes?
12   A.    Yes.
13   Q.    And it says "no lost time," correct?
14   A.    Yes, sir.
15   Q.    And then Sears, and specifically Mary Resendez,
16   AP agent, on January 29th, 1998, as you see down at the
17   bottom, she filed this workers' compensation first
18   report of injury or illness, correct?
19   A.    Yes, sir.
20   Q.    Do you know Mary Resendez?
21   A.    Yes, sir.
22   Q.    Do you know if she's still there?
23   A.    I believe so.
24   Q.    Okay.  And eventually you were given a zero
25   percent whole body impairment rating for this injury,

### Page 71

1    correct?
2    A.    Yes, sir.
3    Q.    Now, each time you reported an on-the-job
4    injury, Sears filed a workers' compensation first report
5    of injury or illness, correct?
6    A.    Yes, sir.
7    Q.    And whenever you were given ratings for your
8    performance, they were always pretty good, correct?
9    A.    Yes, sir.
10   Q.    Now, the second injury was -- if you turn to
11   page 80.  It looks like the second injury was 4-20-98;
12   is that correct?
13   A.    Which was?  All I see is the date.
14   Q.    If you turn two pages ahead, 82, it says,
15   "4-20-98, Harlingen, sprain to right foot."  Is that
16   correct?
17   A.    Yes.
18   Q.    Okay.  And were you given a whole body
19   impairment rating for that?
20   A.    No.  I wore a brace.
21   Q.    Now, do you remember in June '99 you received
22   about a 25 percent raise?
23   A.    Yes.
24   Q.    Why did you get such a big raise; do you know?
25   A.    No, sir.

### Page 72

1    Q.    It looks like the third injury was, if you look
2    at Exhibit -- if we look at page 81, we have one for
3    9-11-99, "strain, pain to right side."  Do you see that?
4          MR. ZAYAS:  9-11-99, is that what you
5    said?
6          MR. OBERTI:  Yes, down at the bottom.
7    A.    Sprain to both legs.
8    Q.    I'm just trying to establish the date.  9-11-99
9    was your third injury, correct?
10   A.    I don't recall this.
11         MR. ZAYAS:  No, that's 1-23-98.
12         MR. OBERTI:  There's several of them on
13   there.
14   Q.    (By Mr. Oberti)  Do you see here in the
15   documents you produced on page 208 it says, "Thank you
16   for referring Amalia Perez, a 45-year-old female, who
17   was injured on September 11th, 1999."  Does that refresh
18   your memory at all that you did suffer an injury on
19   September 11th, '99?
20   A.    Yes, that was my back; but here it says sprain
21   to both legs.
22   Q.    Okay.  So you're saying there was an injury on
23   9-11-99, just it was your back, not your legs, correct?
24   Is that correct?
25   A.    It affected my legs, but it was basically on my

## ORAL DEPOSITION OF AMALIA PEREZ

### Page 73

1  back.
2    Q.    Okay.  And do you recall you were eventually
3  assigned a zero percent whole person impairment rating
4  on that one?
5    A.    Yes.
6    Q.    Then No. 4, it looks like if you go to Exhibit
7  No. 9 -- if you turn to the page that's the sixth page
8  in.  Do you recall that you notified Sears on
9  April 19th, 2002 that you had been injured on-the-job in
10  March 2001 when you smashed your middle finger left
11  hand?
12    A.    Yes.
13    Q.    Mr. Ascevedo took over as the auto center
14  manager on or about September 30th, 2001?
15    A.    Somewhere around there.
16    Q.    So by the time you got terminated, you'd been
17  there -- he'd been there about a little over a year?
18    A.    Yes.
19    Q.    Did you know him before he got to work there?
20    A.    I saw him once before when Mr. Juan Rodriguez
21  was interviewing him, and he was there.
22    Q.    Had he worked for Sears before, do you know?
23    A.    Not to my knowledge.
24    Q.    Do you know where he was coming from?  Did he
25  quit a job to come to Sears, or was he unemployed?  Or

### Page 74

1  do you know?
2    A.    I know he was from San Antonio, but that's all
3  I know.  Later I found out that he only lasted so long
4  in jobs.
5    Q.    He had a spotty history?
6    A.    Yes.
7    Q.    Where did you find that out?
8    A.    From conversations that he would tell other
9  coworkers.
10    Q.    Okay.  And do you remember that your next
11  injury was January 11th, 2002 when you suffered another
12  lower back injury?
13    A.    That's when my back would give out.
14    Q.    Okay.  And you reported that on January 11th,
15  2002?
16    A.    Yes.
17    Q.    And then do you also recall that your next
18  injury after that you reported was March 1st, 2002 when
19  you hurt your middle finger, the same middle finger as
20  before?
21    A.    Well, there were two where I hurt my thumb and
22  my nail fell off, and my middle finger where the nail
23  fell off.
24    Q.    Was it the same finger?
25    A.    No.

### Page 75

1    Q.    Okay.  So the one on March 1st, 2002, this is
2  the second finger injury.  This was your hurt middle
3  finger that you reported, correct?
4    A.    Yes.
5    Q.    Okay.  And then we've already established you
6  filed your Chapter 13 bankruptcy in November 2001,
7  correct?
8    A.    Yes, sir.
9    Q.    Then do you remember your next injury which
10  would be the sixth on-the-job injury reported was
11  1-11-02 when you hurt your lower back on-the-job,
12  correct?
13    A.    Yes.
14    Q.    And then the seventh injury --
15        MR. ZAYAS:  Wait.  I thought we had the
16  first the strained thigh, January 23rd, '98.  The second
17  one was April 20, '98, sprain to the right foot.  And --
18        MR. OBERTI:  Third one, 9-11-99.
19        MR. ZAYAS:  9-11-99 injured her back.
20        MR. OBERTI:  Okay.  Fourth one --
21        MR. ZAYAS:  Fourth one --
22        MR. OBERTI:  March 2001.
23        MR. ZAYAS:  March 2001, but it was
24  reported April 19, 2002.
25        MR. OBERTI:  Correct.

### Page 76

1        MR. ZAYAS:  Fifth one was?
2        MR. OBERTI:  1-11-02.
3        MR. ZAYAS:  Was the lower back injury.
4        MR. OBERTI:  Right.
5        MR. ZAYAS:  And then March --
6        MR. OBERTI:  Right.  Hold on.  I counted
7  that one twice, didn't I?
8        MR. ZAYAS:  I think so.
9        MR. OBERTI:  Okay.  So that was just
10  number five.  The fifth one was 1-11-02, correct?
11        MR. ZAYAS:  And the sixth one was March
12  1st, 2002, the middle finger.  That was the sixth.
13        MR. OBERTI:  All right.
14    Q.    (By Mr. Oberti)  Okay.  So we've covered six of
15  them so far, correct?
16    A.    Yes.
17    Q.    So the seventh one was August 19th, '02, you
18  hurt your middle finger again, but lost no time,
19  correct?
20    A.    Correct.
21    Q.    And then finally seven days before you were
22  fired, you hurt your shoulder on-the-job, and you
23  reported that, correct?
24    A.    Yes, sir.
25    Q.    Okay.  So it's actually -- I think we've

ORAL DEPOSITION OF AMALIA PEREZ

### Page 77

1 counted eight total on-the-job injuries that resulted in
2 workers' compensation claims at Sears, correct?
3    A.   Let me see if I got this straight.  I reported
4 the incidents, so automatically they go to workman's
5 comp as a claim?
6    Q.   Well, I'm asking you.  How many -- how many --
7 well, let's break it down.  You reported eight
8 incidents, correct?
9    A.   Yes.
10    Q.   Do you agree with me -- we can go through it if
11 you want to, but as far as you know, each and every time
12 you reported an incident, Sears filed the workers'
13 compensation first report of injury or illness, correct?
14    A.   Yes.
15    Q.   This last one, the one on 11-7-02, that
16 resulted in a one percent whole body impairment rating
17 being awarded to you, correct?
18    A.   Yes.
19    Q.   Did any of the other injuries result in any
20 percentage whole body impairment ratings being given to
21 you?
22    A.   No.
23    Q.   And as a result of the one percent whole body
24 impairment rating, did you receive some sort of payment
25 to represent what the one percent is?

### Page 78

1    A.   Yes.
2    Q.   How much did you get for that?
3    A.   $6,000.
4    Q.   Okay.  Did you ever talk to anybody else other
5 than this -- you know, you called the ethics line back
6 in February of '02, and then somebody called you to talk
7 about it further, some male; you don't remember his
8 name, correct?
9    A.   No, he didn't call me.  I called them.
10    Q.   Oh, as a follow-up?
11    A.   Yes.
12    Q.   Okay.  Did you call the ethics line anymore
13 until you got fired?  I know you called the day you got
14 fired, right?
15    A.   Yes.
16    Q.   But between February 18th, 2002, you know, and
17 then you talked to them until, I guess, March 7th, '02.
18 Between March 7th, '02 and the day you got fired, did
19 you have any conversations with people on the ethics
20 line?
21    A.   I think I called one more time.
22    Q.   When would that have been, do you know?
23    A.   I would have to look in my files.
24    Q.   Okay.  Was it to complain about Richard?
25    A.   Yes.

### Page 79

1    Q.   Do you remember how that got handled?
2    A.   Nothing came of it.
3    Q.   Okay.  Did you complain to your coworkers about
4 Richard?
5    A.   We all complained to each other about him.
6    Q.   All right.  And did you complain to anybody
7 else at Sears about Richard Ascevedo other than, you
8 know, talking about him to your coworkers and through
9 the ethics line, was there anybody else?
10    A.   We would contact our previous manager, Juan
11 Rodriguez.
12    Q.   And tell him what was going on?
13    A.   (Witness nods her head affirmatively.)
14    Q.   Yes?
15    A.   Yes, sir.
16    Q.   Just to kind of vent your anger?  Or because
17 you wanted him to do something about it?
18    A.   I guess just to get it off our chest.
19    Q.   He wasn't over Richard, correct?
20    A.   No.
21    Q.   Did you ever go to the store general manager of
22 the Harlingen store to complain about Richard Ascevedo?
23    A.   No.
24    Q.   When you talked to the people from the ethics
25 about how they had resolved your complaint, that

### Page 80

1 conversation on March 7, 2002, did the person tell you
2 that Richard Ascevedo was going to be counseled about
3 some of his behaviors?
4    A.   The only thing they said, that they were going
5 to investigate and probably talk to him.
6    Q.   But, I mean, after -- at the end when you
7 called back to see how it was resolved, your complaint,
8 you said that they told you he was going to apologize,
9 but that never happened, correct?
10    A.   Correct.
11    Q.   Did they also tell you that someone had talked
12 to him about his behavior?
13    A.   No.
14    Q.   Do you remember the person telling you anything
15 about what they had done other than that Richard was
16 going to apologize?
17    A.   No, sir.
18    Q.   Did they tell you what he was going to
19 apologize for?
20    A.   No, sir.
21    Q.   Did you tell the people that you were talking
22 to from the ethics line that you didn't think their
23 actions were sufficient?
24    A.   I think I did comment on that.
25    Q.   Did you tell him that you thought Richard

ORAL DEPOSITION OF AMALIA PEREZ

## Page 81

1  needed to be separated from the company?
2     A.   No.
3     Q.   You just told them you generally weren't happy?
4     A.   Basically what I was looking for was for them
5  to talk to him, to back off because he was coming real
6  strong on all of us.
7     Q.   Did it ever -- did his aggressive behavior ever
8  stop or slow down or back off a little bit?
9     A.   No, until I walked into the office one day and
10 I told him that he was -- how do you say it?
11        MR. ZAYAS:  What, pissed or frustrated?
12    A.   We'll use that word, frustrate.  He frustrated
13 people.  And he was upset because we usually got our
14 tire shipment on Friday, and we would put them up on
15 Fridays.  But the guys kind of backed down and didn't
16 put them up until that following week, and he was real
17 upset about it.  And I told him, "you need to back off."
18    Q.   Calm down?
19    A.   I told him, "the guys know what they have to
20 do, you're coming on strong, there's no need for it."
21    Q.   What did he say?
22    A.   He slammed his hands on the desk, and he said,
23 "I'll back off.  If the guys don't do what you tell
24 them, it's going to be your neck."  And I told him,
25 "fine."  I walked out. I told the guys, "put the tires

## Page 82

1  up, he's backing off."  And they were up within 45
2  minutes.
3     Q.   So you didn't have to get your neck chopped
4  off?
5     A.   I knew I wouldn't have my neck chopped off.
6     Q.   Did the guys listen to you?
7     A.   Yes.
8     Q.   You had credibility, correct?
9     A.   Yes.
10    Q.   Ascevedo never had any credibility as a
11 manager?
12    A.   No, sir.
13    Q.   So that's why people didn't respect his
14 supervision?
15    A.   That's correct.
16    Q.   Who hired this Ascevedo, do you know?
17    A.   I'm not sure if it was Mr. Grebb or
18 Mr. Peterson.
19    Q.   Well, Mr. Grebb didn't come onto the Harlingen
20 store until February 25th, 2002.
21    A.   Then it was Mr. Peterson.
22    Q.   February 2002, correct?
23    A.   I don't remember when Mr. Grebb showed up.
24    Q.   Do you remember it was towards the end of your
25 employment, at the last?

## Page 83

1     A.   He scared me, so I didn't -- I kept out of his
2  way.
3     Q.   The last month or so?
4     A.   Huh?
5     Q.   The timing, do you recall that it was about
6  nine months before you got fired that Mr. Grebb became
7  store manager?
8     A.   I don't remember really.
9     Q.   Did you know Mr. Grebb before he became store
10 general manager of the Harlingen store?
11    A.   No.
12    Q.   Did you ever complain to Mr. Grebb about
13 Mr. Ascevedo?
14    A.   No.
15    Q.   Why not? --
16    A.   Because Mr. Ascevedo always ran to Mr. Grebb.
17    Q.   So you figured, what, that it would be futile
18 for you to go to Mr. Grebb?
19    A.   I felt he wouldn't listen to me.
20    Q.   Did he ever say anything to make you feel that
21 way?  Or it was just the fact Ascevedo went to him?
22    A.   He made me feel that way because of a truck
23 that partially fell off an alignment rack, and I told
24 him that vehicles dating back to 1963 had to have a
25 neutral safety switch, and he would not hear of it.

## Page 84

1     Q.   Okay.  We'll cover that incident.  That was the
2  incident in May of '02, correct?
3     A.   Yes, sir.
4     Q.   Okay.  Now, Mr. Peterson was --
5     A.   The district manager.
6     Q.   -- over auto center?
7     A.   Yes, sir.
8     Q.   Did you know him?
9     A.   Yes, sir.
10    Q.   How was he?
11    A.   We -- we got along.
12    Q.   He was over a lot of different auto centers,
13 correct?
14    A.   Yes, sir.
15    Q.   So Mr. Ascevedo or the other ACM's, you'd see
16 them every day in the shop, correct?
17    A.   Yes, sir.
18    Q.   How often would you see Peterson, once a month?
19 Once every three months?
20    A.   Somewhere around there.
21    Q.   Okay.  Do you know of anyone else who was fired
22 for any sort of mistakes or what the company thought was
23 negligent work on a customer's vehicle?
24    A.   I think it was Gilbert Sosa.
25    Q.   Anybody else?

ORAL DEPOSITION OF AMALIA PEREZ

### Page 85

1   A.   I don't remember the gentleman's name. He was
2 a young kid.
3   Q.   Okay. Anybody else?
4   A.   No.
5   Q.   What year was Gilbert fired?
6   A.   In '96.
7   Q.   And the young kid?
8   A.   In '90 -- no, 2001, I believe.
9   Q.   Before Ascevedo or after?
10   A.   Before.
11   Q.   Was Peterson the district manager the whole
12 time you were at Sears?
13   A.   I believe so.
14   Q.   What did Sosa do, do you know?
15   A.   He was a tire installer.
16   Q.   No, I mean, the thing that he got fired for?
17   A.   Something with the electrical system. I don't
18 recall.
19   Q.   Okay. As far as other -- what about the young
20 kid, do you know what he did?
21   A.   He had installed some tires and he had put --
22 didn't know how to put the valve stems correctly, and he
23 let it go like that. They were all crooked.
24          MR. ZAYAS: Can we take a restroom break?
25          MR. OBERTI: Yeah, sure.

### Page 86

1          (A recess was taken for lunch.)
2   Q.   (By Mr. Oberti) We're back from lunch.
3   A.   Before I forget --
4   Q.   Okay.
5   A.   -- I remembered an incident. Gabriel had an
6 injury, Gabriel Aranda, about two -- two weeks before he
7 got fired.
8   Q.   Okay. What was the nature of his injury?
9   A.   He split his thumb open, required stitches, was
10 placed on light duty work.
11   Q.   Do you know if there's a workers' comp claim
12 filed?
13   A.   No.
14   Q.   Now --
15          MR. ZAYAS: No, there wasn't or, no, you
16 don't know?
17   A.   I don't know. I know he reported it and was
18 sent to the doctor and all that.
19   Q.   You would assume that one was filed because
20 every time you reported an on-the-job injury, there was
21 a workers comp claim filed on your behalf, correct?
22   A.   Yes.
23   Q.   Any of those on-the-job injuries at Sears, were
24 any of them your fault?
25   A.   No.

### Page 87

1   Q.   They were just accidents?
2   A.   (Witness nods her head affirmatively.)
3          MR. ZAYAS: You have to say something.
4   A.   Yes.
5   Q.   Did Sears ever intentionally physically injure
6 you? Anybody at Sears ever intentionally physically
7 injure you?
8   A.   Just the equipment.
9   Q.   No. I mean, like any person go out of their
10 way to assault you?
11   A.   No.
12   Q.   Okay. Now, did you ever take any time off
13 work, like miss full days of work because of your
14 on-the-job injuries?
15   A.   Yes.
16   Q.   What's the longest consecutively that you took
17 off work because of an on-the-job injury? A week? Two
18 weeks? A month?
19   A.   I believe it was two weeks.
20   Q.   What year was that?
21   A.   In -- it was the year before Juan Rodriguez
22 left.
23   Q.   1999?
24   A.   '99, somewhere around there.
25   Q.   Okay. You say you took two weeks consecutive

### Page 88

1 off?
2   A.   Yes.
3   Q.   Which injury was that for?
4   A.   It was the back.
5   Q.   That was the one in September 11th, '99?
6   A.   I believe so.
7   Q.   Other than that time, did you miss any full
8 days of work because of any on-the-job injuries at
9 Sears?
10   A.   The times I missed was because of the back
11 going out. And the time that I missed, it was -- I
12 would take my vacation.
13   Q.   You're saying -- okay. The two weeks in '99,
14 when you took two weeks consecutively, was that right
15 after the injury or did you get injured, work for a
16 while, then take the two weeks?
17   A.   Okay. When I got injured the first time with
18 my back, I had light duty. I continued to work. And
19 then again my back gave out, and the second time is when
20 I missed the two weeks.
21   Q.   Okay. So what year was it that you missed the
22 two weeks?
23   A.   It must have been in 2001.
24   Q.   Okay. So you injured your back in '99, but you
25 September of '99, but you worked light duty. Then it

ORAL DEPOSITION OF AMALIA PEREZ

### Page 89

1  wasn't until 2001 you reinjured it, and then you took
2  two weeks off?
3      A.  Yes.
4      Q.  Because -- well, hold on. Maybe we can figure
5  this out. If you look at Exhibit 9, if you go to the
6  fifth page in, do you see there it talks about the
7  9-11-99 injury?
8      A.  Uh-huh.
9      Q.  Yes?
10     A.  Yes.
11     Q.  And then it looks like on February 16th, you
12 were released to full duty, correct? February 16th,
13 2000, correct?
14     A.  Yes, sir.
15     Q.  So between 9-11-99 and February 16th, 2000, you
16 were working light duty?
17     A.  Yes.
18     Q.  So then you were released full duty on
19 February 16th, 2000, correct?
20     A.  Yes.
21     Q.  And then when did you -- then you're saying in
22 2001 you took two weeks off because of the back,
23 correct?
24     A.  Yes, sir.
25     Q.  And was the two weeks that you took off in

### Page 90

1  2001, was that before or after Richard Ascevedo came on
2  board?
3      A.  Before.
4      Q.  And did you receive any temporary income
5  benefits from workers' comp insurance for that?
6      A.  No.
7      Q.  Were you paid for those two weeks?
8      A.  Yes, vacation.
9      Q.  You used your vacation, correct?
10     A.  Yes, sir.
11     Q.  And then after that, 2001 two weeks off, did
12 you ever again miss one or more full days of work due to
13 an on-the-job injury or the effects of an on-the-job
14 injury?
15     A.  This was while Mr. Ascevedo was manager?
16     Q.  I'm saying after -- no. Anytime between the
17 time you came back from your two weeks vacation or time
18 off for the back, in 2001 from the time you came back
19 from that two weeks off until the time you were fired,
20 did you miss one or more full days of work because of
21 any on-the-job injury?
22     A.  Yes, I did. It was the -- again, it was the
23 back.
24     Q.  Okay.
25     A.  And, again, I took pay from my vacation or

### Page 91

1  personal holidays.
2      Q.  And how long consecutively did you take off?
3      A.  I think I missed about maybe three or four
4  days.
5      Q.  In a row or sprinkled over time?
6      A.  In a row.
7      Q.  Okay. And what year was that?
8      A.  I really don't remember. All I can tell you is
9  that it was on three occasions that my back gave out.
10     Q.  Was it after Ascevedo?
11     A.  It was before.
12     Q.  The three to four days?
13     A.  Yes.
14     Q.  Okay. And you used vacation again?
15     A.  Yes.
16     Q.  Okay. Then after that time, was there another
17 time between that time and the time you got fired that
18 you took one or more full days off work because of the
19 back?
20     A.  No.
21     Q.  So the final injury that you got on
22 November 7th when you hurt your shoulder, that shoulder
23 injury, that was distinct from your back injury?
24     A.  Yes.
25     Q.  And you didn't miss any days off work because

### Page 92

1  of that injury?
2      A.  No.
3      Q.  Okay. Turn to Exhibit 12, please. Is your
4  signature on this document?
5      A.  Yes, it is.
6      Q.  Where at?
7      A.  At the bottom left-hand corner.
8      Q.  Okay. The signature part?
9      A.  Yes.
10     Q.  And whose handwriting is this where it says, on
11 May 24th, about ten minutes, blah, blah, blah?
12     A.  That's my handwriting.
13     Q.  Okay. So it says here -- who asked you to
14 provide this written statement?
15     A.  Richard Ascevedo.
16     Q.  And the statement was made to Anna Rodriguez?
17     A.  Yes.
18     Q.  And who is Anna Rodriguez?
19     A.  She works in loss prevention.
20     Q.  In Harlingen?
21     A.  Yes.
22     Q.  And where were you when you gave this written
23 statement?
24     A.  I was in the office of loss prevention.
25     Q.  Over as part of the full store?

ORAL DEPOSITION OF AMALIA PEREZ

Page 93

1    A.   Yes.
2    Q.   And did she tell you why she was asking for
3  this?
4    A.   They wanted to know what had happened.
5    Q.   Did you know what they were talking about?
6    A.   Yes.
7    Q.   What was the background? Give me the
8  background on how this came to your attention. What was
9  going on?
10    A.   Well, I had -- a customer came in and wanted an
11  alignment on a 1989 Ford pickup, and the salesperson
12  asked me. And it was getting close to closing time, and
13  I told him, yes, I'll do it. He drove the pickup up the
14  rack, and he told me that the brakes were a little low.
15  I proceeded to put the ignition on the on position so
16  that we can rotate the tires on the plates. And to my
17  surprise, it jump started. So I jumped off the rack,
18  the truck partially fell off the rack.
19    Q.   Was there any damage done to the truck?
20    A.   From what I saw, it was not that much. We got
21  the truck off the rack. It was drivable. And we called
22  loss prevention, they came, and they told me I had to do
23  an incident report.
24    Q.   Had you ever written out something like this
25  before?

Page 94

1    A.   I think this was the first time.
2    Q.   Okay. Now, at the shop where you worked, was
3  it always one worker to one vehicle?
4    A.   Yes.
5    Q.   In other words, it wouldn't be two people
6  working on one vehicle?
7    A.   Sometimes, but not all the time.
8    Q.   The normal -- it would be -- the typical thing
9  was -- the typical thing would be one person, one
10  vehicle?
11    A.   Yes, sir.
12    Q.   So if there's one person, one vehicle, and the
13  vehicle is somehow not handled properly, whoever the one
14  person is assigned to it would be the one at fault,
15  correct?
16    A.   Yes.
17    Q.   Was there more than one person working on this
18  vehicle here that has to do with this Exhibit 12?
19    A.   No.
20    Q.   Or was it just you?
21    A.   Just myself.
22    Q.   And it says on May -- let me see if I read this
23  correctly, what you wrote. "On May 24, about ten
24  minutes till 7 p.m., CSA" -- what is that, customer
25  service assistant?

Page 95

1    A.   Yes, sir.
2    Q.   -- "Rick Vallejo approached me to ask if I
3  could do an alignment. I agreed. And he, Rick, drove
4  an old model pickup, which appeared to be gray primed,
5  on the alignment rack. I noticed that the pickup tires
6  were not on the alignment plates. I proceeded to turn
7  on the truck. I opened the door. I stepped on the
8  brake and turned the key to the on position, when the
9  truck jumped and went off the alignment rack. I jumped
10  off the alignment to avoid going down with the truck.
11  The truck did not have a safety switch to prevent truck
12  from turning on. After incident, Rick Vallejo informed
13  me when he drove truck in brake -- when he drove truck
14  in, brake pedal was low." Did I read that correctly?
15    A.   Yes, sir.
16    Q.   Now, were you actually physically seated in the
17  truck when you started it?
18    A.   No.
19    Q.   Where were you, like standing and turned it
20  like that?
21    A.   I had one leg outside and one leg inside on the
22  brake and turned on the ignition to the on position.
23    Q.   Now, obviously you didn't -- clearly you didn't
24  do anything intentionally wrong on this incident, right?
25    A.   That's correct.

Page 96

1    Q.   But do you agree with me that you could have
2  handled the situation better so that the truck never
3  would have jumped off the alignment rack?
4    A.   Better? I've always done it that way.
5    Q.   Okay. Would you agree with me -- obviously you
6  guys try to avoid a truck or any vehicle jumping off the
7  alignment rack, correct?
8    A.   Yes.
9    Q.   It's not a good thing, right?
10    A.   That's correct.
11    Q.   Because, what, the vehicle could get damaged,
12  right?
13    A.   Yes.
14    Q.   Or -- and a person working on the vehicle could
15  get hurt, correct?
16    A.   Correct.
17    Q.   Did you get hurt?
18    A.   No.
19    Q.   Did you ever get hurt from any work that you
20  were doing on a vehicle where there was, you know, some
21  sort of accident?
22    A.   No.
23    Q.   And would you agree with me that if there's
24  anybody to blame for the truck going off the alignment,
25  it would be you, correct?

### ORAL DEPOSITION OF AMALIA PEREZ

#### Page 97

1   A.   Yes, sir.
2   Q.   Okay. Do you accept some responsibility for
3   the truck going off the alignment?
4   A.   No.
5   Q.   Why not?
6   A.   Because that truck shouldn't have done what it
7   did.
8   Q.   What do you mean?
9   A.   When you put a vehicle on the on position, it's
10  like you want to turn on the radio, you're going to put
11  it on the on position.
12  Q.   Uh-huh. You're saying you just put it on the
13  on position, the next thing you know it started and
14  jumped off?
15  A.   Yes.
16  Q.   Is that unpredictable?
17  A.   All I can tell you is that that vehicle should
18  have had a neutral safety switch. That truck shouldn't
19  have done what it did.
20  Q.   Okay. To your knowledge, has any other vehicle
21  done that?
22  A.   No.
23  Q.   Isn't it true, though, that the standard
24  operating procedure at Sears was for the technician to
25  actually physically be in the vehicle when they do that?

#### Page 98

1   A.   Not necessarily because the majority of the
2   technicians did it that way.
3   Q.   All right. Well, is this the one you talked to
4   Mr. Grebb about?
5   A.   Yes.
6   Q.   And what was -- and his position was what I
7   just said, that you should have been fully in the
8   vehicle and that way you -- that was his position,
9   correct?
10  A.   Yes.
11  Q.   And he was saying if you had been fully in the
12  vehicle, you would have had a better opportunity to
13  control the vehicle, correct? That's what he was
14  saying, correct?
15  A.   Right.
16  Q.   Do you agree with that? And that is true,
17  isn't it?
18  A.   Yes.
19  Q.   And are you saying based on what he told you,
20  after that you didn't really trust him?
21  A.   No, because I even went to the Ford Company to
22  inquire about this neutral safety switch, and they told
23  me that all vehicles should have a neutral safety switch
24  back to 1963.
25  Q.   And is --

#### Page 99

1   A.   I even took the manual, and I showed Mr. Grebb.
2   He didn't want to hear about it. They were just more
3   anxious to get something written down and blame
4   somebody.
5   Q.   Okay. So did you ever get any clarification in
6   your mind as how it is this vehicle didn't have a
7   neutral safety switch?
8   A.   It was an old model.
9   Q.   According to the manual, they had them all the
10  way from '63 forward.
11  A.   Probably it just wasn't working. They
12  nigger-rigged it or something. You can do that.
13  Q.   You said nigger-rigged?
14         MR. ZAYAS:  Don't use that term.
15  A.   Well, they tinkered with it.
16  Q.   But that's what you said, right? Yes?
17  A.   Yes.
18  Q.   Okay. But you're just speculating. You don't
19  actually know why it didn't have a neutral switch,
20  correct?
21  A.   That's correct.
22  Q.   Did you ask the customer, the owner of the
23  vehicle?
24  A.   No.
25  Q.   Do you make any room for the possibility that

#### Page 100

1   perhaps you turned the switch too far and you actually
2   turned the car on? Is that possible?
3   A.   Well, even so, the vehicle was --
4   Q.   Is it possible?
5   A.   It's possible, but it's a standard vehicle. On
6   a standard vehicle, you need to put in the clutch.
7   Q.   It was a standard?
8   A.   Yes, sir.
9   Q.   Okay. Was there anything else about -- so in
10  any event, the first person to come to you about this
11  was Ms. Rodriguez?
12  A.   No. The first person that showed up after the
13  truck partially fell off was Rick Vallejo.
14  Q.   And what did he say?
15  A.   He looked at it and he said, there's really not
16  that much damage, we can get it off the rack. And
17  that's what we proceeded to do. But first he went and
18  called loss prevention.
19  Q.   Rick did?
20  A.   Yes.
21  Q.   Why did he do that?
22  A.   Because we had to report it.
23  Q.   Whenever there's what?
24  A.   An incident. We have to report it.
25  Q.   Okay. So then what happened?

## ORAL DEPOSITION OF AMALIA PEREZ

### Page 101

1   A.   By that time I believe Ms. Rodriguez showed up.

2   Q.   Okay. And she asked you for a statement?

3   A.   She started taking pictures. Mr. Vallejo,

4 myself, and Mr. Vargas proceeded to lift the vehicle so

5 that we could push it back on the alignment rack.

6   Q.   Okay. Did you get it back on the rack?

7   A.   Yes.

8   Q.   And completed the work?

9   A.   No.

10   Q.   What happened?

11   A.   We got it off the alignment rack, Rick Vallejo

12 talked to the customers and said that we would pay for

13 the damages, and they drove off.

14   Q.   The customer did?

15   A.   Yes.

16   Q.   What was the work that was trying -- that you

17 were -- you-all were hired to do on the vehicle?

18   A.   An alignment.

19   Q.   Did it get done?

20   A.   No.

21   Q.   I mean, and what was the minor amount of damage

22 that was done as a result of the truck jumping off the

23 alignment rack?

24   A.   What I noticed was that the rail where you

25 stand to get on the truck.

### Page 102

1   Q.   The running board?

2   A.   Right. That was bent. And a part of the

3 fender.

4   Q.   Was bumped up?

5   A.   Yes.

6   Q.   Okay. Did you-all fix that?

7   A.   No.

8   Q.   Do you know who did?

9   A.   I don't know who fixed it. But I later found

10 out that there was $800 in damages or something or

11 other.

12   Q.   How did you find that out?

13   A.   The -- Mr. Ascevedo told me.

14   Q.   Okay. If you turn to Exhibit 15. That's what

15 you're talking about, right?

16   A.   Maybe that's it. I don't know.

17   Q.   Well, the dates match up. It says that the

18 incident occurred on May 24th, 2002, which matches up

19 with what you said, the May 24th incident. So that's

20 the same vehicle we're talking about, a Ford truck,

21 right?

22   A.   Uh-huh.

23   Q.   Yes?

24   A.   Yes, sir.

25   Q.   Okay. And according to this, they paid the

### Page 103

1 owner of this, L. Parra, $1,125.22 for the damage that

2 was caused by the truck coming off the alignment rack,

3 correct?

4   A.   If that's the amount, I guess.

5   Q.   Had you ever seen this document before?

6   A.   No.

7   Q.   Okay. But you were told that Sears had to pay

8 for the damage from the truck coming off the alignment

9 rack, correct?

10   A.   Yes, sir.

11   Q.   And this document reflects that, correct?

12   A.   Yes, sir.

13   Q.   In any event, so did -- so you talked to Rick,

14 you talked to Anna Rodriguez and you gave her this

15 statement, correct?

16   A.   Yes, sir.

17   Q.   Did you talk to Mr. Ascevedo about it?

18   A.   No, because he was real upset.

19   Q.   And did you talk to --

20   A.   And he didn't want to talk to me.

21   Q.   Did you talk to Mr. Grebb about it?

22   A.   No, not until they took me into his office.

23   Q.   For the write-up?

24   A.   Yes.

25   Q.   If you go to the next document, Exhibit 13 --

### Page 104

1 I'm sorry, back to -- Exhibit 13, is this another

2 written statement from you?

3   A.   That's the same one.

4   Q.   I think it's different, actually. If you look

5 at 12 and 13, they're not exactly the same, are they?

6   A.   Maybe this is the one I was --

7   Q.   Are they both your handwriting?

8   A.   Yes.

9   Q.   Okay.

10   A.   So I must have done it twice. I don't

11 remember.

12   Q.   What is the safety switch anyway? Is that just

13 the neutral part?

14   A.   Uh-huh.

15   Q.   Yes?

16   A.   Yes, sir.

17   Q.   Had this ever happened to you at Sears before

18 or since?

19   A.   No, sir.

20   Q.   Where a truck came off the alignment?

21   A.   No, sir.

22   Q.   Okay. So it's unusual to happen?

23   A.   Yes, sir.

24   Q.   You agree it's a legitimate basis for

25 investigation, correct?

ORAL DEPOSITION OF AMALIA PEREZ

## Page 105

1    A.   Yes, sir.
2    Q.   And you agree that since you were the person --
3 the employee that was working on that truck, you're a
4 legitimate person to have a conversation with about what
5 happened, correct?
6    A.   Yes, sir.
7    Q.   Is Exhibit 14 the write-up that you got off of
8 that incident?  If you look at the second page, I think
9 your signature is on there.
10   A.   Yes, sir.
11   Q.   Who is in -- who was there when they gave you
12 this?
13   A.   Mr. Grebb and Mr. Ascevedo.
14   Q.   Where were you all at?
15   A.   In Mr. Grebb's office.
16   Q.   Okay.  And it says you were given -- do you
17 recall it was about five days after the incident
18 actually happened?
19   A.   I believe so.
20   Q.   It says, "Written warning.  On 5-24-2002, Molly
.21 demonstrated careless behavior while attempting to move
22 a customer's vehicle on the alignment rack.  Property
23 damage resulted from this action as well as personal
24 damage to her tool caddy."  Was your tool caddy damaged?
25   A.   Yes, sir.

## Page 106

1    Q.   What's a tool caddy?
2    A.   It's like a cart.
3    Q.   That carries tools?
4    A.   Yes.
5    Q.   Were they Sears tools or your tools?
6    A.   My tools.
7    Q.   Oh, you actually owned the tools?
8    A.   Yes.
9    Q.   But did everybody have their own tools there?
10   A.   Yes.
11   Q.   That's not uncommon, huh?
12   A.   No, sir.
13   Q.   Did you get your tools back after they fired
14 you?
15   A.   Yes, sir.
16   Q.   Okay.  And what happened to the tool caddy?
17   A.   A total loss.
18   Q.   Was it underneath the truck, underneath the
19 alignment --
20   A.   It was by the wall in front of the alignment
21 rack.
22   Q.   So when the truck jumped off --
23   A.   It partially landed on top of the caddy also.
24   Q.   Well, how tall is the caddy?
25   A.   It's about -- I'd say about three or four feet

## Page 107

1 in height.
2    Q.   Well, how high up was the truck when it jumped
3 off?
4    A.   The truck -- the alignment rack at the time was
5 an old alignment rack which only went up about three
6 feet.
7    Q.   The whole truck didn't come off, did it?
8    A.   No.
9    Q.   Just, what, it was like hanging off the side?
10   A.   Actually, just the tires.
11   Q.   On the front part?
12   A.   Right.
13   Q.   Okay.  On your tool caddy, did you have to
14 replace the caddy then?
15   A.   No.  I just disposed of it.
16   Q.   Where did you keep your tools in after that?
17   A.   I had a toolbox.
18   Q.   Then it says, "This type of behavior is
19 unacceptable and will result in further disciplinary up
20 to and including termination."  Correct?
21   A.   Yes.
22   Q.   And then next it says, "I have read this
23 associate ethics policy violation notice, and it has
24 been fully explained to me.  My signature on this form
25 does not necessarily express my agreement with this

## Page 108

1 notice, but merely my awareness of this notice.  I
2 understand that if I refuse to sign this form, my action
3 will not nullify or void this document.  I understand
4 that I will be able to make whatever comments I feel are
5 appropriate."  Did I read that correctly?
6    A.   Yes, sir.
7    Q.   And did you sign it?
8    A.   Yes, sir.
9    Q.   And it looks like you signed it 5-29-02,
10 correct?
11   A.   Yes, sir.
12   Q.   And like it says there, did you understand that
13 you were able to make -- you were able to make whatever
14 comments you felt were appropriate on the document?
15   A.   Yes, sir.
16   Q.   And isn't it true that the section for
17 associate comments, you decided not to make any
18 comments, correct?
19   A.   Correct.
20   Q.   And why didn't you?
21   A.   I didn't feel they would listen to me.
22   Q.   So are you saying --
23   A.   They were just looking for somebody to blame,
24 so I just signed it and get it over with.
25   Q.   You didn't agree that you were careless?

ORAL DEPOSITION OF AMALIA PEREZ

## Page 109

1    A.    No.
2    Q.    Now, and you're saying this the conversation --
3  this is the meeting where you had the conversation with
4  Mr. Grebb where he said you were careless because you
5  should have been in the vehicle?
6    A.    Yes.
7    Q.    And you're saying based on that, you lost
8  confidence that he would do anything to help you?
9    A.    Yes.
10   Q.    Prior to that, prior to 5-29-02, had Mr. Grebb
11 done anything to lose your confidence?
12   A.    No.
13   Q.    Why didn't you complain about Mr. Ascevedo to
14 Mr. Grebb somewhere between February '02 and 5-29-02?
15   A.    About Mr. Ascevedo?
16   Q.    Yeah.
17   A.    Because Mr. Ascevedo always went to his office
18 without failure and didn't feel like Mr. Grebb would
19 even listen to us employees.
20   Q.    You were assuming that Mr. Grebb was already
21 biased in Mr. Ascevedo's favor?
22   A.    Yes.
23   Q.    But, I mean, the fact that Mr. Ascevedo was
24 going to Mr. Grebb, that was natural since Grebb was his
25 supervisor, correct?

## Page 110

1    A.    I thought the district manager was his
2  supervisor.
3    Q.    Mr. Peterson?
4    A.    Yes.
5    Q.    Okay. Well, did you understand that there was
6  some reporting relationship between Ascevedo and Grebb?
7    A.    Well, it was the first because previous
8  managers never dealt with store managers.
9    Q.    Okay. Did you ever ask anybody about, hey, why
10 is Ascevedo dealing with the store general manager?
11   A.    Everybody thought he was scared to make any
12 decisions and he would leave it up to Mr. Grebb to take
13 the fall if anything went wrong.
14   Q.    Did you ask anybody in Sears management why the
15 store general manager was getting involved in the auto
16 center?
17   A.    No.
18   Q.    Did Mr. Parra, the owner of this Ford vehicle,
19 see the incident occur?
20   A.    He was there.
21   Q.    Did he get upset?
22   A.    Not with me he didn't. I don't know if he got
23 upset with the salesperson.
24   Q.    Did you have any conversation with him about
25 it?

## Page 111

1    A.    No.
2    Q.    Okay. Did anybody tell you what the
3  customer -- how the customer reacted to this?
4    A.    No. He was in the shop all the time.
5    Q.    Afterwards?
6    A.    Yes.
7    Q.    Okay. Did you ever have any conversation with
8  him ever?
9    A.    No.
10   Q.    Okay. And that was the first write-up that you
11 got at Sears, the one we just covered?
12   A.    Yes.
13   Q.    Now if you turn to Exhibit No. 16, do you
14 recall that you got this write-up here on July 20th,
15 2002?
16   A.    First of all, Mr. Ascevedo said it was not a
17 write-up; it was just something to cover our backs.
18   Q.    Okay. Do you recall receiving this document
19 that's entitled Performance Plan For Improvement,
20 performance memo which has been marked as Exhibit 16 on
21 July 20, 2002?
22   A.    Yes.
23   Q.    And it says, "Reason for memo: Alternator
24 bracket was broken as Molly was changing out an
25 alternator." Is that true or false?

## Page 112

1    A.    The alternator bracket was broken, yes.
2    Q.    It's true?
3    A.    But it wasn't broken by me.
4    Q.    Okay. So you're saying the alternator bracket
5  was broken as you were changing an alternator?
6    A.    It was cracked.
7    Q.    The alternator bracket was cracked as you were
8  changing out an alternator, but it was already cracked?
9    A.    Yes.
10   Q.    That's what you're saying?
11   A.    Yes, sir.
12   Q.    Okay. Then it says, "Action needed: Molly
13 needs to ask for help when she runs into a situation in
14 which she's unfamiliar. Molly needs to stop trying to
15 for the issue if she is having difficulty repairing or
16 exchanging a car part." Did I read that correctly?
17   A.    Yes.
18   Q.    And then you wrote, "I will first do a visual
19 before beginning any work, check parts out for
20 condition, and notify and document any findings, place
21 parts with TLC" -- meaning tender loving care?
22   A.    Yes, sir.
23   Q.    -- "as if it were my own vehicle." Is that
24 what you wrote?
25   A.    Yes, sir.

### ORAL DEPOSITION OF AMALIA PEREZ

#### Page 113

1    Q.    That's your handwriting?
2    A.    Yes, sir.
3    Q.    Okay. What's the -- what was the situation
4  with this alternator deal?
5    A.    The dials were bad in the alternator, and they
6  needed to be replaced. The customer agreed. The
7  salesperson ordered the alternator, and the salesperson
8  told me to remove the alternators, when I started to
9  do. And as soon as I took off the last bolt, the
10  bracket was -- it just came apart.
11    Q.    The bracket that holds the alternator?
12    A.    Yes.
13    Q.    All right. So then what happened?
14    A.    I went and informed the CSA that the bracket
15  was cracked.
16    Q.    Are the CSA's the ones that interact with the
17  customer?
18    A.    Yes, or the salesperson.
19    Q.    Yeah.
20    A.    So she said, "well, we need to get the part."
21  And I said, "well, I'll check with all the junkyards."
22  And I had to go tell Mr. Ascevedo, and he got upset.
23    Q.    All right. Did anybody tell the customer about
24  this?
25    A.    I told the customer --

#### Page 114

1    Q.    Immediately?
2    A.    -- that it was going to take longer because the
3  bracket was cracked and we needed to get the bracket.
4    Q.    So now it's not an issue of just getting an
5  alternator, but an alternator and an alternator bracket?
6    A.    Yes, sir.
7    Q.    Do you-all have alternator brackets in stock
8  there?
9    A.    No, sir.
10    Q.    That's why you had to go searching?
11    A.    We called the junkyard -- well, I called the
12  junkyard, and I found one in Mercedes. And I went and I
13  got the bracket myself.
14    Q.    In Mercedes, Texas?
15    A.    Yes, sir.
16    Q.    You drove out there in your own personal
17  vehicle?
18    A.    Yes, sir.
19    Q.    Got the bracket?
20    A.    Yes, sir.
21    Q.    Brought it back?
22    A.    Yes, sir.
23    Q.    Put it in?
24    A.    Yes, sir.
25    Q.    Put the alternator in?

#### Page 115

1    A.    Yes, sir.
2    Q.    Everything's fine?
3    A.    Yes, sir.
4    Q.    Customer drives off?
5    A.    Yes, sir.
6    Q.    All right. When you first talked to the
7  customer about it, what was their response?
8    A.    He wasn't upset. He just said okay. I just
9  told him, it's going to take a little longer, sir. The
10  bracket was cracked. It needs to be replaced. We will
11  get it. And since it was in the shop, it won't be any
12  extra charge for you.
13    Q.    Okay. Who paid for the bracket?
14    A.    We did.
15    Q.    Why?
16    A.    Because according to Mr. Ascevedo, any vehicle
17  that comes into the shop is Sears property. So if
18  anything happens, we have to fix it other than what the
19  customer comes in for.
20    Q.    Okay. But did something happen?
21    A.    Just that the bracket was cracked, and it
22  needed to be replaced.
23    Q.    You're saying the bracket was cracked before it
24  even came to Sears, correct?
25    A.    Yes, sir.

#### Page 116

1    Q.    All right. Did you have a discussion with the
2  customer about that?
3    A.    Yes, sir.
4    Q.    What did the customer say?
5    A.    I informed him that we had to replace it
6  because otherwise the alternator would not function
7  properly.
8    Q.    And the customer, as I'm sure, said, well,
9  fine, but I'm not paying for the bracket because I just
10  wanted an alternator, and I didn't know anything about
11  this cracked bracket?
12    A.    Correct. But he wasn't upset because I told
13  him it was cracked. And he said, well, I didn't know it
14  was cracked.
15    Q.    Okay.
16    A.    And I told him, I understand, but either way,
17  you know, since we -- we're working on it, we have to
18  replace it.
19    Q.    Okay. But was there -- did you have any
20  conversation with the customer about who's going to pay
21  for this new bracket?
22    A.    No, because I told him we were going to pay for
23  it.
24    Q.    So before he even said I shouldn't have to pay
25  for it, you volunteered and said, we'll pay for it?

ORAL DEPOSITION OF AMALIA PEREZ

### Page 117

1   A.   Correct.
2   Q.   Well, why did you say that if it was already
3   cracked when it got to Sears and nothing happened to it
4   when you were at Sears -- when it was at Sears, it was
5   already cracked? Why would you tell him that?
6   A.   Because, like I said, Mr. Ascevedo told us that
7   any vehicle that comes in, it's already Sears property,
8   and we have to fix it.
9   Q.   So you're saying according to your directions
10  from Mr. Ascevedo, if a car comes in and the customer
11  says I want you to fix part A, and it turns out that
12  parts B through Z are all broken, Sears is supposed to
13  pay for parts B through Z and fix B through Z for free
14  and just charge for A?
15  A.   According to Mr. Ascevedo, yes.
16  Q.   Are you sure you got that -- was this verbally?
17  A.   Yes.
18  Q.   Are you sure you interpreted that correctly?
19  A.   I even questioned him. I said, why are we
20  going to pay for something we didn't do? He said,
21  because any vehicle that comes into the Sears automotive
22  is Sears property.
23  Q.   Okay. So you're making it sound right now like
24  it was terribly unfair of you to be given this
25  performance memo, correct?

### Page 118

1   A.   Well, it wasn't -- he just told me, this is not
2   a write-up, it's just something so we can cover our
3   backs.
4   Q.   Cover our backs? What do you --
5   A.   I don't know.
6   Q.   Do you know what he meant?
7   A.   I didn't question the man for anything.
8   Q.   Okay. Well, I guess what I'm wondering is
9   right now you're making it sound like you did nothing at
10  all to deserve any sort of performance memo or anything
11  else, correct? Is that correct?
12  A.   That's correct.
13  Q.   So on the associate's comments, why didn't you
14  just write, I didn't do anything wrong, leave me alone?
15  Instead you wrote, "I will first do a visual before
16  beginning any work, check parts out for condition, and
17  notify and document any findings, place parts with TLC
18  as if they were my own vehicle." Why did you write
19  that, I didn't do anything wrong, leave me alone?
20  A.   Because I had already told him verbally, and
21  basically I was just writing down what he wanted to
22  hear.
23  Q.   Well, whose words are those, his or yours?
24  A.   The bottom one or the top one?
25  Q.   The bottom one that says associate comments?

### Page 119

1   A.   Those are my words.
2   Q.   Okay. And he didn't tell you what to write
3   word-for-word, did he?
4   A.   No.
5   Q.   Am I right, you wrote, "I will first do a
6   visual before beginning any work." So did you do a
7   visual this time before doing any work?
8   A.   Yes.
9   Q.   And it says you will "check parts out for
10  condition and notify and document any findings." Did
11  you do that that time?
12  A.   There wasn't anything that was noticeable.
13  Q.   And then it says you will "place parts with TLC
14  as if it were my own vehicle." You did it that time?
15  A.   Yes, sir.
16  Q.   Exhibit No. 17, this is a signed associate
17  witness statement you gave about this incident on
18  July 21st, 2002?
19  A.   July 2002?
20  Q.   Yeah, July 21st, 2002.
21  A.   Yes, sir.
22  Q.   Okay. And that's your handwriting and your
23  signature?
24  A.   Yes, sir.
25  Q.   And it says, "I was to replace alternator, bad,

### Page 120

1   took off serpentine belt, began to remove bolts and one
2   nut on back of alternator. There are two bolts, one on
3   right side and left. Removed right. And when I removed
4   left, the slot where bolt goes on left fell off the
5   alternator bracket." Did I read that correctly?
6   A.   Yes, sir.
7   Q.   Who asked for this statement?
8   A.   I don't even remember.
9   Q.   Okay. And so even though Exhibit 16 and 17
10  don't indicate that you had any disagreement with what
11  had occurred, now you're saying that you didn't do
12  anything wrong, correct?
13  A.   I always said that.
14  Q.   How much did this alternator bracket from
15  Mercedes cost the company?
16  A.   I'm not sure if it was $17 or $20.
17  Q.   They didn't take that out of your paycheck, did
18  they?
19  A.   No.
20  Q.   They didn't make you pay for it?
21  A.   No.
22  Q.   What about the $1,125.22 the company had to pay
23  to L. Parra, did they try to make you pay for that?
24  A.   No.
25  Q.   Take it out of your paycheck?

**ORAL DEPOSITION OF AMALIA PEREZ**

### Page 121

1    A.  No.
2    Q.  Okay.  Do you know of -- if any other -- do you
3  know if -- what's his name, Mike Guerrero, if Mike
4  Guerrero ever worked on a car where the company had to
5  actually give money to a customer for damage to the car?
6  Do you have actual personal knowledge of that?
7    A.  No.  There was just incidents that on certain
8  cars that he would break.
9    Q.  I just want to know, do you know whether or not
10  Sears actually paid money to a customer of a car that
11  Mike Guerrero had worked on because of something he'd
12  done on the car?  Do you actually know one way or the
13  other?
14    A.  No.
15    Q.  Now, Exhibit No. 18, is this another associate
16  witness statement signed by you that's dated 11-13-02?
17    A.  Yes.
18    Q.  And who asked you for this one, if you know?
19    A.  Richard.
20    Q.  And it says, "on November 2, 2002, customer
21  Lordon came to automotive, purchased battery and then an
22  alignment chamber."  Does that say chamber?
23    A.  Camber.
24    Q.  "Camber was out and began to loosen bolts on
25  the control arm shaft to install shims to bring camber

### Page 122

1  to specs. After doing so, camber was still out of specs
2  and proceeded to loosen bolts again. I loosened right
3  bolt first and then the left. The left bolt came off,
4  and in doing so, the right bolt came off stripping it
5  and noticed the left bolt was also stripped at the
6  beginning threads. I informed CSA to call the auto
7  parts to see if they carried bolts, and they didn't.
8  Nissan dealership was closed. I informed customer and
9  told him only thing left to -- was to rethread where
10  bolts went, and he agreed. I printed out specs on
11  alignment and gave copy to customer with" --
12    A.  Comments.
13    Q.  -- "comments. Bolt stripped, auto parts don't
14  carry and Nissan dealership closed. Had to improvise to
15  get customer home."  Did I read that correctly?
16    A.  Yes, sir.
17    Q.  And what was this customer Lordon, can you give
18  me a context for what that was all about?
19    A.  As far as what, the alignment?
20    Q.  Yeah.
21    A.  I had to put the camber into specs and loosen
22  the bolt. There's two bolts.
23    Q.  Okay. And in this one bolt, the thread was no
24  good on it anymore?
25    A.  Correct.

### Page 123

1    Q.  And you guys didn't have one in there and you
2  couldn't get anymore out?
3    A.  They were metric bolts.
4    Q.  Okay. And you couldn't get one at the auto
5  dealer -- auto parts place or the Nissan dealership?
6    A.  No, because it was late in the evening.
7    Q.  Okay. So -- and what was this bolt -- what
8  part of the car was this connected to, a strut?
9    A.  It's where the wheels go on the side. It goes
10  on the back part of the --
11    Q.  Axle?
12    A.  No, the tires, where the tires are at. It
13  brings them in or out. We put shims to bring it out or
14  we take off to take it in.
15    Q.  Okay. And is the bolt an important bolt?
16    A.  Yes.
17    Q.  What would happen if you drive around without
18  the bolt possibly? The wheel come off?
19    A.  Probably.
20    Q.  So that's what I'm trying to figure out, is how
21  did you improvise to get the customer home given the
22  fact you didn't have this bolt for his car?
23    A.  We rethreaded the holes to put standard bolts.
24    Q.  And you used standard bolts?
25    A.  Yes.

### Page 124

1    Q.  That you had in the shop?
2    A.  Yes, sir.
3    Q.  And how many standard bolts did you use?
4    A.  We did two.
5    Q.  So the other bolt on that -- the right bolt
6  that had decent thread, you took that out and put in the
7  standard bolt?
8    A.  Yes, sir.
9    Q.  And do you know -- that wouldn't have been
10  Nissan specs, would it have been?
11    A.  No. It was just to get him home. And I
12  informed the customer that he had to take it back to
13  Sears so they could get the proper bolts.
14    Q.  Take it back to Sears or Nissan?
15    A.  Well, eventually Sears was -- since we were
16  going to be at fault, Sears had to pay for it.
17    Q.  Okay. Did he bring it back?
18    A.  Well, he took it. He wasn't from here, he was
19  from, I believe, Corpus, so he went over there.
20    Q.  Okay. And how do you know he did that?
21    A.  Because I believe the manager from Sears called
22  over to our Sears in Harlingen.
23    Q.  For what?
24    A.  To find out what was done exactly to the
25  vehicle.

ORAL DEPOSITION OF AMALIA PEREZ

Page 125

1    Q.    Did you talk to him?
2    A.    No.  It was a salesperson.
3    Q.    And did this -- was this customer from Corpus
4  or something?
5    A.    Yes.
6    Q.    And what eventually happened, do you know?
7    A.    No.
8    Q.    Do you even know -- and you were the one
9  responsible for this vehicle?
10   A.    Yes.
11   Q.    Do you know, it was your idea to do the bolt --
12 to exchange the regular bolts that it came with for the
13 standard bolts?
14   A.    Yes.  I informed the customer.  I told him the
15 only other thing we can do is change the bolts to
16 standard.  And -- or we could get you a rental or a
17 motel here.  And he said, well, I don't want to stay, so
18 go ahead and do the standard holes so we can put those
19 bolts.
20   Q.    He wanted to get back to Corpus?
21   A.    Yes.
22   Q.    What was he in town, just for business or
23 something?
24   A.    I didn't ask him.
25   Q.    All right.  Had this ever occurred before or

Page 126

1  since?
2    A.    To me?
3    Q.    Yeah.
4    A.    No.
5    Q.    Or anybody else that you know of?
6    A.    There's been some incidents where they have to
7  rethread, yes.
8    Q.    Do you -- did you do any research to determine
9  whether or not these bolts have the -- could possibly
10 fail on this car?
11   A.    No.
12   Q.    And would you agree with me that what -- were
13 you just assuming that it would be okay?
14   A.    There, yes, I would assume, yes.
15   Q.    But, I mean, you yourself told him, hey, you
16 need to go back to Sears pretty soon.  I'm sure you told
17 him as soon as possible --
18   A.    Yes.
19   Q.    -- and get this taken care of, correct?
20   A.    Yes.
21   Q.    Did you tell him what kind of -- this is kind
22 of jerry-rigging the situation just so you can get home
23 tonight?
24           MR. ZAYAS:  Did you say jerry-rigging?
25           MR. OBERTI:  Yeah.

Page 127

1    A.    Yes, because while I was doing that, another
2  technician came and assisted me.
3    Q.    Who?
4    A.    Jesse Garcia.
5    Q.    Okay.  Assisted you how?
6    A.    In rethreading.
7    Q.    Okay.  But you were the one that did the
8  improvisation, correct?
9    A.    Yes.
10   Q.    You agree with -- you told the customer, we're
11 just improvising here.  We're just jerry-rigging this to
12 get you home tonight, correct?
13   A.    Yes.
14   Q.    Did you tell the customer -- did you advise him
15 that, hey, this is actually somewhat of a risky
16 position, it's up to you whether you want to do it or
17 not?
18   A.    Yes, we did.
19   Q.    And the customer said, I'll take that chance,
20 put it on me?
21   A.    Yes.
22   Q.    Okay.  So you -- did you get him to sign
23 anything, this customer Lordon, to -- you know, where he
24 waived all the possible liability against Sears if his
25 wheel were to come flying off while he's driving down

Page 128

1  the highway, or you just took his word?
2    A.    No.  I wrote down all the information and what
3  I had stated with the customer.  I gave the copy to the
4  CSA, and I gave a copy to the customer so he could take
5  to the Sears over there in Corpus.
6    Q.    Okay.  And then he took off?
7    A.    Yes.
8    Q.    Did you clear this decision to improvise, the
9  way you did, with anybody above you in the chain of
10 command at Sears?
11   A.    First of all, I had to get permission to get
12 the tools to rethread, and the assistant manager was the
13 one that approved it.  And I explained to him why, and
14 he told me, hey, just do whatever it takes to get the
15 customer on the road.
16   Q.    Who was that?
17   A.    I don't remember his name.  Maybe Mr. Grebb can
18 tell you.
19   Q.    Assistant manager of what, the full line store?
20   A.    Yes.
21   Q.    Well, where was Richard?
22   A.    Richard was at home.
23   Q.    How do you know that?
24   A.    Well, he was -- I assumed he was at home, but
25 he wasn't there.

ORAL DEPOSITION OF AMALIA PEREZ

### Page 129

1    Q.   Okay.  So Richard wasn't around to ask him what
2  to do?
3    A.   Correct.  And I also asked Mary Resendez from
4  loss prevention, and she also asked the assistant
5  manager.
6    Q.   Okay.  And this assistant manager, you don't
7  remember who that is?
8    A.   I don't remember if it was Mark or -- but he's
9  in the Harlingen -- I mean, excuse me, he's in the
10  McAllen store now.
11    Q.   Okay.  So you're saying whoever this person is,
12  you told them what you were doing and explained to him
13  that it's improvisation, it's a risky thing, but the
14  customer wants us to do it -- wants to do it, so, you
15  know, can I do it?
16    A.   Yes.
17    Q.   And the assistant manager said, all right,
18  whatever the customer wants?
19    A.   Yes, sir.
20    Q.   Okay.  And then so the customer goes on his
21  way, correct?
22    A.   Yes, sir.
23    Q.   So then -- then apparently that was on
24  November 2nd?
25    A.   Yes.

### Page 130

1    Q.   So then what happens next regarding this
2  customer and this car?
3    A.   I didn't hear anything more about it until I
4  heard something about the CSA talking to the CSA from
5  Corpus, and that was the last I heard.
6    Q.   Apparently Richard came to you on 11-13-02, so
7  11 days after the car was worked on?
8    A.   I also informed Richard the following day what
9  happened on this vehicle.
10    Q.   You told him everything?
11    A.   Yes.
12    Q.   Just like you told me?
13    A.   Yes.
14    Q.   What did he say?
15    A.   He said, "well, let's see what happens."  And
16  that was it.
17    Q.   All right.
18    A.   Then, you know, he told me to write this.
19    Q.   So then -- so on 11-3-2002 you told him what
20  happened, he said let's see what happens?
21    A.   Yes.
22    Q.   Did he have a look of fear in his eyes?
23    A.   Yeah.
24    Q.   Kind of like, uh-oh, I hope this doesn't blow
25  up in our face?

### Page 131

1    A.   And, again, he told me write down what
2  happened.
3    Q.   Wait a second.  Hold on.  I just want to go to
4  11-3-2002.  You told to Richard what happened, correct?
5    A.   Yes.
6    Q.   He had a look of dread in his face?
7    A.   Yes.
8    Q.   Like, uh-oh, if this goes bad, it could be a
9  horrible situation, meaning worst case scenario,
10  customer would get killed on the road, right?
11    A.   Yes.
12    Q.   Okay.  And then you didn't hear about it again
13  until 11-13-02?
14    A.   No.  Richard came to me and told me to write
15  down what had happened.
16    Q.   When did he ask you to do that?
17    A.   The day before I got terminated.
18    Q.   Which is 11-13-02?
19    A.   Yes.
20    Q.   Okay.  And this is when you wrote this?
21    A.   Yes.
22    Q.   Did you ask him what's -- what's going on,
23  Richard?  Why -- why ten days later after our last
24  conversation are you asking me for this?
25    A.   I don't know, because ever since that day,

### Page 132

1  everything started going so fast.  I didn't know what
2  hit me.
3    Q.   You were confused?
4    A.   I didn't know if I was coming down or nothing.
5  And he just told me, we're just doing this to cover our
6  backs.
7    Q.   Did you ask him -- did the customer get into --
8  did the customer's wheel come off?  Or was there a
9  problem?
10    A.   No.  He just said, we're just covering our
11  backs.
12    Q.   At this point you had already heard that the
13  CSA from Corpus had called down to the shop there in
14  Harlingen?
15    A.   Yes.
16    Q.   But as far as you know, it was just a matter of
17  trying to figure out what you-all had done?
18    A.   Yes.
19    Q.   Okay.  So as far as you knew, there hadn't been
20  a report that there had been a problem?
21    A.   Correct.
22    Q.   Okay.  So what time of the day was it, the day
23  before you got fired, that Richard asked you for this
24  signature?
25    A.   This was done about 4:30, 4:45, somewhere

## ORAL DEPOSITION OF AMALIA PEREZ

### Page 133

1 around there.
2   Q.   Okay.  So you wrote it out and you gave it to
3 him?
4   A.   Yes, sir.
5   Q.   And then what happened?
6   A.   I handed it to him, and that was it.
7   Q.   Okay.  So you didn't have anymore discussion
8 about it?
9   A.   No.
10   Q.   Okay.  Exhibit No. 19.  Let me ask you this.
11 On these prior write-ups that we've gone over, were you
12 given copies of any of these?
13   A.   About what?
14   Q.   Well, let's go through here.  Let's say like in
15 number -- let's start with No. 12.
16   A.   No.
17   Q.   13?
18   A.   No.
19   Q.   14?
20   A.   No.
21   Q.   16?
22   A.   (Witness shakes her head negatively.)
23   Q.   No?
24   A.   No.
25   Q.   17?

### Page 134

1   A.   No.
2   Q.   18?
3   A.   No.
4   Q.   Did you ask for any copies of them?
5   A.   No.
6   Q.   Exhibit 19, have you ever seen this document
7 before?
8   A.   No.
9   Q.   It says, "On November 11th, Molly approached me
10 and expressed concern about a call from a customer from
11 Austin, Texas.  Amalia said Mr. Talavera complained
12 about work performed on his vehicle by Molly."  Are
13 those two statements true?
14   A.   Yes.
15   Q.   And who is "me" in this, Ascevedo?
16   A.   I believe.  He's the one that did it.
17   Q.   All right.  But he's the one that you
18 approached and expressed concern about a call from a
19 customer in Austin named Mr. Talavera who had complained
20 about work performed on his vehicle by you, correct?
21   A.   Yes.
22   Q.   It says, "I called the manager in Austin.  He
23 said Mr. Talavera had taken his vehicle to an outside
24 mechanic and was told whoever did this work split the
25 strut mount tower."  Do you know if that's true or not.

### Page 135

1 that he -- yeah, that Richard called the manager in
2 Austin?
3   A.   Oh, I don't know if he did or didn't.
4   Q.   Okay.  Then it says, "I called Mr. Talavera and
5 asked him to bring his vehicle in to us in order to make
6 a visual determination of the problem."  Do you know if
7 Richard called Mr. Talavera and asked him to bring his
8 vehicle in?
9   A.   No.
10   Q.   Then it says, "After our technician in Austin
11 looked at the car, he did agree the work was, in fact,
12 sloppy."  Do you know if that's true or not?
13   A.   No, sir.
14   Q.   Do you even know the name of the manager in
15 Austin?
16   A.   No, sir.
17   Q.   Did you ever speak to that person?
18   A.   No, sir.
19   Q.   And obviously then you wouldn't know who the
20 technician was in Austin who may have looked at this
21 car, correct?
22   A.   Correct.
23   Q.   Then it says, "The instructions for fixing the
24 alignment are previously stated in the machine."  Do you
25 know what machine he's talking about?

### Page 136

1   A.   No.
2   Q.   "There is a caution about not drilling more
3 than three-eighths inch deep."  Do you know if that's
4 true or not?
5   A.   That's true.
6   Q.   Where is the caution?
7   A.   Strut mounts.  It's like a little plate, and
8 it's riveted.  And we have to drill it out.
9   Q.   And you're not supposed to drill three-eighths
10 inch deep?
11   A.   Correct.
12   Q.   Is that on any car?
13   A.   Yes, sir
14   Q.   Why, because you'll go through a strut mount
15 and into the, what, into the gas tank?
16   A.   No.
17   Q.   What?
18   A.   That's where the tire is.  Instead of a shock,
19 it's a strut.
20   Q.   I don't know.  But it wouldn't be a good thing
21 if you drilled more than three-eighths inch deep?
22   A.   Correct.
23   Q.   Okay.  "As a result, the struck mount plate was
24 not mounted flush onto the housing."  Do you know if
25 that's true or not?

ORAL DEPOSITION OF AMALIA PEREZ

Page 137

1    A.   It has to be flush.
2         MR. ZAYAS:  That's not the question.
3    Q.   (By Mr. Oberti)  Do you know if, in fact, this
4    particular strut -- do you even know what strut mount
5    plate he's talking about?
6    A.   No.
7    Q.   Okay.  "There is also one of three studs that
8    hold the housing."  Is that true?
9    A.   Yes.
10   Q.   Is it one to three studs or one of three studs?
11   A.   It should be three.
12   Q.   Okay.  Stripped.  "This is another example of
13   Molly's carelessness and poor workmanship.  I feel we
14   can no longer continue to have our customers" -- All
15   right.  Tell me about this situation with Mr. Talavera.
16   A.   I hadn't heard about Mr. Talavera until
17   November.  Supposedly I worked on this vehicle in July.
18   Q.   Of '02?  Okay.  It says here that you got a
19   call from this guy.
20   A.   I didn't get the call.  The person that came
21   and told me was Gabriel Aranda.
22   Q.   What did he tell you?
23   A.   He asked me if I remembered working on a
24   vehicle back in July on a customer Talavera.  And I
25   said, "No.  I've worked on so many vehicles, how do you

Page 138

1    expect me to remember?"  And then he told me, "Well,
2    they're saying that you messed up the vehicle."  I said,
3    "How can they be blaming me for something that happened
4    back in July, here it is November."
5    Q.   Did he say who was blaming you?
6    A.   No.
7    Q.   Did you ask him who's making these accusations?
8    A.   I asked him, "Well, who said that?"  And he
9    said, "I don't know, but that's what they said.  They
10   called over here."  I said, "Well, who called?"  And he
11   said, "Well, you need to talk to Richard."
12   Q.   So you don't know if it was Talavera who called
13   or somebody from the Austin store?
14   A.   Correct.
15   Q.   Okay.  So then Gabriel Aranda -- did you get
16   along with him or not?  He trained you, right?
17   A.   Yes.  But then he started getting like Richard.
18   Q.   He changed his personality?
19   A.   Yes.
20   Q.   So by this time he's -- he transformed into
21   being more like Richard?
22   A.   Yes.
23   Q.   All right.  So you had the conversation with
24   Gabriel that you just told me about, and then he really
25   couldn't explain anything and said you need to talk to

Page 139

1    Richard?
2    A.   Correct.
3    Q.   So then you went to Richard?
4    A.   He didn't know anything about it.
5    Q.   But that's -- I assume when you told him that
6    you expressed concern about a call from a customer in
7    Austin, Texas, and that this Mr. Talavera had supposedly
8    complained about work performed on his vehicle by you,
9    correct?
10   A.   Right.
11   Q.   And this conversation with Richard occurred on
12   November 11, 2002?
13   A.   Correct.
14   Q.   And then so what did Richard say:  I don't know
15   anything about this?
16   A.   He didn't know anything about it.  He said he'd
17   look into it.  Other than that, I don't know.  I didn't
18   hear anything after that, the day that I talked to him.
19   It wasn't mentioned to me after that.  And from the
20   14th, I was terminated.
21   Q.   Okay.  So between that conversation with
22   Richard on November 11th and the day you got fired,
23   there was no more conversation about this Talavera?
24   A.   No, sir.
25   Q.   Okay.  On this Exhibit No. 16, the one that you

Page 140

1    say Richard said it was just being done to cover our
2    back, right?
3    A.   Yes, sir.
4    Q.   It says here, "Molly needs to ask for help when
5    she runs into a situation which she is unfamiliar.
6    Molly needs to stop trying to for the issue if she is
7    having difficulty repairing or exchanging a car part."
8    Did Richard tell you that?
9    A.   No.
10   Q.   Did he ever tell you that, hey, you know, if
11   you're -- if you confront a difficult or unfamiliar
12   situation, you know, ask for help?
13   A.   Anytime I came into some difficult situation,
14   the person I always turned to was Gabriel Aranda.  And
15   he was the only one that ever helped me as far as when I
16   got stuck on something.
17   Q.   Okay.  But my question is just simply:  Did
18   Mr. Acevedo ever tell you that if you confronted
19   unfamiliar difficult situations, you should ask for
20   help?
21   A.   Because I always did.
22   Q.   Okay.  Did he ever tell you anything about your
23   performance or your need to improve your performance, in
24   his opinion?
25   A.   Just to be careful.  That's about it.  Be