## ORAL DEPOSITION OF AMALIA PÉREZ

### Page 141

1 careful when you were doing the work.
2    Q.   Okay.  I'm sure he told you that after the
3 May 24th incident, correct?
4    A.   Yes.
5    Q.   Okay.  Did he tell you that after this
6 July 20th incident, just be careful?
7    A.   The July?
8    Q.   Yeah.  The one we were just looking at right
9 there?
10    A.   No.  Just told me to write down --
11    Q.   How many times do you think he told you --
12 Ascevedo told you be careful, something along those
13 lines?
14    A.   Just that one time.
15    Q.   Did he ever say anything else about your
16 performance or what he thought you should be doing other
17 than just the one time saying be careful?
18    A.   No.  The only thing he did say was if I was
19 interested in going into the salesperson position.
20    Q.   Were you?
21    A.   No.
22    Q.   Did you ask him, why are you asking me that?
23    A.   I didn't want to talk to the man.
24    Q.   Would that be -- when would he have asked you
25 that?  Did he ask you that just once or more than once?

### Page 142

1    A.   I think he asked me about twice.
2    Q.   Was it --
3    A.   If I would consider going into the salesperson.
4    Q.   You're talking about the positions held by
5 Norma and Matilda?
6    A.   Yes.
7    Q.   And who's the third one?
8    A.   Yolanda McCormick.
9    Q.   Well, was there an opening over there?
10    A.   No.  I don't recall.  Or if -- I'm not sure.
11    Q.   But anyway, you didn't want it anyway, correct?
12    A.   No.
13    Q.   Did he ask you before you were written up in
14 May or after?
15    A.   I think it was after.
16    Q.   Was it after this July 20th thing?
17    A.   It was before that.
18    Q.   Okay.  So it was sometime between the end of
19 May and end of July?
20    A.   Yes.
21    Q.   Okay.  Did he ever tell you that he wanted you
22 to consider another position because it would be more of
23 a light duty position for you?
24    A.   Just that time he walked me to my vehicle.
25    Q.   What did he say?

### Page 143

1    A.   He told me that maybe I should consider looking
2 for work in a different field.  And I told him that
3 anytime my back goes out, I always take vacation or PH.
4 And he said, well, that's not always going to last.
5    Q.   How much vacation did you get each year?
6    A.   I was up to two weeks.
7    Q.   80 hours?
8    A.   (Witness nods her head affirmatively.)
9    Q.   Yes?
10    A.   Yes.
11    Q.   Okay.  And then you complained about those
12 comments when you called the 1-888 assist number in
13 February of '02, correct?
14    A.   Yes, sir.
15    Q.   After February '02 did Mr. Ascevedo make any
16 other comments about your back or your physical
17 condition?
18    A.   After I called the --
19    Q.   Ethics line?
20    A.   No.
21    Q.   Would the sales position that Matilda and
22 Yolanda was in, would that be a little more of a -- that
23 would be a less physically strenuous job obviously,
24 correct?
25    A.   Yes.

### Page 144

1    Q.   I mean, was there any job in the Sears store
2 that was more physically strenuous than your job?
3    A.   Unless you worked in --
4    Q.   In where?
5    A.   In appliances or, you know, moving appliances
6 or whatever.
7    Q.   And what was your height and weight when you
8 were working at Sears, roughly?
9    A.   About the same.
10    Q.   Which is?
11    A.   220, about 5'6".
12    Q.   Would you agree with me that your doctors have
13 said that essentially you're not medically -- medically
14 you shouldn't be performing the job that you had at
15 Sears anymore, correct?
16         MR. ZAYAS:  Objection, form.  You can
17 answer if you want, but I object to the form of that
18 question.
19    A.   My doctors?
20    Q.   Yeah.  Like we read there before, basically
21 said in February you shouldn't be doing the mechanic
22 type work that you were doing at Sears anymore, true?
23         MR. ZAYAS:  Objection, form.
24    A.   Again, I said yes and no.
25    Q.   No.  I'm just saying what the doctors said, not

ORAL DEPOSITION OF AMALIA PEREZ

## Page 145

1  how you feel.
2        MR. ZAYAS: Objection, form.
3     A.  No, I don't think so.
4     Q.  Did you -- do you know whether or not when you
5  worked on Mr. Talavera's car, whether or not you drilled
6  more than three-eighths inch deep on the --
7     A.  No.
8     Q.  -- strut? Do you know? They can track whether
9  you worked on Talavera's car or not by looking at the
10 tickets, correct?
11    A.  Yes.
12    Q.  Okay. Did you have an employee number?
13    A.  Yes.
14    Q.  What was it?
15    A.  408476.
16    Q.  So was there any conversations about your
17 performance or any of these jobs that you did on
18 November 12th or 13th?
19    A.  About the jobs that I did?
20    Q.  Yeah. Those are normal days, 12th and 13th;
21 nothing happened really, correct?
22    A.  Correct.
23    Q.  Other than you gave that statement, correct?
24    A.  Correct.
25    Q.  And then on the 14th you came in, and what time

## Page 146

1  of the day were you fired?
2     A.  It was in the evening.
3     Q.  About what time in the evening?
4     A.  5:30, 6:00.
5     Q.  And tell me how it happened.
6     A.  Mr. Ascevedo came up to me and told me, "Can
7  you stay late?" And I said sure. "Because we're going
8  to talk to Gabriel." So I proceeded to continue
9  working. And I remember I was working on a battery
10 installation. A while later Gabriel Aranda comes up to
11 me and says that he was fired. And I told him to quit
12 kidding around. And he said, "no, really, I was fired."
13    Q.  Who said that, Gabriel?
14    A.  Gabriel Aranda.
15    Q.  Okay.
16    A.  And I said, "Well, I'm sorry, dude." He said,
17 "I'll talk to you later on."
18    Q.  Oh, Gabriel told you he was fired?
19    A.  Yes. He was the first one to go.
20    Q.  That day?
21    A.  Yes.
22    Q.  Okay. So you said, "sorry, dude, see you
23 later"?
24    A.  Yeah.
25    Q.  And then what happened?

## Page 147

1     A.  A couple of minutes later Richard comes up to
2  me and says, "We need to go to the front office." I
3  said okay. When we got there, Mr. Grebb was there, Mary
4  Resendez on my left, and Richard Ascevedo on my right.
5  And Mr. Grebb said, "Because of the truck that partially
6  fell off the alignment rack and the bracket that was
7  broken from the alternator, we find you to be a
8  liability, and you're terminated." And I said, okay.
9  got up and walked out.
10    Q.  So it was a pretty short meeting?
11    A.  Yes.
12    Q.  Did he -- did Ascevedo or Resendez talk during
13 the meeting?
14    A.  No.
15    Q.  Just Grebb?
16    A.  Yes.
17    Q.  And didn't he, in fact, use the phrase "safety,
18 you're a safety liability"?
19    A.  I don't recall him saying that.
20    Q.  Okay. He just said liability?
21    A.  Yes.
22    Q.  You didn't argue about it at the time, correct?
23    A.  Correct.
24    Q.  You didn't say, this is wrong or this is
25 discrimination? You didn't say that at that very

## Page 148

1  minute, did you?
2     A.  No.
3     Q.  You just said, okay, and left?
4     A.  Yes, sir.
5     Q.  You were shocked? Were you shocked?
6     A.  I was angry. I was angry because my automotive
7  manager wouldn't even back up his employees.
8     Q.  Well, who do you blame for -- obviously you
9  don't feel like you should have been fired, correct?
10    A.  Yes, sir.
11    Q.  Who do you blame for firing you, Ascevedo? Or
12 who do you think is behind it?
13    A.  I think Mr. Ascevedo pushed it.
14    Q.  He was the instigator?
15    A.  Yes.
16    Q.  Obviously, of the managers involved, he was the
17 closest to the situation, correct?
18    A.  Correct.
19    Q.  Do you think Grebb just kind of rubber-stamped
20 it? I mean, he didn't know -- he didn't know himself
21 what was going on?
22    A.  Mr. Grebb was the scapegoat for Mr. Ascevedo.
23 Excuse me.
24    Q.  Meaning -- meaning what, that --
25    A.  He was going to do the dirty work.

ORAL DEPOSITION OF AMALIA PEREZ

Page 149

1    Q.    Okay.
2    A.    And he was -- Mr. Ascevedo was too scared to
3  even take partial or full responsibility about what was
4  going on in automotive.
5    Q.    Okay. But I mean, automotive was Ascevedo's
6  department, correct?
7    A.    Correct.
8    Q.    Do you think Ascevedo mislead Grebb as to the
9  true nature of what you had done or not done, that maybe
10  Mr. Grebb was operating based on probably a
11  misconception of what you had done?
12    A.    Yeah.
13    Q.    I mean, as far as you know, Grebb was just
14  relying on what Ascevedo told him, correct?
15    A.    Yes, sir.
16    Q.    Now, you called -- if you go to Exhibit No.
17  23 -- wait a second. You called the Sears 888 assist
18  number again on December 4th; is that right?
19    A.    Yes.
20    Q.    And you complained that you were wrongfully
21  terminated, but then once you told them that you were
22  going to -- that you had retained an attorney, they told
23  you, sorry, we'll just deal with the attorney then,
24  correct?
25    A.    Correct.

Page 150

1    Q.    Had you already retained an attorney by then,
2  within like two weeks of your termination?
3    A.    I retained an attorney the next day after I was
4  terminated.
5    Q.    Who did you get?
6    A.    Mr. Zayas.
7    Q.    Okay. And have you actually paid him any money
8  out of your own pocket so far?
9    A.    No.
10    Q.    Exhibit 24, I don't know if you annualized your
11  pay -- do you know how much you made in 2001?
12    A.    No.
13    Q.    I mean, do you know --
14    A.    I would have to look at my income tax.
15    Q.    Okay. I think we've got that in here
16  somewhere. It looks like Exhibit 25, you actually
17  called -- you actually called to complain about your
18  termination on November 26th, correct?
19    A.    I think I called about two or three times.
20    Q.    Yeah. And it says here that this is when you
21  specifically mentioned Mike Guerrero, correct?
22    A.    Yes.
23    Q.    Okay. Did anyone ever tell you that Ray
24  Peterson had also approved your termination?
25    A.    No.

Page 151

1    Q.    Okay. Exhibit 26, this is your EEOC charge
2  that you filed?
3    A.    Yes, sir.
4    Q.    On March 4, 2003?
5    A.    Yes, sir.
6    Q.    And you claimed sex and age discrimination,
7  correct?
8    A.    Yes, sir.
9    Q.    And it says, "I was told I was terminated for
10  an accident that occurred in May 2002." I thought you
11  said he -- that Grebb just told you you were being
12  terminated because you were a liability?
13    A.    But he used the truck.
14    Q.    Oh, as an example? He cited the truck, which
15  was the May 24th incident, correct?
16    A.    Correct.
17    Q.    Then he also cited the --
18    A.    The bracket.
19    Q.    The bracket from July 20th, correct?
20    A.    Yes, sir.
21    Q.    Did he rely upon the Lordon and Talavera?
22    A.    No.
23    Q.    He just cited those first two?
24    A.    Yes, sir.
25    Q.    Okay. You never filed an EEOC charge before?

Page 152

1    A.    No, sir.
2    Q.    So Exhibit 28, you were sent a copy of -- you
3  know, when Sears responded to your EEOC charge, then the
4  EEOC sent you a copy of their response, correct?
5    A.    EEOC, yes.
6    Q.    Okay. Page 2 of this document. Well, why --
7  it talks about the May 24th incident there. Do you see
8  that? I'm sorry, where are you at? On page 2, not
9  Exhibit 2. Exhibit 28, page 2. Why were you turning
10  the truck on anyway when it was up on the alignment
11  rack?
12    A.    Why was I turning it on?
13    Q.    Were you turning it on?
14    A.    No.
15    Q.    What were you doing? Trying to turn the radio
16  on or something, or what?
17    A.    I was putting the key on the on position so
18  that we can move the tires.
19    Q.    Oh, okay. So here where it says that you broke
20  the alternator bracket on July 20, 2002, you deny that,
21  correct?
22    A.    Yes, sir.
23    Q.    But you realize that that's exactly what you
24  were accused of when you were given that document on
25  July 20th, 2002 that Richard said was just for purposes

### ORAL DEPOSITION OF AMALIA PEREZ

#### Page 153

1  of covering our back?
2     A.   Yes, sir.
3     Q.   Exhibit 30, Tab 1, you agree that under Sears
4  policy you can be terminated -- an employee can be
5  terminated for unsatisfactory work or unacceptable
6  performance as it relates to either quantity or quality
7  of work, correct?
8     A.   Yes.
9     Q.   You're just denying that your work was that
10 bad, correct?
11    A.   Yes.
12    Q.   Did you know a Victor Trevino?
13    A.   Victor Trevino?
14    Q.   Service technician trainee who was terminated
15 in 2000 after working there a month and a half?
16    A.   Yes.  That was the gentleman that I told you
17 about the tires.
18    Q.   Okay.  The kid?
19    A.   (Witness nods her head affirmatively.)
20    Q.   Yes?
21    A.   Yes.
22    Q.   And do you know David Jimenez?
23    A.   Yes.
24    Q.   Tire battery trainee who was terminated in '99
25 for unsatisfactory performance.  Any of them?  Do you

#### Page 154

1  know anybody else that Ascevedo -- that was fired from
2  the auto shop during Ascevedo's management other than
3  you and Gabriel Aranda?
4     A.   No.  I don't remember Victor Trevino or David
5  Jimenez.
6     Q.   They were fired before apparently, if you look
7  at the dates.  Was Mike Guerrero -- was he a Service
8  Technician II?  Did I already ask you that?
9     A.   He was a Service Technician III.
10    Q.   Is that higher or lower than --
11    A.   Higher.  Certified.
12    Q.   What does that mean, certified?
13    A.   He went to school and he completed the
14 certificate.
15    Q.   How long do you have to go for that?
16    A.   I don't know.
17    Q.   Exhibit -- if you go to Tab 4 there, does this
18 look like the people who worked for -- worked as
19 automotive technicians or service technicians while
20 Richard was the manager?  That's supposedly what it is.
21 I was wondering if --
22    A.   While Richard was the manager?
23    Q.   Yeah.
24    A.   Well, the first one wasn't there.
25    Q.   Wait a second.  According to this, you were

#### Page 155

1  still active in 2003.  De La Rosa?
2     A.   No.
3     Q.   You're saying that she was gone by the time
4  Richard came on board?
5     A.   Yes.  That's Toni De La Rosa.
6     Q.   Okay.  How about the second one, McCormick?
7     A.   She's still there.
8     Q.   What about Booth?
9     A.   She's still there.
10    Q.   Garcia?
11    A.   She's still there.
12    Q.   Salinas?
13    A.   He's still there.
14    Q.   Vargas?
15    A.   He's still there.
16    Q.   Oh, by the way, did Richard speak Spanish?
17    A.   Yes.
18    Q.   And English?
19    A.   Yes.
20    Q.   Did everybody in the shop other than Vargas?
21    A.   Yes.
22    Q.   Gracia?
23    A.   Gracia, yes, she's still there.
24    Q.   Madrigal?
25    A.   Madrigal, he's not there.

#### Page 156

1     Q.   All right.  Who fired him, do you know?
2     A.   He quit.
3     Q.   Okay.  Under Richard?
4     A.   I believe so.
5     Q.   Because, what, he couldn't stand to work for
6  this jerk?
7     A.   That, and he went to a job that paid more.
8     Q.   Garcia?
9     A.   Garcia, no, he's not there.
10    Q.   Was he let go before Richard or -- it must have
11 been -- must be during Richard or after.  Was he still
12 there when you were terminated?
13    A.   All I know is that there was only one Garcia,
14 and that was Norma.
15    Q.   Norma is still there, right?
16    A.   Yes.
17    Q.   But she's a customer service advisor?
18    A.   Yes.
19    Q.   So you don't know who this other Garcia is?
20    A.   No.
21    Q.   Okay.  What about Guerrero?
22    A.   He's gone.
23    Q.   Was he gone before you got fired?
24    A.   No.  He got fired, what, a month ago, two
25 months ago.

## ORAL DEPOSITION OF AMALIA PEREZ

### Page 157

1    Q.   So after Richard left. You know Richard left
2 the company about one month after you?
3    A.   Yes.
4    Q.   All right.
5    A.   To go to Home Depot.
6    Q.   All right. Did you ever run into him over at
7 Home Depot?
8    A.   I didn't go to Home Depot at all.
9    Q.   Just because of that?
10   A.   Yes.
11   Q.   Did you start going back to Sears?
12   A.   Who?
13   Q.   You.
14   A.   Did I go back to Sears?
15   Q.   Well, I mean, do you shop at Sears?
16   A.   Yes.
17   Q.   Okay. At the Harlingen store?
18   A.   Yes.
19   Q.   All right. You don't -- so you're not mad at
20 Sears then, or are you?
21   A.   No.
22   Q.   Okay. I mean, do you feel like it was really
23 just Ascevedo was a bad apple, or do you feel like
24 Sears, the company, is the bad apple, or just Ascevedo?
25   A.   I don't know.

### Page 158

1    Q.   I mean, everybody else -- all the other
2 managers you had at Sears treated you well, correct?
3    A.   Yes.
4    Q.   So having a bad manager like Richard was the
5 exception, not the rule, at Sears?
6    A.   (No response.)
7    Q.   We'll go on. Martinez?
8    A.   I don't know who he is.
9    Q.   Gamez?
10   A.   No, he's not there.
11   Q.   Paredes?
12   A.   He's not there.
13   Q.   Vallejo?
14   A.   He's not there.
15   Q.   Valenzuela?
16   A.   He's not there.
17   Q.   Aranda?
18   A.   He's not there.
19   Q.   Perez?
20   A.   He's not there.
21   Q.   Solas?
22   A.   No.
23   Q.   Martinez?
24   A.   He's not there.
25   Q.   Okay. So have you seen Richard since you got

### Page 159

1 fired?
2    A.   No.
3    Q.   Exhibit 33, if you look at Tab 3 behind Exhibit
4 33. Do you see here on the first page a performance
5 plan for improvement, performance memo. The same form
6 of the one you got on July 20, '02, Mike got on July
7 2nd, '02, correct, Mike Guerrero. Do you see that?
8    A.   Well, I see the date.
9    Q.   Okay. I mean, do you deny that this occurred,
10 or do you know?
11   A.   I don't know.
12   Q.   Does that look like Richard Ascevedo's
13 handwriting to you, on these first two parts?
14   A.   I really don't recognize the -- I never paid
15 attention to the way he wrote.
16   Q.   Well, if you turn back a few more pages,
17 there's -- I guess the last page, there's ethics policy
18 violation notice to Mike for this other situation here,
19 too, correct?
20   A.   Where are you at?
21   Q.   The very last page of Exhibit 3, right there
22 where he got written up for not wearing his glasses, his
23 safety glasses. Do you see that?
24        MR. ZAYAS:  Is there a question?
25   Q.   (By Mr. Oberti) Well, just do you see that,

### Page 160

1 that he got written up for not wearing his glasses?
2    A.   Okay.
3    Q.   Okay. So is it accurate to say that you
4 wouldn't necessarily have personal knowledge of other
5 employees being written up and disciplined or not,
6 correct?
7    A.   No.
8    Q.   Is that correct?
9    A.   Yes, sir.
10   Q.   And as part of your job as Service
11 Technician II, it wasn't part of your job to supervise
12 other employees, correct?
13   A.   Correct.
14   Q.   Did you know that this fellow Frank Gonzalez
15 replaced Richard?
16   A.   Yes.
17   Q.   Did you know Frank?
18   A.   Yes.
19   Q.   How did you know Frank?
20   A.   Through Mr. Rodriguez. He used to be a
21 salesperson here at the Brownsville Sears.
22   Q.   Did you ever work in the same store with Frank?
23   A.   No.
24   Q.   So do you know whether or not he's a fair guy?
25   A.   He seemed like he was.

## ORAL DEPOSITION OF AMALIA PEREZ

### Page 161

1    Q.  Do you know Jaime Macias, the district manager?
2    A.  No.
3    Q.  In Harlingen's climate, do tie rods rust and
4 freeze in place?
5    A.  Yes.
6    Q.  And if they freeze in place, is it sometimes
7 impossible or very difficult to remove them without
8 breaking one?
9    A.  Not necessarily.
10   Q.  Well, have you ever broken a tie rod?
11   A.  No.
12   Q.  Would you agree with me that just because one
13 breaks, it doesn't necessarily indicate negligence by
14 the technician?  Do you agree with that?
15   A.  No, because there were other mechanics there
16 that would remove tie rods, and I never heard any of
17 them breaking except Mike.
18   Q.  Okay.  How many did he break?
19   A.  I lost count after five.
20   Q.  So what is a tie rod?
21   A.  A tie rod is like a little long rod with
22 threads, and there's where you make adjustments for the
23 tow on a vehicle.
24   Q.  Where is that on the car?
25   A.  On the bottom on the front.

### Page 162

1    Q.  So every car has a tie rod?
2   A.  No, not every car.  It depends on the make of
3 the vehicle.
4   Q.  Okay.  Did anybody at Sears ever make any
5 comments about your age?
6   A.  No.
7   Q.  Did anybody at Sears make any -- what you
8 consider to be discriminatory comments specifically
9 about your age?
10   A.  I don't remember.
11   Q.  I mean, there were -- like the list we covered,
12 it looks like there was quite a few employees over 40
13 who worked there and still work there, like McCormick,
14 Booth, Ms. Garcia, and Vargas, correct?
15   A.  Yes.
16   Q.  And do you have any proof that the reason you
17 were let go from Sears is because of your age?
18   A.  Do I have --
19        MR. ZAYAS:  Objection, form.
20   A.  -- proof?
21   Q.  Right.
22        MR. ZAYAS:  I'll object to the form.
23   Q.  (By Mr. Oberti)  Just on the age right now, any
24 proof that the reason Sears fired you was because --
25 specifically because of your age?

### Page 163

1    A.  That depends.  You're saying Sears.
2   Q.  Well, a manager like Ascevedo, whoever you
3 think is responsible for firing you, do you think you
4 got fired from Sears because of your age, or do you have
5 any proof of that?
6   A.  The only thing Mr. Ascevedo said, "you're not
7 getting any younger."  That's all I can tell you.
8   Q.  So there was some comments made about your age?
9   A.  That was what he told me.  Other than
10 that, that was that one time.  But to me that was
11 enough.
12   Q.  All right.  So let's break it down.  Your proof
13 that you were terminated because of your age is that
14 Richard Ascevedo told you one time that you weren't
15 getting any younger, correct?
16   A.  Yes.
17   Q.  Other than that one comment, you don't have any
18 proof that you were terminated because of your age,
19 correct?
20        MR. ZAYAS:  Objection, form.  Let me
21 clarify something.  Other than the findings from the
22 EEOC or anything like that?
23        MR. OBERTI:  Well, I don't think the EEOC
24 found age discrimination.
25        MR. ZAYAS:  I think they did.

### Page 164

1        MR. OBERTI:  Maybe they did.  Let me see.
2   Q.  (By Mr. Oberti)  Okay.  Fair enough.  Your
3 attorney coached you into reminding everybody that the
4 EEOC found a probable cause that you were terminated
5 because of your age, correct?
6        MR. ZAYAS:  Objection, form.
7   A.  Yes.
8   Q.  All right.  So let me throw that in there then.
9 Other than the one comment by Mr. Ascevedo saying that
10 you weren't getting any younger and the EEOC's probable
11 cause finding, in your mind anyway, do you have any
12 other proof that Sears terminated you because of your
13 age?
14   A.  No.
15   Q.  On the one comment that Mr. Ascevedo made, he
16 made it one time?
17   A.  To me, yes.
18   Q.  And when was this?  Was it before you called
19 the Sears 1-888 assist?
20   A.  Yes.
21   Q.  I know it's been a long time, but around about
22 how long before?
23   A.  I don't know.  About maybe two or three weeks.
24   Q.  Okay.  So Ascevedo told you some time -- it
25 would have been made in January or early February of

ORAL DEPOSITION OF AMALIA PÉREZ

### Page 165

1  2002 that you weren't getting any younger, correct?
2      A.   Yes.
3      Q.   And what did you say?
4      A.   I just laughed.  I smiled.  I just blew it off.
5      Q.   I mean, what was the -- was there some context
6  to the conversation or he just walked up out of the blue
7  and said it?
8      A.   I believe we were in the break room, and we
9  were eating.  He showed up.  I was talking to -- I think
10 it was Matilda, something about Matilda's age.  And then
11 Norma walked in, and she said, I don't disclose my age.
12 And I said, well, I'm not even going to say anything,
13 you know.  And he said, well, you're not getting any
14 younger.  So I just looked at him, and I just smiled and
15 didn't even want to socialize with him.
16     Q.   You know, did he make it like a light-hearted
17 joke, or did you think it was a malicious poison
18 dripping from his lips?  You know, people joke about age
19 a lot.  You know that, right?  I mean, now that I'm
20 approaching 40, I say, oh, these bones are getting
21 creaky or something.  You know, people say stuff like
22 that, right?
23     A.   Yes.
24     Q.   That's what I'm trying to get at.  Did you take
25 it like he was joking like that, or did you take it like

### Page 166

1  this guy is like Hitler?  Which one?
2      A.   Like Hitler.
3      Q.   But you laughed?
4      A.   Yes.
5      Q.   Did you hear him say anything like that about
6  you not getting any younger to anybody else?
7      A.   Not that I heard.
8      Q.   How come you didn't mention that when you
9  called in to the 1-888 assist line on 2-18 -- in
10 February 2002?
11     A.   Because at the time I was more concerned about
12 him trying to get rid of me because of my back.
13     Q.   Okay.  So you told me everything that you can
14 think of as far as any proof of age discrimination?
15     A.   Yes.
16     Q.   Now, in regards to sex discrimination, did
17 Mr. Ascevedo or anybody else at Sears make any comments
18 to you that were discriminatory based upon your sex?
19     A.   He always made me feel like I couldn't do the
20 work.  He was always sending Gabriel to look at what I
21 was doing.
22     Q.   Thanks.  Well, for now I'm just focusing on
23 anything that Ascevedo or somebody else at Sears would
24 have said.  Like did anybody call you a bitch?
25     A.   No.

### Page 167

1      Q.   Did anybody say, you know, hey, this is man's
2  work, what are you doing in this shop?
3      A.   The only one that I could think of would be
4  Mike.
5      Q.   Mike said that?
6      A.   Said -- I don't know.  He just didn't like me
7  working in the shop.
8      Q.   I'm just -- we're going to get to this other
9  stuff.  I just want to know about actual verbal
10 comments.  Did anybody at Sears actually say anything
11 along the lines of, hey, this is man's work, what is a
12 woman like you doing in this shop?
13     A.   Not to me.
14     Q.   Did anyone at Sears actually make a verbal
15 comment verbally, orally that you thought was sexual
16 discrimination or sexist?
17     A.   Not to me.
18     Q.   Okay.  To anybody that you know of?
19     A.   If anybody, it would have been Matilda.
20 Matilda always told me everything.
21     Q.   What did Matilda tell you that may have been
22 discriminatory?
23     A.   About me being a girl working in the shop.
24     Q.   What did she say?
25     A.   Apparently Gabriel one time commented that he

### Page 168

1  didn't think I belonged there.  But it was hearsay, so I
2  didn't say anything.
3      Q.   Matilda told you at one time that Gabriel said
4  he didn't think you belonged in the shop?
5      A.   Correct.
6      Q.   Did you go ask Gabriel about it?
7      A.   No.
8      Q.   And did Matilda tell you that Gabriel said he
9  felt that way because you're a woman, or he just said
10 it?
11     A.   I didn't ask her why or -- she just told me.
12     Q.   Okay.  Was this before Ascevedo or during
13 Ascevedo's time?
14     A.   It was during.
15     Q.   Okay.  Did you complain to anybody about it?
16     A.   It was just basically Matilda and I.  We had
17 lunch together, and we would just open our mouths and
18 just say what we felt.
19     Q.   Sure.  Just like regular employees going to
20 lunch, shop talk?
21     A.   Correct.
22     Q.   Okay.  Now, was Gabriel already there when you
23 started working at Sears in '95?
24     A.   I believe he was there about a week after I --
25 before I started there.

ORAL DEPOSITION OF AMALIA PEREZ

Page 169

1    Q.   So you guys' career paths were very -- almost
2  identical?
3    A.   Yes.
4    Q.   Okay.  And you're saying you got along real
5  well with him initially?
6    A.   Yes.
7    Q.   And he even trained -- helped train you?
8    A.   Yes.
9    Q.   And even after you got promoted in 2001, he
10 helped train you?
11   A.   Yes.
12   Q.   And then so when did the relationship start
13 going south?
14   A.   When Mr. Ascevedo came in.
15   Q.   Okay.  So the end of 2001?
16   A.   Yes.
17   Q.   Okay.  Did you ever tell Gabriel like, hey, why
18 are you acting -- why are you changing the way you're
19 acting or something like that?
20   A.   No, because Gabriel got this impression that
21 Richard was going to help him climb up the ladder.  And
22 when he got injured, he was on light duty and he started
23 going all dressed up and kept telling me he was going to
24 be assistant manager.  And Richard never told him
25 anything.  He would talk to customers and so forth.  And

Page 170

1  he would tell them, I'm going to be the assistant
2  manager.
3    Q.   He would tell customers that?
4    A.   (Witness nods her head affirmatively.)
5    Q.   All right.  So what did you think, that Gabriel
6  changed because he was trying to brown nose his way into
7  Richard's good graces?
8    A.   Oh, he did brown nose him.
9    Q.   It worked?
10   A.   Yes.
11   Q.   But then -- so when you found out Gabriel got
12 fired, you must have been --
13   A.   Devastated.
14   Q.   You were devastated?
15   A.   He was, Richard.
16   Q.   Oh, yeah.  Who was?
17   A.   Richard.
18   Q.   Richard was devastated that Gabriel got fired?
19   A.   Because he told him, dude, I tried my best to
20 save you from being terminated.
21   Q.   How do you know he told him that?
22   A.   That's what Gabriel told me.  So, again, it's
23 hearsay.
24   Q.   So Gabriel was telling you it wasn't Richard
25 that fired him, but somebody else?

Page 171

1    A.   Correct.
2    Q.   Did he say who the somebody else was?
3    A.   No.
4    Q.   But whoever it was, Richard was playing it off
5  to him like, dude, I was trying to save you?
6    A.   Yes.
7    Q.   Okay.  So it's accurate to say that, to your
8  knowledge, you don't know of anybody in the shop
9  actually making a sexist comment about you or any other
10 woman, correct?
11   A.   Correct.
12   Q.   Now, do you have any proof of sex
13 discrimination?  In other words, that you were fired
14 because you were a woman by Sears other than the EEOC's
15 determination?
16   A.   Do I have any other proof?  No.
17   Q.   Now, have you actually seen Mike Guerrero since
18 you left Sears?
19   A.   Well, while he was employed there, I would go
20 get my oil changed.
21   Q.   After you got fired?
22   A.   Uh-huh.
23   Q.   Yes?
24   A.   Yes.
25   Q.   Did you let him change your oil?

Page 172

1    A.   No.
2    Q.   Did you let him work on your car at all?
3    A.   No.
4    Q.   Who did you let work on your car?
5    A.   It was either Eddie Salinas or Humberto Vargas.
6    Q.   Do you think those guys are competent?
7    A.   Yes.
8    Q.   Okay.  Exhibit 33, tab 2.
9         MR. ZAYAS:  Page 2, you mean?
10        MR. OBERTI:  No, no, tab 2 behind Exhibit
11 33.
12   Q.   (By Mr. Oberti)  What is this?
13   A.   This is a work order.
14   Q.   Okay.  And does the -- I mean, could we tell
15 from this which employee of Sears worked on the car?
16   A.   Not on this one.
17   Q.   Not this one.  Is this what they look like?
18   A.   Yes.
19   Q.   Is this the same thing as a ticket?
20   A.   Yes.
21   Q.   Where are you -- where can you tell from the --
22 where is it supposed to be the person -- the identity of
23 the person who worked on the car?
24   A.   Like on the second one, if you look on the
25 middle box where it says tech, that one, right there.

**ORAL DEPOSITION OF AMALIA PÉREZ**

### Page 173

1      MR. ZAYAS: Where your finger is to the
2  right?
3      Q.  (By Mr. Oberti)  Okay.  That's the number?
4      A.  Correct.
5      Q.  Okay.  So it goes by employee number.  Do you
6  know whose number that is, 894014?
7      A.  Let me see what was done.
8      MR. ZAYAS: Don't try to guess.  Do you
9  know whose number that was?
10     A.  No.
11     Q.  What was your number again?
12     A.  408476.
13     Q.  408 --
14     A.  476.
15     Q.  Okay.  If you go towards the -- if you go 11
16  documents in, I'm looking for this one that says Molly
17  Perez.
18     A.  This one?
19     Q.  Yeah.  What is that?  Why is that?
20     A.  I authorized some work to be done on my
21  vehicle.
22     Q.  Oh, okay.  So that's your vehicle actually?
23     A.  Uh-huh.
24     Q.  Yes?
25     A.  Yes.

### Page 174

1      Q.  Do you know which tech worked on it?
2      A.  I think that is Eddie Salinas' employee number.
3      MR. ZAYAS: Are you sure?
4      THE WITNESS: There's only one way to find
5  out.  I have it in my vehicle.
6      MR. ZAYAS: Well, you think it's Eddie
7  Salinas?  That's your answer.
8      THE WITNESS: Yes.
9      A.  It has to be either Eddie Salinas or Humberto
10  Vargas.
11     Q.  Okay.  Do you know if Mike Guerrero -- you're
12  aware that the EEOC -- they found probable because they
13  thought that Mike and your errors were similar, but only
14  you were terminated?
15     A.  Correct.
16     Q.  Are you aware of any customer of a car that
17  Mike worked on subsequently bringing the car back to a
18  Sears shop with complaints?
19     A.  Yes, there were occasions.  Mike had a lot of
20  comebacks.
21     Q.  Okay.  And tell me each one that you know
22  about.
23     A.  When I was there, he was installing some U
24  joints on a half shaft.  And there was a pickup.  Mike
25  had a habit of using a hammer, I don't know why.  But

### Page 175

1  when you put in the shaft, it's got a yoke where you
2  have to wiggle it into that yoke, and he was using the
3  hammer.  The next day after he installed it, he raised
4  up the vehicle and Rick Vallejo was inside the vehicle,
5  and he told him to step on the gas.  I was doing an oil
6  change, and that shaft flew off, and it was coming
7  towards me.  If I hadn't seen, that thing would have hit
8  me in the head.  Richard Ascevedo, Gabriel informed him
9  that the shaft was messed up.  So they went to the
10  junkyard and they got a new one.  That was it.
11     Q.  Where is the customer coming back and
12  complaining of this?
13     A.  Oh, okay.  That was one incident where the
14  customer came.  He was upset because he had to wait.  He
15  was going to go to work.  And he had to wait until they
16  got that shaft.
17     Q.  Okay.  But I appreciate you telling me about
18  it.  But the customer didn't leave and then come back
19  again with the car, correct?
20     A.  Right.
21     Q.  I just want to know about the situation where
22  Mike did work on a car and then because of some problem
23  in Mike's work not being what it's supposed to have
24  been, the customer had to bring the vehicle back into
25  Sears.  Do you know of any situations --

### Page 176

1      A.  A lot of comebacks that he had was on brakes.
2      Q.  Okay.
3      A.  And a lot of the times Gabriel Aranda would get
4  upset because he had to repair his mistakes.
5      Q.  How many customers do you know for sure that
6  came back from work that Mike had done?
7      A.  I would say about 50 percent.
8      Q.  You're saying 50 percent of all the work he did
9  customers came back?
10     A.  Yes.
11     Q.  Well, that would be literally hundreds a year,
12  correct?
13     MR. ZAYAS: Are you exaggerating?
14     THE WITNESS: No.
15     Q.  (By Mr. Oberti)  And did any of them come back
16  and say, my brakes failed, I almost died?
17     A.  Yeah.  Mike drove in a vehicle one time, and he
18  nearly took the oil can containers.
19     Q.  Okay.  How do you know all this?  Did you
20  actually --
21     A.  Because the salespeople would tell me.
22     Q.  I guess do you have -- did you ever hear a
23  customer with your own two ears -- hear a customer
24  complain about Mike's work?
25     A.  There were some customers that I would hear.

ORAL DEPOSITION OF AMALIA PEREZ

## Page 177

1    Q.   Okay.  What did you actually hear with your own
2  two ears customers say?
3    A.   A customer would come in that the brakes that
4  were worked on there, they were worse than when they
5  came in.  They were making noise.  The salesperson would
6  bring out the ticket and, sure enough, it was Mike.
7  There was another incident where Mike installed some
8  struts, and Gabriel had to correct the mistake.  The
9  customer was upset.  And it got to where the customer
10  said he didn't want Mike touching the vehicle anymore.
11    Q.   Did Mike -- so you're saying Mike's shoddy work
12  was consistent -- consistently poor quality from the
13  beginning all the way through when you were terminated?
14    A.   Yes, sir.
15    Q.   Was it just as bad before Ascevedo as it was
16  under Ascevedo?
17    A.   It was getting worse.
18    Q.   Was anybody's work close to or nearly as bad as
19  Mike's?
20    A.   No.
21    Q.   He was head and shoulders above everybody else
22  in terms of the shoddiness of his work?
23    A.   Correct.
24    Q.   How many different auto center managers, you
25  know, did he work under when this occurred?  Obviously

## Page 178

1  Ascevedo and Juan?
2    A.   Gordon Woodward.
3    Q.   Gordon Woodward?
4    A.   Yes.
5    Q.   What nationality was he?  White?
6    A.   Yes.
7    Q.   And anybody else?
8    A.   There was Sam Pena, Rick Castillo.
9    Q.   Five or six, right?
10    A.   Yes.
11    Q.   And so you're saying five or six auto center
12  managers just tolerated this?
13    A.   Well, like I said before, what happened in
14  Sears Automotive was taken care of in Sears Automotive.
15    Q.   Okay.  So my question is according to what
16  your --
17        MR. ZAYAS:  Just answer the question.
18    Q.   (By Mr. Oberti)  Your testimony is that Mike's
19  incompetence and shoddy and poor work spanned the ten
20  years of five or six auto center managers, all of whom
21  put up with it?
22    A.   Yes.
23    Q.   Do you have any idea why they would all put up
24  with somebody whose work was so bad?
25    A.   We always wondered that.

## Page 179

1    Q.   Did you ever get any answer in your mind?
2    A.   No.
3    Q.   Because there was other males under 40 who were
4  fired for poor performance, correct?
5    A.   Yes.
6    Q.   So did Mike have pictures of somebody that --
7    A.   I have no idea, sir.
8    Q.   Okay.  Do you know any of the customers' names
9  who brought their cars back in on Mike -- for work Mike
10  had done?
11    A.   I had some tickets, but I don't know if you
12  have them.
13    Q.   Did you give them to the EEOC?
14    A.   Yes.
15    Q.   So you'd have to look at the tickets and then
16  we can figure out the names?
17    A.   Yes, sir.
18    Q.   Now, you admit on November 2nd, 2002 you
19  essentially made an agreement with that customer Lordon
20  that he was going to drive off the shop with these other
21  bolts; and even though there was some risk of safety to
22  that, he was fully informed and he agreed to proceed on
23  that basis?
24    A.   Yes, sir.
25    Q.   Had you ever done that before with a customer?

## Page 180

1    A.   No, sir.
2    Q.   Are you aware of any situation where Mike made
3  such an agreement with a customer?  I'm talking about
4  your own personal knowledge, not that somebody told you
5  about.
6    A.   There was one incident where he told a customer
7  to go somewhere to get repaired, something he did, but a
8  lot of the times we just kept away from Mike.  We just
9  didn't want to deal with him.
10    Q.   Right.  And it wasn't your job to be following
11  up on Mike anyway, right?
12    A.   Correct.
13    Q.   Okay.  So is it fair to say that you don't know
14  from -- it's accurate to say you don't know from your
15  own personal knowledge of Mike ever entering a deal with
16  a customer to drive a vehicle that is dangerous off the
17  Sears premises?
18    A.   No.
19    Q.   Okay.  Did you ever have any customers return
20  to Sears, you know, on vehicles that you had done work
21  on with some complaint or another other than this
22  perhaps Mr. Talavera?
23    A.   The only thing would be car pulling, but it
24  turned out it was the tires.  Of course, we had to
25  change the tires so we could figure out, you know, how

## ORAL DEPOSITION OF AMALIA PEREZ

### Page 181

1  to resolve the problem, why the vehicle was pulling, but
2  that was about it.
3     Q.   Okay.  Now, are you claiming that anybody else
4  at Sears was terminated for filing a workers' comp claim
5  other than you, or being injured on-the-job other than
6  you?
7           MR. ZAYAS:  Objection, form.  I mean, as
8  part of this lawsuit?
9           MR. OBERTI:  Right.
10    Q.   (By Mr. Oberti)  Well, not suing for, but I
11 mean, do you contend that -- well, first of all, you're
12 contending that part of the reason Sears fired you had
13 to do with all the workers' comp claims that were filed;
14 is that true?
15    A.   Not that I'm aware of.
16    Q.   Well, let me ask you to turn to Exhibit 38.
17           MR. ZAYAS:  Did you understand his
18 question?
19           THE WITNESS:  Not really.
20    Q.   (By Mr. Oberti)  Did you read this document,
21 this plaintiff's original complaint, Amalia Perez versus
22 Sears, Roebuck and Company?  Did you read this before it
23 was filed with the court?
24    A.   Okay.  Now, what was your question again?
25    Q.   My question was -- my new question is:  Had you

### Page 182

1  read this plaintiff's original complaint, Exhibit 38,
2  before it was filed?
3     A.   I believe so.
4     Q.   Okay.  Now, you see there in paragraph 17 it
5  says, "In addition or in the alternative, defendant
6  committed unlawful employment practice against plaintiff
7  by retaliating against plaintiff because she instituted
8  a workers' compensation claim, which activity is
9  protected under the Texas Labor Code," correct?  Did I
10 read that correctly?
11    A.   Unlawful employment practices?
12    Q.   Paragraph 17, number 17.
13           MR. ZAYAS:  This is our complaint against
14 them.  They're the defendant.  You're the plaintiff.
15    Q.   (By Mr. Oberti)  Did I read that correctly?
16    A.   Yes.
17    Q.   Okay.  So are you claiming that part of the
18 reason the company fired you was for filing workers'
19 comp claims?  Or was that -- was that the first time you
20 had heard that?
21    A.   No.
22    Q.   Well, let me ask a new question.  As you sit
23 here today, why do you think Sears fired you?  Do you
24 have any idea?
25           MR. ZAYAS:  Objection, form.  The legal

### Page 183

1  theories are pled in the petition.  Go ahead and answer
2  the question.
3     A.   They're saying that if I'm filing because of
4  these reasons?
5     Q.   I'm just saying -- put all that aside for a
6  minute and just you and me talking, why do you think
7  Sears fired you?
8     A.   Because of the discrimination, and I believe
9  because of the last injury that I had.
10    Q.   The discrimination based on you being --
11    A.   A female.
12    Q.   Anything else?
13           MR. ZAYAS:  She just said and the last
14 injury she had.
15    Q.   (By Mr. Oberti)  And the last injury, the one
16 on November 7th?
17    A.   Yes.
18    Q.   Now, are you claiming that anybody else from
19 Sears, any of your coworkers or former coworkers, were
20 fired because of an on-the-job injury?
21           MR. ZAYAS:  Objection, form.  We're not
22 making any of those claims in this lawsuit.
23    Q.   (By Mr. Oberti)  Do you know?
24    A.   No.
25    Q.   Did Sears ever challenge your right to a

### Page 184

1  workers' comp, compensation insurance?
2     A.   No.
3     Q.   Now, who was their workers' compensation
4  insurer, do you know?  Liberty Mutual?
5           MR. ZAYAS:  Who did you get your check
6  from?
7           THE WITNESS:  I'm thinking.
8     Q.   (By Mr. Oberti)  I'm thinking it was Liberty
9  Mutual.  If you look at Exhibit --
10    A.   Yeah, Liberty Mutual.
11    Q.   Okay.  Did they ever challenge your workers'
12 comp claim --
13    A.   No.
14    Q.   -- or claims?  If you go to Exhibit 9, the last
15 page.
16           MR. ZAYAS:  Do you need a break?  Are you
17 tired?
18           THE WITNESS:  A little bit.
19           MR. ZAYAS:  Mark, let's take a break.
20           (A recess was taken.)
21    Q.   (By Mr. Oberti)  Back on the record.
22 Ms. Perez, the last page of Exhibit 9 there -- I think
23 you're on 10.  This is for the injury -- this is the
24 Workers' Compensation First Report of Injury Or Illness
25 that Sears filed based upon your injury of 11-7-02,

## ORAL DEPOSITION OF AMALIA PEREZ

### Page 185

1 correct?
2    A.   Yes.
3    Q.   It looks like Mary filed it on 11-8-02?
4    A.   I believe so, yes.
5    Q.   And who did you notify about this, Mary
6 Resendez?
7    A.   Yes.
8    Q.   Okay. Did you tell Richard about the injury
9 that you suffered on 11-17-02, Richard Ascevedo?
10    A.   I might have mentioned it the next day, but not
11 that same day that the accident occurred.
12    Q.   Do you actually, as you sit here now, do you
13 know whether or not between 11-7 and the day you were
14 fired, whether or not you told Richard about your injury
15 on 11-7? Do you actually know one way or the other?
16    A.   Yes.
17    Q.   You did?
18    A.   He knew.
19    Q.   You told him?
20    A.   Yes.
21    Q.   Okay. What did you tell him?
22    A.   That I was working on a Ford Mustang and that
23 the trunk had fallen on my upper back with the lock
24 portion hitting it.
25    Q.   Did you tell him that it was a shoulder injury?

### Page 186

1    A.   Yes.
2    Q.   Did you tell him it wasn't the back problem
3 this time?
4    A.   Yes.
5    Q.   Did you talk to Mr. Grebb about the injuries
6 suffered on 11-7-02?
7    A.   No.
8    Q.   What did -- what was Mary's attitude towards
9 the injury?
10    A.   She just told me to write down what had
11 happened.
12    Q.   You had reported a number of them, a number of
13 different injuries to her over the years, correct?
14    A.   Yes.
15    Q.   Did she ever -- did she or anybody else at
16 Sears ever exhibit a negative attitude towards your
17 injury condition?
18    A.   She or anybody?
19    Q.   Yeah.
20    A.   The only person that told me that I had a lot
21 of accidents was Porfirio.
22    Q.   Who?
23    A.   Porfirio.
24    Q.   Who's he?
25    A.   He used to be the manager for loss prevention.

### Page 187

1    Q.   When did he tell you that?
2    A.   When he was working there, because he later
3 became my manager, too.
4    Q.   When did he -- did he leave the company at some
5 time?
6    A.   He went to Iraq.
7    Q.   Okay.
8    A.   But he's back. I think he's working for Sears
9 here in Brownsville.
10    Q.   Okay. What did he say, you have a lot of
11 injuries or a lot of accidents?
12    A.   Yes.
13    Q.   What year did he say that?
14    A.   That was when he was manager of loss
15 prevention, which was probably 2001, I believe.
16    Q.   Okay. You think he was -- he was just
17 stating a fact? You did have a lot of injuries, right?
18    A.   Not then. I think I had about maybe three or
19 four.
20    Q.   Okay.
21    A.   Or maybe -- no, three.
22    Q.   Whatever. Porfirio wasn't involved in your
23 termination, was he?
24    A.   No.
25    Q.   He was in Iraq at the time, correct?

### Page 188

1    A.   Yes.
2    Q.   Okay. Did anybody in Sears management who may
3 have been involved in your termination ever exhibit a
4 negative attitude towards your on-the-job injuries?
5    A.   Maybe Mary Resendez. It wasn't so much what
6 she said; it was her facial expressions.
7    Q.   What was her facial expressions?
8    A.   Like frowning her mouth or --
9    Q.   Did anybody say anything negative about your
10 on-the-job injuries or your injured condition at Sears
11 that may have been involved in your termination?
12    A.   Not that I'm aware of.
13    Q.   Okay. Did anybody at Sears show any caring or
14 compassion for any of your injuries?
15    A.   Anna Rodriguez.
16    Q.   And she was in loss prevention?
17    A.   Yes.
18    Q.   What did she do that was calm or caring or
19 compassionate?
20    A.   She just told me to take care of myself and do
21 whatever the doctor told me.
22    Q.   Did anybody ever make fun of you for your
23 injuries to your face or behind your back, make fun of
24 you in a demeaning or belittling way?
25    A.   No.

ORAL DEPOSITION OF AMALIA PEREZ

## Page 189

1  Q.  During the time you were working there before
2  you got fired, did you feel like you were being
3  discriminated against?
4  A.  Just by Richard.
5  Q.  Did you ever notify Sears about an on-the-job
6  injury, and then they refused to file an employer's
7  first report of injury or illness?
8  A.  No.
9  Q.  Every time you notified them of an injury, they
10 filed one?
11 A.  Yes.
12 Q.  Can you think of any reason why Sears would
13 file workers' compensation claims on your behalf, but
14 then retaliate against you for doing so?
15 A.  What was that again?
16 Q.  Can you think of any reason why Sears would
17 file workers' compensation claims on your behalf,
18 initiate workers' compensation claims for you, but then
19 turn around and discriminate against you or retaliate
20 against you for the claims that they initiated? Can you
21 think of any reason why Sears would do that?
22 A.  The only thing would be that if due to the
23 amount of accidents. That's all I can think of.
24 Q.  And do you know how much your workers' comp
25 claims cost the insurer?

## Page 190

1  A.  No. All I know is that every time there was an
2  accident, it was automatically Sears had to pay $20,000.
3  I don't know if that was accurate or not.
4  Q.  Who told you that?
5  A.  I think it was Gordon Woodward.
6  Q.  Gordon Woodward told you every time there is an
7  on-the-job injury Sears had to pay $20,000?
8  A.  Yes.
9  Q.  Yes?
10 A.  Yes.
11 Q.  No matter how minor the injury was?
12 A.  Correct.
13 Q.  But you don't know if that was accurate or not?
14 A.  Correct.
15 Q.  Because you're saying during the time you were
16 employed by Sears, you never actually took -- you never
17 actually received temporary income benefits, any actual
18 money yourself from workers' compensation insurance,
19 correct?
20 A.  Correct.
21 Q.  The only thing you got while you were actually
22 working there was the cost of your medical care was
23 covered by the workers' compensation insurance, correct?
24 A.  Correct.
25 Q.  And you never spent any like nights in the

## Page 191

1  hospital during your employment for Sears, did you?
2  A.  No.
3  Q.  So do you have any idea how much actual cost of
4  medical care was incurred from the different on-the-job
5  injuries while you were employed at Sears?
6  A.  No.
7  Q.  Now, during the bankruptcy you filed in 2001
8  that was dismissed or finally closed out in January this
9  year or your new bankruptcy, have you ever mentioned the
10 fact that you had filed an EEOC charge or have a claim
11 against Sears?
12 A.  I mentioned it to my attorney.
13 Q.  Okay. Don't tell me about what you mentioned
14 to your attorney because that's privileged.
15 A.  Okay.
16 Q.  You mean your bankruptcy attorney, right?
17 A.  Yes.
18 Q.  Okay. Did you mention it, though, to the
19 court, the bankruptcy courts, or the trustees?
20 A.  No.
21 Q.  Okay. Did you ever tell your debtors about it?
22 A.  About the lawsuit?
23 Q.  Yeah.
24 A.  No.
25 Q.  Or the judge?

## Page 192

1  A.  No.
2  Q.  Do you know the judge who was over your first
3  bankruptcy?
4  A.  No.
5  Q.  Do you know if your second bankruptcy was in
6  front of the same judge?
7  A.  No.
8  Q.  Okay. Exhibit No. 39, did you get a copy of
9  the EEOC file at some point?
10 A.  I got some copy, but I don't remember seeing
11 this one.
12     MR. ZAYAS:  That's just making the
13 request. The rest of it is the file.
14 Q.  (By Mr. Obert) If you turn to page 281 at the
15 bottom, it looks like your total income for 2002 was
16 $25,201, correct?
17 A.  Yes, sir.
18 Q.  And then page 283, is that how much roughly you
19 were earning a week at Spherion, $210.55?
20 A.  Yes, sir.
21 Q.  Sometimes you'd earn a little more, like I see
22 here on 287 you got $373.74 because you worked 14 hours
23 of overtime?
24 A.  Yes, sir.
25 Q.  So it would usually be high $200 to high $300,

ORAL DEPOSITION OF AMALIA PEREZ

Page 193

1  correct?
2      A.  Yes, sir.
3      Q.  And you worked at Spherion, what, six months
4  before you --
5      A.  Five months.
6      Q.  Then you went to Jabil?
7      A.  Yes.  They hired me.
8      Q.  Okay.  Page 317, this is -- you gave the EEOC
9  different persons' names, including Norma Garcia as
10 witnesses.
11     A.  Uh-huh.
12     Q.  Yes?
13     A.  Yes.
14     Q.  And they sent some of these letters asking for
15 information, correct?
16     A.  Yes, sir.
17     Q.  And do you know is the next three pages -- this
18 is a statement from Norma Garcia dated 9-12-03, correct?
19 At least that's what it appears to be, correct?
20     A.  Yes, sir.
21     Q.  And, of course, Ms. Garcia didn't work in the
22 actual auto shop itself, correct?
23     A.  No, sir.
24     Q.  Is that correct?
25             MR. ZAYAS:  "Is that correct" is the

Page 194

1  question.
2      A.  I'm sorry.  What was that again?
3      Q.  Ms. Garcia, she didn't work in the actual shop
4  where the work was done, correct?
5      A.  Correct.
6      Q.  She worked out where they have the floor and
7  they have tires and stuff like that?
8      A.  Majority of the time, yes, but she occasionally
9  has to go into the shop to deliver the parts or to make
10 requests.
11     Q.  Okay.  But neither her nor Matilda or Yolanda
12 actually worked on the cars like you did, correct?
13     A.  No, sir.
14     Q.  Is that correct?
15     A.  Yes, sir.
16     Q.  Okay.  Then you also on page 325, you gave them
17 Yolanda McCormick's name and information and the EEOC
18 obtained a statement from her as well?
19     A.  Yes, sir.
20     Q.  Did Yolanda, Norma, and Matilda, were they also
21 part of the crowd that generally disliked Mike Guerrero?
22 I mean, everybody generally disliked him, including
23 them, correct?
24     A.  Well, Matilda Booth disliked him because he was
25 always grabbing her.

Page 195

1      Q.  What?
2      A.  He was always grabbing her.
3      Q.  Okay.  Sexually or something?
4      A.  Yes, poking her on the ribs or talking about
5  her bottom, buttocks.
6      Q.  What?
7             MR. ZAYAS:  Buttocks.
8      Q.  (By Mr. Oberti)  So that's Matilda?
9      A.  Yes.
10     Q.  So Matilda didn't like Mike, but she thought
11 Mike was a pig?
12     A.  Yes.  And --
13     Q.  What about the other two, did they dislike Mike
14 as well?  I imagine since he's poking at their friend.
15     A.  Well, Norma Garcia because Mike made advances
16 at her daughter.
17     Q.  Not likely to win friends with Norma?
18     A.  No.
19     Q.  So Mike had made sexually romantic advances
20 towards --
21     A.  "Hey, babe, when are we going to go out?"  And
22 every time Norma's daughter would take lunch to her, you
23 know, she finally told her mom, and her mom told the
24 manager at the time, which was Frank.  And I understand
25 that --

Page 196

1      Q.  This is after you were fired?
2      A.  Yes.
3      Q.  Okay.  She told Frank, and what happened?
4      A.  Well, from what I understood from Norma told me
5  Frank wanted for her daughter Sophie to get -- come in
6  and give a statement, but Sophie didn't want to.  She
7  just --
8      Q.  She didn't want to get involved?
9      A.  Right.  And Matilda didn't want to say anything
10 because, well, come on, the guy has to work.  And I
11 said, what about if your husband finds out?
12     Q.  He's a big guy?
13     A.  No.  But just the matter of fact that it's her
14 husband.
15     Q.  Matilda's husband?
16     A.  He would go up to him and tell him something.
17     Q.  How big is Mike Guerrero?
18     A.  Mike Guerrero is about five feet tall.
19     Q.  Five feet?  Okay.  So anyway, it's safe to say
20 that Matilda Booth was offended by Mike's boorish and
21 sexually aggressive behavior?
22     A.  Yes.
23     Q.  And so she would clearly have a motive, and a
24 legitimate one at that, to seriously dislike this
25 person, Mike Guerrero, correct?

## ORAL DEPOSITION OF AMALIA PEREZ

### Page 197

1   A.   And plus, he would yell at her.
2   Q.   I just want to know: Yes, correct?
3   A.   Yes.
4   Q.   And then was it -- which one with the daughter,
5 Norma?
6   A.   Norma.
7   Q.   Norma found out that -- wait. How long was
8 Mike doing this, even when you were working there was he
9 making passes at her?
10   A.   Yes.
11   Q.   How old is Sophie?
12   A.   Sophie is about 21.
13   Q.   Now?
14   A.   Yes.
15   Q.   Okay. So at the time Mike was doing this
16 from ages when Sophie was like 17 on up?
17   A.   Well, towards the end it got more to where he
18 would tell her, "let's go to the beach" or stuff like
19 that.
20   Q.   Did he ever touch her?
21   A.   No, because she wouldn't -- she wouldn't even
22 get near him.
23   Q.   But he was making clumsy romantic overtures
24 towards her?
25   A.   Yes.

### Page 198

1   Q.   And naturally -- and is he married?
2   A.   Divorced.
3   Q.   Was he divorced at the time or is it since then
4 he got divorced?
5   A.   I don't know. Mike's funny about women.
6   Q.   Okay. Anyway you slice it, Norma Garcia
7 clearly was not appreciative of the fact that Mike
8 Guerrero, a man in his, what --
9   A.   30's.
10   Q.   -- 30's was making these romantic overtures to
11 her minor or nearly minor daughter, Sophie, correct?
12   A.   Correct.
13   Q.   So naturally she had a motive to disdain Mike
14 Guerrero, correct?
15   A.   Yes.
16   Q.   And then what about Yolanda? Let me guess, he
17 did something to make her upset, too?
18   A.   He yelled at her.
19   Q.   Did he sexually harass her?
20   A.   I don't know. She never told me.
21   Q.   Okay. But he -- Mike yelled at Yolanda?
22   A.   On several occasions he would yell at her.
23   Q.   Like what sort of things, job-related?
24   A.   Job-related like why didn't you give me the
25 ticket, you're always giving the tickets to the other

### Page 199

1 techs, you know.
2   Q.   Was he an angry person in general?
3   A.   Mike was moody, in his own way.
4   Q.   Sometimes he'd be feeling -- sometimes he'd be
5 in a good mood?
6   A.   Yes. And sometimes he would yell at people
7 like really bad, no matter who was around. And the next
8 day he'd be like nothing ever happened.
9   Q.   Did he have any like best friend there, or was
10 he a loner?
11   A.   The only one that I know of was Mary Resendez
12 from loss prevention.
13   Q.   Mike and Mary?
14   A.   Yes.
15   Q.   Was there some hanky-panky going on there?
16   A.   At the time, yes.
17   Q.   Was this -- is Mary married?
18   A.   Well, she got married recently.
19   Q.   Okay. But she wasn't at the time?
20   A.   No.
21   Q.   Okay. And was Mike married at the time, or do
22 you know?
23   A.   I don't think so.
24   Q.   Okay. So were they open about it, that they
25 were in love? Love was in the air at the shop?

### Page 200

1       MR. ZAYAS: Objection, form. I don't
2 think she said that.
3   Q.   (By Mr. Oberti) Maybe they weren't in love.
4   A.   I have no idea.
5   Q.   What was the nature of the hanky-panky?
6   A.   Mary would go looking for him at the
7 automotive. They would talk.
8   Q.   Smooch under the shade of alignment?
9   A.   I never saw them smooch, but they would go
10 outside and they would talk. And I think Mary basically
11 just needed him for repairs of her car.
12   Q.   She was using him to get free repairs?
13   A.   Yes.
14       MR. ZAYAS: It's a cruel world.
15   Q.   (By Mr. Oberti) Did you feel compelled to tell
16 Mike, Hey, Mike, wake up and smell the coffee --
17   A.   No.
18   Q.   -- she's just using you?
19   A.   I didn't care about it.
20   Q.   Wait. Is it all right for him to fix the car
21 for free?
22   A.   Supposedly we're not supposed to work on
23 outside vehicles from the company.
24   Q.   Was he doing this at the Sears shop or away
25 from the Sears shop?

ORAL DEPOSITION OF AMALIA PEREZ

Page 201

1    A.    Away from the shop.
2    Q.    Oh, okay.  All right.  So did you ever warn
3  Mary like, hey, girl, this Mike's no -- up to no good?
4    A.    It wasn't my business.
5    Q.    All right.  So the answer is no?
6    A.    No.
7    Q.    Okay.  Anyway, now she's married?
8    A.    Yes.
9    Q.    Great.  Did you go to her wedding?
10    A.    No.
11    Q.    Were you invited?
12    A.    Yes.
13    Q.    Why didn't you go?
14    A.    Because Mary is another person that's moody.
15    Q.    All right.  So did Mike yell at any of the
16  guys?
17    A.    Yes.  He yelled at Humberto Vargas.  He got
18  into it with Eddie Salinas.  And he almost got in a
19  fight with Gabriel, and I intervened.  I got in the
20  middle of both of them.
21    Q.    Physical?
22    A.    (Witness nods her head affirmatively.)
23    Q.    Did Mike yell at you, or did he know better?
24    A.    Mike didn't yell at me because I didn't let
25  him.  And I always put him in his spot.

Page 202

1    Q.    Did you have any arguments with him where you
2  told him, listen, don't come barking my way?
3    A.    Yeah, we had a couple of incidents where we got
4  into it.
5    Q.    Now, it looks like they sent Eddie Salinas a
6  form, but he never filled it out?
7    A.    He forgot.
8    Q.    Is that what he told you?
9    A.    Yes.
10    Q.    Were you following up with these people to see
11  if they turned in their form?
12    A.    No.  By this time I was already living in San
13  Benito and barely saw them.  And when I did go by to get
14  an oil change, he told me.
15    Q.    And what about Matilda?
16    A.    Matilda, I didn't even ask Matilda.  Matilda's
17  more like -- she's getting ready to retire.
18    Q.    Her name is right here?
19    A.    Yeah, but I don't think she filled it out.  And
20  Matilda is the type that she doesn't want to lose her
21  retirement.
22    Q.    Gabriel Aranda?
23    A.    I don't know about Gabriel.
24    Q.    So far the two of them that filled it out that
25  we talked about, Norma and Yolanda, they haven't lost

Page 203

1  their jobs, correct?
2    A.    Correct.
3    Q.    Have they felt like they've been retaliated
4  against for giving you statements; do you know?
5    A.    I don't know.  I don't believe so.
6    Q.    Do you talk to them pretty regularly?
7    A.    Norma is like family to me.  We visit every
8  other weekend.
9    Q.    All right.  So you would know if she felt like
10  if she was retaliated against for giving the statement?
11    A.    Yes.
12    Q.    She hasn't said anything yet about it?
13    A.    No.
14    Q.    What about Yolanda, has she said?
15    A.    No.
16    Q.    And you told them about Rick Vallejo, and he
17  didn't fill one either, it doesn't look like?
18    A.    He lives in Dallas.  I don't know.
19    Q.    Is he still with Sears?
20    A.    No.
21    Q.    Jesus Gracia, who's he?
22    A.    He's a mechanic there at Sears.
23    Q.    Did you actually go -- did you ever actually go
24  to the San Antonio EEOC office?
25    A.    No.

Page 204

1    Q.    It was all over the phone or by mail?
2    A.    Yes.
3    Q.    Okay.  And page 355.
4    A.    355.
5    Q.    Yeah.  This is where they acknowledge that you
6  sent them this list, which if you turn to the next page
7  this is the list that you sent to the EEOC of witnesses,
8  correct?
9    A.    Yes, sir.
10    Q.    And you had -- before you sent the names in,
11  you got all their permissions to use their names at the
12  EEOC?
13    A.    Yes.
14    Q.    So a lot of people liked you, correct?
15    A.    Yes, sir.
16    Q.    Did any of your coworkers tell you that they
17  thought you were the victim of sex discrimination or age
18  discrimination?
19    A.    Did they tell me?
20    Q.    Yeah.
21    A.    No.
22    Q.    Then here's a letter you sent in to the EEOC
23  shortly after your termination there, page 359?
24    A.    Okay.
25    Q.    It was one week after you were fired, correct?

ORAL DEPOSITION OF AMALIA PEREZ

## Page 205

1   A.   Yes.
2   Q.   Okay.  And you previously telephoned them, I
3 guess, three days after you were fired?
4   A.   Yes.
5   Q.   You're saying that after this incident on
6 May 24th, you're saying within a day or two after that
7 Richard Ascevedo asked you if you would step down?
8   A.   Yes.
9   Q.   And, what, go into the customer service
10 representative job?
11   A.   To be a tire installer again.
12   Q.   You-all had tire installers there?
13   A.   I started as a tire installer.
14   Q.   But I mean, they had people there at the
15 Harlingen auto shop as just tire installers?
16   A.   Uh-huh.
17   Q.   Yes?
18   A.   Yes.
19   Q.   They weren't authorized to do mechanic work,
20 just tires?
21   A.   They can install like an alternator or starter,
22 shocks.
23   Q.   So you're saying Richard told you -- or asked
24 you if you would step down?
25   A.   Yes.

## Page 206

1   Q.   And go into a tire changer position?
2   A.   Yes.
3   Q.   And you said no?
4   A.   Yes, sir.
5   Q.   Did he threaten you with termination at that
6 time?
7   A.   Yes, sir.
8   Q.   The form itself said if you continue to do it,
9 you could be fired, correct?
10   A.   Yes, sir.
11   Q.   Okay.  And then you said that other technicians
12 had done mishaps and not been asked to step down or even
13 threatened to be terminated.  Then it says Richard told
14 me, quote, "unfortunately, he was going to make an
15 example of me"?
16   A.   Correct.
17   Q.   He told you that?
18   A.   Yes, sir.
19   Q.   And then it says, "I told him to do what he had
20 to and that I had seen an attorney."
21   A.   Yes.
22   Q.   So you told him that at the end of May?
23   A.   No.  I believe he wanted -- I think when I told
24 him that I had an attorney, he went and talked to Dave
25 Grebb.

## Page 207

1   Q.   I just want to know.  In your letter here
2 you're talking about the first write-up, which is May
3 25th or May 29th?
4   A.   The truck, yes.
5   Q.   Yeah, the truck.  At the end of May 2002.  Is
6 that when you told him that you had already seen an
7 attorney?
8   A.   Yes.
9   Q.   Okay.  And what did he say then?
10   A.   He went to talk to Dave Grebb and Dave Grebb
11 apparently told him that for me not to do any work in
12 the shop, I was going to be getting paid my mid pay,
13 which was $10 an hour.  And he told me that he wanted an
14 answer as to what I was going to do.  And I told him
15 I'll need some time to think about it.  And that's when
16 I told him that I had decided not to step down.
17   Q.   Okay.  Here -- you know, we've already looked
18 at this Exhibit 18 that you wrote up about this incident
19 with the customer Lordon?
20   A.   Yes.
21   Q.   And I just wondered, you're saying that you got
22 approval to do what you did from Mary and from the
23 assistant store manager?
24   A.   I went and I informed Mary --
25   Q.   Okay.

## Page 208

1   A.   -- and she told me she was going to ask the
2 assistant manager.
3   Q.   So you didn't actually talk to the assistant
4 manager yourself?
5   A.   No.  She went and asked.
6   Q.   How come you didn't mention that in your
7 written statement?  Well, is it true you didn't mention
8 that in your written statement, that anybody approved
9 this?
10   A.   I don't know.  I just didn't think of it at the
11 time, I guess.  But I did talk to Mary and I told her
12 what had happened, and she said, well, I can't approve
13 this.  And she went and talked to that gentleman, that
14 assistant manager, and he said "mark out what she needs
15 and get the customer going."
16   Q.   What do you mean mark out what she needs?  What
17 does that mean?
18   A.   Well, I needed a dye set, and I had to mark it
19 out from the store to use it, and the price was $100.
20   Q.   Okay.  And were you going to charge the
21 customer for this?
22   A.   No.
23   Q.   Why not?
24   A.   It was going to be for store use.
25   Q.   Because you needed that to make this new bolt?

### ORAL DEPOSITION OF AMALIA PEREZ

#### Page 209

1    A.    The threads.
2    Q.    To rethread this -- jerry-rigged he bolt?
3    A.    Yes.
4          MR. ZAYAS:  Did you say jerry-rigged?
5          MR. OBERTI:  I said it.
6    Q.    (By Mr. Oberti)  So Mary came back and said the
7 assistant store manager approved that?
8    A.    Yes.
9    Q.    But I mean, what were you seeking approval of,
10 to do that, to get the dye set?
11    A.    Yes.
12    Q.    Okay.  That's different than seeking approval
13 to --
14    A.    I explained to Mary what needed to be done in
15 order to get this customer to go.
16    Q.    Okay.  Does Mary have a mechanical background?
17    A.    I don't know.
18    Q.    Okay.  In this letter here you say apparently,
19 referring to the -- referring to that alternator
20 bracket, you said, "Apparently it was cracked, but I was
21 blamed for it."  Do you see that?  You have some
22 highlighted parts, too.  You're not supposed to have
23 them.
24    A.    Maybe the word "apparently" wasn't appropriate,
25 but it was cracked.

#### Page 210

1    Q.    You saw where I was going there.  You're pretty
2 smart, right?
3    A.    Somewhat.
4    Q.    Okay.  Have you ever taken an I.Q. test?
5    A.    No.  Am I going to have to?
6          MR. ZAYAS:  No.
7    Q.    (By Mr. Oberti)  No, we won't push for that.
8 Now, how did you get this ticket from 12-19-2002 that
9 you gave to the EEOC?
10    A.    A salesperson gave it to me.
11    Q.    Who?
12    A.    I don't remember.
13    Q.    You have to say.
14    A.    I have to say?  Why?
15    Q.    Well, because you're under oath here, and this
16 is our opportunity to get --
17          MR. ZAYAS:  You have to say if you
18 remember, is what he means.
19    A.    I have to say if I remember?
20    Q.    Yeah.  In other words, if you remember, you
21 can't say "I don't remember."
22    A.    I don't recall.
23    Q.    Okay.  364 and 365, is this another letter you
24 sent in to the EEOC?  This one is dated December 21st,
25 2002?

#### Page 211

1    A.    364?
2    Q.    And 365.
3    A.    Yes, sir.  It says December 19th.
4    Q.    December.  No.  Up at the top it says December
5 21st, correct?
6    A.    Oh, okay.  Yes.
7    Q.    Who's the office manager?  Is that different
8 than the assistant manager?
9    A.    At Sears?
10    Q.    Yeah.
11    A.    Yes.
12    Q.    Who was the office manager?
13    A.    Maybe I wrote them -- let's see, I don't
14 remember his name.
15    Q.    Okay.  366, this is the Lordon ticket, correct?
16    A.    Yes.
17    Q.    And that's your number there under tech?
18    A.    Yes, sir.
19    Q.    Okay.  And there's a number of pages that go
20 with this.  They go all the way up to 372, correct,
21 or -- yeah, 372, correct?
22    A.    374 and 373.
23    Q.    It looks like they go up -- 373 and 374 is
24 Talavera.  The ones we're looking at now up to 372 are
25 all Lordon, correct?

#### Page 212

1    A.    Yes.
2    Q.    Okay.  And where did you tell him anything
3 about -- you said you wrote on here on the ticket about
4 how dangerous it was.
5    A.    It wasn't on the ticket, it was on the printout
6 on the specs of the alignment.
7    Q.    Do you have that?
8    A.    I gave it to the CSA, and she didn't know where
9 she placed it.
10    Q.    So you didn't have that to give to the EEOC?
11    A.    No.
12    Q.    Okay.  And the CSA, you called her back after
13 you were fired and asked her to see if you could get
14 that so you could give it to the EEOC?
15    A.    Yes.
16    Q.    And who was that?
17    A.    It was Yolanda McCormick, which originally was
18 the salesperson on this ticket.
19    Q.    Okay.  And then the next one, 373, 374, that's
20 the Talavera ticket, correct?
21    A.    Yes.
22    Q.    And, in fact, that's your tech number on the
23 ticket, correct?
24    A.    Yes.
25    Q.    And it looks like it's dated -- the work was

ORAL DEPOSITION OF AMALIA PEREZ

## Page 213

1  done in --
2      A.    July.
3      Q.    -- July 12th, 2002, correct?
4      A.    Yes, sir.
5      Q.    Okay. Where did you get this ticket? Where
6  did you get all these tickets that you attached here?
7  The --
8      A.    On some of them I --
9      Q.    -- Lordon and Talavera?
10     A.    This one, Yolanda McCormick gave it to me.
11     Q.    The Talavera?
12     A.    No.
13     Q.    Lordon?
14     A.    Right.
15     Q.    Talavera, who gave you that one?
16     A.    This one, I had a -- I always kept copies of
17 tickets that I did.
18     Q.    Personal copies?
19     A.    (Witness nods her head affirmatively.)
20     Q.    Yes?
21     A.    Yes.
22     Q.    Did anybody at Sears approve you to do that?
23     A.    No.
24     Q.    Then why did you do that?
25     A.    So in case if I would have a comeback, I would

## Page 214

1  know which customer we're talking about.
2      Q.    Okay. And then you submitted a bunch of
3  statements to the EEOC from -- well, three of them from
4  Joe Colton, Gordon Woodward, and Juan Rodriguez singing
5  your praises, correct?
6      A.    Yes.
7      Q.    Is Eddie Salinas still there?
8      A.    Yes.
9      Q.    And you're saying he hurt his back near the end
10 of October 2002?
11     A.    That's what he told me.
12     Q.    Gabriel Aranda is about 26 years old?
13     A.    Yes.
14     Q.    Eddie Salinas is about 33?
15     A.    Yes, sir.
16     Q.    And it says that Mr. Ascevedo quit on or
17 about -- I'm reading from page 383 and 384. It says,
18 "Mr. Ascevedo quit on or about 12-13-02. He knew in
19 September that upper management wanted to get rid of
20 him."
21     A.    There was comments.
22     Q.    How do you know that upper management wanted to
23 get rid of Ascevedo in September and that he knew about
24 it?
25     A.    There was talk, I believe. I don't remember if

## Page 215

1  Mr. Rodriguez had told me something about that.
2      Q.    Who?
3      A.    Juan Rodriguez.
4      Q.    Oh, that's where you got that from?
5      A.    He mentioned something about him trying to get
6  work somewhere else because they were watching him
7  closely.
8      Q.    Juan told you that?
9      A.    Uh-huh.
10     Q.    Yes?
11     A.    Yes.
12     Q.    Did he tell you who was watching him closely?
13     A.    No.
14     Q.    So apparently you were actually at the Sears
15 store getting work done on your car on December 19th,
16 2002, correct?
17     A.    December 19th?
18     Q.    Yeah. Remember, we saw a ticket for your own
19 car?
20     A.    Oh, okay. An oil change?
21     Q.    Yeah.
22     A.    I do my oil changes there.
23     Q.    Well, you had told the EEOC that Mike Guerrero
24 had broken a tire rod on December 19th, 2002. Do you
25 remember that?

## Page 216

1      A.    Uh-huh.
2      Q.    Yes?
3      A.    Yes.
4      Q.    And you knew -- and you're saying you got that
5  information when you were up at the Sears store getting
6  your car done that day, getting your oil changed that
7  day?
8      A.    I think they were -- they told me about that.
9      Q.    Who?
10     A.    One of the salespersons or one of the
11 technicians.
12     Q.    When you were up there that day?
13     A.    Right.
14     Q.    Okay. I mean, the truth of the matter is since
15 it wasn't your job, you don't really know what Mike --
16 what mistakes were or weren't, and you don't know all
17 the details of how serious they were, correct?
18     A.    Not all of them.
19     Q.    I mean, you would need to know all that in
20 order to make an accurate comparison between yourself
21 and Mike, correct?
22     A.    Yes.
23     Q.    Where did -- he went to Texas State, too?
24     A.    Yes.
25     Q.    Were you-all there at the same time?

ORAL DEPOSITION OF AMALIA PEREZ

## Page 217

1  A.  No.
2  Q.  Okay.  Exhibit 40, do you remember you filed
3 for unemployment?
4  A.  Yes.
5  Q.  And do you remember Sears contested it?
6  A.  Yes.
7  Q.  Did you ever have to go through a hearing?
8  A.  Yes.
9  Q.  Was there anybody from Sears on the phone line?
10  A.  Never.
11  Q.  Okay.  Do you remember people from the Texas
12 Workforce Commission calling you on the phone and taking
13 statements from you?
14  A.  Yes.
15  Q.  Okay.  If you turn to page 536, do you see here
16 it says, "Statements from Amalia Perez.  Why were you
17 fired?  Reason you were given."  Did you tell the
18 workforce commission, "I was told that I was fired
19 because they considered me a liability"?
20  A.  Correct.
21  Q.  And then it says, "name and title of person who
22 fired you: Dave Grebb, store manager," correct?
23  A.  Yes.
24  Q.  And then it says, "Was there a final instant
25 that led to termination, yes or no?"  You said yes,

## Page 218

1 correct?
2  A.  Yes.
3  Q.  And it says, "If yes, explain."  You said,
4 "They were blaming me or blaming for some work that was
5 done there," correct?
6  A.  Yes.
7  Q.  And it says, "Yes.  Did you have prior
8 warnings, yes or no?"  You said, "Yes, for an alignment
9 on a car," correct?
10  A.  I had noticed that it said car.  It was
11 basically that it was supposed to be a truck.
12  Q.  Okay.  All right.  Then it says, "Did you do
13 it?"  And you said, "yes"?
14  A.  I was referring to the truck.
15  Q.  Okay.  So when you said "yes, I did it,"
16 meaning you're guilty of that offense, correct?
17  A.  Well, I had already signed that paper.
18  Q.  Okay.  So you figured it's kind of too late to
19 fight about it now?
20  A.  Correct.
21  Q.  How long did you collect unemployment?  Never
22 mind.  I think that information is somewhere else.
23 We'll get to that.  They cut it off for a while because
24 you were considered temporarily disabled from any work;
25 is that right?

## Page 219

1  A.  Well, they contested it so I didn't get
2 unemployment until about March, so I didn't have any
3 income whatsoever until my pension came in.
4  Q.  Okay.  Let's see here.  Okay.  Here we go.  It
5 says you received $289 a week from unemployment benefits
6 and they -- even though they didn't start paying you
7 until March 1st, 2003, they backdated it starting from
8 November 23rd, 2002, correct?
9  A.  Yes.
10  Q.  And then you received the $289 per week for how
11 many weeks?
12  A.  It wasn't that long because I called the
13 workman's comp, and I told them that I didn't feel I
14 should be getting unemployment benefits because I was
15 going to therapy, and that I felt that they were the
16 ones that should be paying me.  And the lady, LaTricia
17 Hayes, she looked into it, and she said I was right.
18 And that's when they sent me the $6,000.
19  Q.  That was the one percent impairment body
20 rating?
21  A.  Yes.
22  Q.  Okay.  And when did you actually receive that
23 $6,000?
24  A.  March, April.
25  Q.  Okay.  Exhibit No. 42, page 131, do you

## Page 220

1 remember some investigator from Liberty Mutual came out
2 to talk to you in March of 2003?
3  A.  Yes.
4  Q.  Okay.  He just kind of popped in?
5  A.  Yes.
6  Q.  Okay.  And it says here that you received
7 social security income benefits after your termination.
8 Is that true?
9  A.  Social security?
10  Q.  SSI, it stands for social security income.
11  A.  No.        o th
12  Q.  That's wrong?
13  A.  That's wrong.
14  Q.  He must be talking about workers' comp,
15 correct?
16  A.  Yes.
17  Q.  The lump sum of $6,188, that's workers' comp,
18 not social security, correct?
19  A.  Correct.
20  Q.  Did you -- have you had workers' comp injuries
21 or on-the-job injuries at other employers other than
22 Sears?
23  A.  No.
24  Q.  Just Sears?
25  A.  Yes.

**ORAL DEPOSITION OF AMALIA PEREZ**

### Page 221

1  Q.  And this is where I got the page 132 under
2  current employment. It says, "The claimant stated she
3  is currently unemployed." Do you see that?
4  A.  Yes.
5  Q.  And it says, "Claimant stated she was
6  terminated by the insured approximately one week after
7  she was injured. The claimant stated she was told by
8  the manager she was a safety liability."
9  A.  Correct.
10  Q.  Okay. So does that refresh your memory that
11  Grebb said safety liability in the termination meeting?
12  A.  I don't recall him saying safety, but that's
13  what it says there.
14  Q.  Well, let me ask you this: Did you tell this
15  investigator that you were told by the manager you were
16  a safe -- that he had told you --
17  A.  No. I always said the way he said it.
18  Q.  Which is liability?
19  A.  Yes.
20  Q.  Well, did you realize that's what he was
21  talking about, was safety liability?
22  A.  No.
23  Q.  Or what did -- well, did you have any idea what
24  he was talking about when he said liability?
25  A.  Just liability. Made me feel like I was --

### Page 222

1  Q.  Dragging --
2  A.  No good.
3  Q.  Dragging the company down?
4  A.  After supposedly eight years.
5  Q.  Here on page 133 where they say circumstances
6  of injury, it basically says that you told this
7  investigator that even though you hurt your shoulder on
8  November 7th, it didn't really start hurting until the
9  morning of November 16th of 2002. Is that accurate?
10  A.  Well, that's when I called it in.
11  Q.  But I mean --
12  A.  It was on the weekend.
13  Q.  Right. But I mean, between the date you
14  injured the shoulder on November 7th and November 16th,
15  was the shoulder not painful as long as you didn't touch
16  it?
17  A.  Correct. There was a big bruise.
18  Q.  So at that point were you thinking this
19  probably isn't that big of a deal?
20  A.  Correct.
21  Q.  And then -- and you didn't perceive that it was
22  possibly a serious -- more serious injury until November
23  16th --
24  A.  Correct.
25  Q.  -- 2002?

### Page 223

1  A.  Correct.
2  Q.  Okay. So when you reported it to Mary on the
3  7th, did you inform Mary that, you know, you didn't
4  think it was going to be a big deal?
5  A.  Correct.
6  Q.  Okay. And you had no reason to change that
7  opinion until November 16th?
8  A.  When I couldn't even turn.
9  Q.  Okay. It was that bad?
10  A.  Yes.
11  Q.  All right. It says here on page 134 that you
12  said that your normal job duties required 100 percent
13  standing. Is that correct?
14  A.  For Sears?
15  Q.  Yeah.
16  A.  Yes.
17  Q.  And if you averaged it out between your $7.01
18  an hour and your commission, would it average out to
19  about $13 an hour at the time you were let go?
20  A.  Roughly, yes.
21  Q.  More or less depending on the circumstances?
22  A.  Yes, sir.
23  Q.  On page 135, did you ever tell the investigator
24  that the doctor gave you an impairment rating of 20
25  percent?

### Page 224

1  A.  That's when Dr. Torres had commented to me.
2  Q.  And then subsequently it was after this you
3  were found to have -- you were just awarded the one
4  percent?
5  A.  Correct.
6  Q.  Have you ever applied for social security
7  disability benefits?
8  A.  No.
9  Q.  And then for light duty, it says, "The claimant
10  stated she couldn't return to work if modified light
11  duty was available. The claimant stated she has spoken
12  to her doctor about the possibility of modified light
13  duty, and he has released her to return to work. The
14  claimant stated she has not spoken to her supervisor at
15  the insured." Did I read that correctly?
16  A.  The supervisor, which meaning who?
17  Q.  Well, the insured is Sears, which obviously you
18  weren't even working there anymore, right?
19  A.  Correct.
20  Q.  I guess, do you feel as though -- are you --
21  have you been medically released to return to do your
22  job at Sears full duty?
23  A.  From the doctor? Yes.
24  Q.  Do you enjoy woodworking?
25  A.  Yes.

## ORAL DEPOSITION OF AMALIA PEREZ

### Page 225

1    Q.   Any other hobbies?
2    A.   Just collecting movies.
3    Q.   Movies?
4    A.   Movies.
5    Q.   On DVD or something?
6    A.   Yes, VHS.
7    Q.   Like what? Any particular genera? Horror?
8 Romance?
9    A.   Comedy, drama.
10   Q.   What's the best comedy you've ever seen?
11 Something About Mary?
12   A.   Super Star.
13   Q.   I haven't seen that one. Okay. Who's that?
14 Jerry Lewis?
15   A.   No.
16   Q.   Okay. Moving on here. Did you -- so when did
17 you first receive any income after you were fired, from
18 any source?
19   A.   I believe it was in December.
20   Q.   What did you get?
21   A.   I think it was my retirement or my pension or
22 something.
23   Q.   All right. So around $5,000?
24   A.   Yes, sir.
25   Q.   You had to cash that out and take the penalty?

### Page 226

1    A.   Yes, sir.
2    Q.   And then you didn't get anymore money until,
3 what, March?
4    A.   Correct.
5    Q.   When you started getting unemployment?
6    A.   Correct.
7    Q.   All right. And then either that month or the
8 next month or so, you got the roughly $6,000 from the
9 workers' comp?
10   A.   Correct.
11   Q.   Okay. And then when did you get your first --
12 your first job you got here in June of 2003, correct?
13   A.   Correct.
14   Q.   Where you worked at Giddyap Services, Inc. from
15 June 2003 to August 2003?
16   A.   Yes.
17   Q.   And you left that job to take the job at
18 Spherion?
19   A.   Yes.
20   Q.   Okay. You had to vacate your apartment on
21 May 1st, 2003 due to financial problems?
22   A.   Correct.
23   Q.   Did you -- were you at the end of a lease?
24 Were you on a lease?
25   A.   Close. It was until July.

### Page 227

1    Q.   It was going to expire?
2    A.   From my physical address where I was at first
3 when employed with Sears was at -- on Seventh Street,
4 and I had to vacate that one.
5    Q.   Did the landlord come after you for the extra
6 two months?
7    A.   I left on good terms.
8    Q.   Okay.
9    A.   He knew I was unemployed.
10   Q.   But you had two more months left on the lease,
11 correct?
12   A.   I left that place in -- I gave him notice in
13 June that I would be vacating July 31st.
14   Q.   So by the time you vacated, your lease had
15 expired?
16   A.   Yes.
17   Q.   Then where did you move to?
18   A.   I moved to 1605 High Street. As a matter of
19 fact, it was Mr. Vallejo's house.
20   Q.   Who's Mr. Vallejo?
21   A.   He used to be a salesperson at Sears.
22   Q.   And then you moved in there renting?
23   A.   Renting. But I couldn't pay the rent. I
24 couldn't find work.
25   Q.   So then what happened? Well, you were working

### Page 228

1 at Spherion?
2    A.   I had just started.
3    Q.   Okay.
4    A.   I was already behind on the rent.
5    Q.   Okay. So how long did you live there?
6    A.   Three months. From there, I --
7    Q.   Did you sign a lease? Or were you just living
8 there?
9    A.   I was just living there.
10   Q.   So from there, where did you go?
11   A.   I didn't have anywhere to go. I finally called
12 an ex-coworker if she would have a little compassion and
13 let me stay at her place.
14   Q.   Who's that?
15   A.   Isabel Degastry.
16   Q.   Where does she work now?
17   A.   She works at Los Fresnos Independent School
18 District.
19   Q.   As a teacher?
20   A.   No. She works in the cafeteria.
21   Q.   Okay. And are you still there?
22   A.   No.
23   Q.   How long did you live there?
24   A.   I was there until March.
25   Q.   Of '04?

ORAL DEPOSITION OF AMALIA PEREZ

### Page 229

1   A.   Yes.
2   Q.   And then what happened?
3   A.   It got to where it was getting so hectic going
4  back and forth to McAllen from San Benito, and so I
5  moved to my house in Edinburg.
6   Q.   How long have you owned the house in Edinburg?
7   A.   Since my parents passed away.
8   Q.   You inherited it?
9   A.   Yes.
10   Q.   What year was that that you inherited it?
11   A.   In '91.
12   Q.   And had you been renting it out since then?
13   A.   Yes.
14   Q.   Okay.  And so did you have to kick out some
15  tenants for you to move in?
16   A.   No, just things fall in place, I guess, and the
17  tenants moved out on their own.  But they left the house
18  in bad shape, and I didn't have the money to fix it.  So
19  I moved.
20   Q.   So you're not living at your house anymore?
21   A.   I'm living there.
22   Q.   Okay.
23   A.   So I didn't rent the house.  The house needs
24  work.
25   Q.   Do you need to take a break?

### Page 230

1   A.   No.
2   Q.   Let me know if you do.  So you moved back to
3  your house in March of this year?
4   A.   In April the 1st I was there.
5   Q.   Okay.  How much had you been renting it out
6  for?
7   A.   For $385.
8   Q.   And how far is -- is it Edinburg or
9  Edinborough?
10   A.   Edinburg.
11   Q.   How far is Edinburg from your job?
12   A.   It's about 18 miles.
13   Q.   Okay.  That's not too bad, is it?
14   A.   No.
15         MR. ZAYAS:  Not in Houston standards.
16   Q.   (By Mr. Oberti)  What type of car do you drive?
17   A.   I have a 1998 Chevy pickup, LS.
18   Q.   Is that what you had when you were working at
19  Sears at the end?
20   A.   Yes.
21   Q.   Chevy pickup LS?
22   A.   S-10.
23   Q.   Okay.  Is it in good shape?
24   A.   Yeah.
25   Q.   How many miles on it?

### Page 231

1   A.   About 88,000.
2         MR. ZAYAS:  She gets her maintenance done
3  at Sears.  What do you think?
4         MR. OBERTI:  I object.
5   Q.   (By Mr. Oberti)  So have you ever thought about
6  maybe selling that house in Edinburg?
7   A.   Where would I go?
8   Q.   Okay.  So have you thought about it and ruled
9  it out?
10   A.   I came close to selling it when I was
11  unemployed.
12   Q.   How much is it worth, do you know?
13   A.   About $39,000.
14   Q.   Okay.  And so you're saying that because of
15  your financial difficulties, you were going to lose the
16  house?
17   A.   Yes.
18   Q.   And that's what stimulated this new bankruptcy
19  filing?
20   A.   Yes.
21   Q.   And is the house under a mortgage still?
22   A.   It was under mortgage.  I tried to pay off some
23  of my bills.  It needed a new roof.
24         MR. ZAYAS:  Did you get a home equity loan
25  or what?

### Page 232

1         THE WITNESS:  Yes.
2         MR. OBERTI:  A what?
3         MR. ZAYAS:  Home equity loan.
4         MR. OBERTI:  Oh, I didn't think you could
5  do that in Texas.  They changed that law.
6         MR. ZAYAS:  No, you can now.
7   Q.   (By Mr. Oberti)  So you -- the house was paid
8  for when your parents passed away?
9   A.   Yes.
10   Q.   But then you had to take out a new loan against
11  the house to fix the roof?
12   A.   The roof and pay taxes that my father never
13  paid.
14   Q.   And how much is the loan?  Originally how much
15  was the balance when you took it out?
16   A.   About $23,000.
17   Q.   And how much is still left owing on it?
18   A.   About the same because I had to refinance.
19   Q.   Who's the lender?
20   A.   Citi Financial.
21   Q.   Have they been reasonable in trying to work
22  with you or have they been onerous?
23   A.   Calling me all the way up to 9 o'clock.  The
24  phone was constantly ringing.
25   Q.   Did you tell them to refer all calls to Richard

ORAL DEPOSITION OF AMALIA PEREZ

**Page 233**

1 Zayas?
2    A.    I wish.
3              MR. ZAYAS:  Thanks.
4    Q.    (By Mr. Oberti) All right.  So that's where
5 you're living at right now?
6    A.    Yes.
7    Q.    And how much were you getting paid by Spherion
8 per hour?
9    A.    $8.25.
10    Q.    $8.25.  Okay.  And then so you worked at
11 Spherion from August 2003 until --
12    A.    December 8th.
13    Q.    Okay.  And then you became --
14    A.    Jabil employee on December 8th.
15    Q.    Okay.  And how much do you make there again?
16    A.    $8.50.
17    Q.    $8.50.  And there's no commission or bonus or
18 anything?
19    A.    Overtime and the bonus, they haven't been that
20 good.  $62 was the last one I got.
21    Q.    How often do you get them?
22    A.    On a quarterly basis.
23    Q.    So the last quarter you got $62?
24    A.    Correct.
25    Q.    What's that based on, company performance?

**Page 234**

1    A.    I don't know.
2    Q.    What's the most -- well, you've only been
3 there -- I guess you've been there, what, three quarters
4 now?
5    A.    I've only gotten two checks.
6    Q.    Well, how much was the other one?
7    A.    $107.
8    Q.    Have you been looking for any new work, or do
9 you feel like you're going to stay at Jabil?
10    A.    I believe that I'll be staying there.  It's
11 getting harder to find work.
12    Q.    Can you pay your bills and live on what you
13 earn at Jabil?
14    A.    If you want to live from check to check and not
15 have any social life.
16    Q.    And what do you do over there at Jabil?  What
17 is your job?
18    A.    I'm a warehouse clerk.  I fill orders and pack
19 computer drives.
20    Q.    Have you applied for any mechanic type work
21 since you left, since you were terminated by Sears?
22    A.    Yes.
23    Q.    Like where?
24    A.    I applied at Goodyear.  They were considering
25 hiring me, but I was desperate for a job, and I took the

**Page 235**

1 first one that called me.
2    Q.    Would that type of work usually pay more?
3    A.    Automotive?
4    Q.    Yeah.
5    A.    Yes.
6    Q.    Would you be willing to go back into that job,
7 that type of work even though it's stressful on your
8 back and everything?
9    A.    With Sears?
10    Q.    No.  With some other company?
11    A.    Sure.  It pays good.
12    Q.    How come you haven't applied then?  Just no
13 time since you're so busy working for Jabil?
14    A.    Well, because the question there, it says have
15 you ever had back injuries.
16    Q.    For their applications?
17    A.    Yes.  Nobody is going to hire me.
18    Q.    Well, have you been actually turned down for
19 any jobs because of your back injuries?
20    A.    Yeah.  I applied, and it wasn't mechanical
21 work.  It was at O'Reilly's as an inventory clerk, and
22 the gentleman told me because of the back, he couldn't
23 risk it.
24    Q.    Was this before or after he made you a job
25 offer?

**Page 236**

1    A.    Well, when I went --
2              MR. ZAYAS:  Objection, form.  You're
3 assuming that there was a job offer made.
4    Q.    (By Mr. Oberti) Did he make you a job offer?
5    A.    I went and applied.  I heard there was an
6 opening.
7    Q.    He never made you an offer?
8    A.    No.
9    Q.    But he told you the reason he's turning you
10 down is because of your back problems?
11    A.    (Witness nods her head affirmatively.)
12    Q.    How did he know about the back problems?
13    A.    Because I don't lie on the applications.
14    Q.    You're saying the application itself asks for
15 information about prior back injuries?
16    A.    Correct.
17    Q.    All right.  And this was O'Reilly's Auto Parts?
18    A.    Yes.
19    Q.    So have you actually been like screened by any
20 doctor for -- or medical professional for any job you
21 applied for?
22    A.    No.
23    Q.    Did you -- what about the Goodyear opportunity?
24 You said they were considering hiring you?
25    A.    The gentleman wanted to hire me.

## ORAL DEPOSITION OF AMALIA PEREZ

### Page 237

1    Q.    Did he know about the prior back problems?
2    A.    No, because I didn't fill out an application.
3 And the reason I found out about the that was through an
4 ex-employee from Sears.
5    Q.    What?
6    A.    That they were hiring at Goodyear.
7    Q.    Okay. You won Employee of the Month at Jabil
8 in June?
9    A.    Yes, sir. And I'm getting it again.
10    Q.    For October?
11    A.    Yes, sir.
12    Q.    Great. What do you get for that?
13    A.    A $25 gift card at Wal-Mart, a T-shirt, a
14 plaque, and a parking space.
15    Q.    A special parking place?
16    A.    Right in front.
17    Q.    Right in front? Right next to the president of
18 the company?
19    A.    Not the president, but right in front of the
20 door to go in.
21    Q.    How big is this Jabil Global?
22    A.    It's huge.
23    Q.    Is it like an international company or a
24 national company? Do you know?
25    A.    I don't know about that. It's a big warehouse.

### Page 238

1         MR. ZAYAS: You mean huge -- go ahead.
2    Q.    (By Mr. Oberti) Do you know how many employees
3 they have roughly? Hundreds? Thousands?
4    A.    No. About 90.
5    Q.    So when did your -- are you saying that you're
6 not covered under workers' comp anymore for your
7 shoulder injury?
8    A.    For my back, my shoulder, my wrist, anything.
9    Q.    Who told you that?
10    A.    Well, when I called in to give my refill on my
11 prescription, they told me they closed the case.
12    Q.    Who?
13    A.    LaTricia from workman's comp.
14    Q.    LaTricia with Liberty Mutual?
15    A.    (Witness nods her head affirmatively.)
16    Q.    Yes?
17    A.    Yes.
18    Q.    And when did this occur?
19    A.    I think it was in December or January.
20    Q.    Of '03 or '04?
21    A.    Yes.
22    Q.    Okay. And did you ask her why?
23    A.    No, because she had already said no. And who
24 am I to argue with a company?
25    Q.    Well, you're doing that here, right?

### Page 239

1    A.    (Witness nods her head affirmatively.)
2    Q.    Anyway, so you earned about $7500 in 2003, as I
3 recall; is that correct?
4    A.    7500 hours?
5    Q.    $7500 in 2003 from actual employment, correct?
6    A.    Oh, yes.
7    Q.    Okay. If you go here to -- I think I'm done
8 with that binder now.
9         MR. ZAYAS: We're going to Binder 2.
10         MR. OBERTI: We're going to Binder 2, but
11 hopefully we're almost done.
12         MR. ZAYAS: He likes asking a lot of
13 questions.
14         THE WITNESS: Some of them are
15 repetitious.
16         MR. ZAYAS: It's his job. He's got to do
17 his job.
18    Q.    (By Mr. Oberti) If I -- if I already asked the
19 question, just tell me I already asked it. I don't do
20 it on purpose.
21         All right. The other binders -- okay.
22 Interrogatory No. 5. So according to interrogatory
23 No. 5, I just want to confirm you got $289 a month -- or
24 $289 a week between November 23rd, 2002 and March 1st,
25 2003 in unemployment benefits, correct?

### Page 240

1    A.    Yes, sir.
2    Q.    Have you gotten any other unemployment benefits
3 since then?
4    A.    No, sir.
5    Q.    Have you applied?
6    A.    No, sir.
7    Q.    And then you cashed out your Sears pension. It
8 turns out to be a net payment of $4,440.94 on
9 December 17th, '03, correct?
10    A.    Yes, sir.
11    Q.    And then you got workers' compensation checks,
12 it looks like, from March until April 2nd, 2003 of --
13 well, I'm sorry, from March 14th, 2003 to April 2nd,
14 2003 you got four workers' compensation temporary income
15 benefit checks of -- one of $385.57, another one of
16 385.57, another one of $362.30, another one of $214.84,
17 correct?
18    A.    Yes, sir.
19    Q.    And you got the lump sum of $6,188.27, correct?
20    A.    Yes, sir.
21    Q.    Do you have a treating doctor now? Is it Juan
22 Torres?
23    A.    No.
24    Q.    When was the last time you've seen a doctor?
25    A.    He was the last one.

ORAL DEPOSITION OF AMALIA PEREZ

## Page 241

1    Q.    When was -- when did you see him last?
2    A.    February, I believe.
3    Q.    Were you getting cortisone shots?
4    A.    Cortisone, no.
5    Q.    And interrogatory No. 11, is there any other
6  jobs that you applied for other than the ones listed
7  here?
8    A.    Where is that?
9    Q.    It's interrogatory No. 11. Keep on going. It
10  says you were terminated by Sears. Any other positions
11  or companies that you've applied with for jobs since --
12    A.    No.
13    Q.    These are all of them, correct?
14    A.    Yes, sir.
15    Q.    Do you know what the case number is on your new
16  bankruptcy case?
17    A.    No, I don't.
18    Q.    So as far as the difference between what you
19  were making per year, if you annualize it at Sears, and
20  what you make now at Jabil, would you say that that
21  would equal out to about $8,000 a year difference?
22    A.    I couldn't honestly answer that because I
23  haven't been there a complete year yet.
24    Q.    But I mean, if you extrapolate it out from what
25  you've made so far. If you're making about $8.50 an

## Page 242

1  hour at Jabil, and you were making about -- you say
2  about $13 an hour at Sears, then that's a $5 an hour
3  difference, times 2,000 hours, that's $10,000?
4    A.    Correct.
5    Q.    Okay. And then --
6            MR. ZAYAS: $10,000. I think you said
7  hours.
8    Q.    (By Mr. Oberti) $10,000 per year difference,
9  correct?
10    A.    Yes.
11    Q.    Have you ever taken any medication or drugs for
12  depression or stress or any other psychiatric malady?
13    A.    I can't afford it.
14    Q.    So the answer is no?
15    A.    No.
16    Q.    Never taken like Zoloft or Prozac?
17    A.    No.
18    Q.    And since you were terminated, did you take up
19  any bad habits like drinking, smoking?
20    A.    No.
21    Q.    Running with a rough crowd?
22    A.    No.
23    Q.    How is your health other than the back and the
24  shoulder?
25    A.    It's good.

## Page 243

1    Q.    And you never had any sort of like mental
2  breakdown or anything like that --
3    A.    No.
4    Q.    -- in your life?
5    A.    No.
6    Q.    Okay. When you got terminated, though, I
7  imagine that caused some stress?
8    A.    Yes.
9    Q.    Did you cry?
10    A.    Yes.
11    Q.    That day?
12    A.    Yes.
13    Q.    What about since that day about, you know, what
14  happened, getting terminated from Sears?
15    A.    I still do sometimes.
16    Q.    Frustrated by it?
17    A.    Yes.
18    Q.    Anxious about the future?
19    A.    Very much.
20    Q.    I don't want to beat a dead horse, but does
21  that pretty much accurately characterize your mental
22  anguish from your termination; anger, frustration,
23  anxiety and --
24    A.    Well, there was a time when --
25    Q.    Is that accurate?

## Page 244

1    A.    -- I even prayed for God to take me.
2    Q.    To take you away from this earth?
3    A.    Yes.
4    Q.    Did you ever contemplate -- you didn't actually
5  ever contemplate doing yourself in, did you?
6    A.    No. It's a sin to do that.
7    Q.    Right. Are you Catholic?
8    A.    Yes.
9    Q.    Me, too. Do you go to church pretty regularly?
10            MR. ZAYAS: I knew I liked you for a
11  reason.
12    Q.    (By Mr. Oberti) Do you go to church pretty
13  regularly?
14    A.    Not very regularly, but I do go.
15    Q.    You know, obviously life is a gift from God,
16  and to destroy a gift from God would be a sin?
17    A.    Yes.
18    Q.    So anything else as far as your mental anguish
19  goes?
20    A.    Humiliated, embarrassed. I never thought I
21  would wind up with nothing, having to sleep in a
22  four-by-eight.
23            MR. OBERTI: Why don't we take a break.
24            (A recess was taken.)
25    Q.    (By Mr. Oberti) Ms. Perez, let me show you

ORAL DEPOSITION OF AMALIA PEREZ

### Page 245

1  what's been marked as Exhibit 46. Do you recognize this
2  document?
3      A.  Yes, I remember.
4      Q.  And is this a document dated 7-21-02 entitled
5  Performance Plan For Improvement, Performance Memo?
6      A.  (Witness nods her head affirmatively.) By
7  Richard Ascevedo?
8      Q.  And it says reason for memo: "Ignition on
9  vehicle would not turn on after service by Molly.
10 Action needed: Molly needs to be aware of the process
11 to be sure this type event does not happen again. Molly
12 needs to concentrate on what task she is performing."
13 Did I read that correctly?
14     A.  Yes.
15     Q.  Is that Ascevedo's writing?
16     A.  I believe so.
17     Q.  And the section under here under associate's
18 comments, is that your writing?
19     A.  Yes.
20     Q.  And it says, "Red Grand Am was in shop for four
21 tires, checked one, finished tire installed and parked
22 vehicle in other stall. Waiting for alignment. I got
23 the ticket and keys were in the ignition. I drove
24 vehicle for alignment. After alignment, drove vehicle
25 to north parking lot. I placed vehicle in park and key

### Page 246

1  would not come out of the ignition. I turned vehicle on
2  again, and placed it on neutral and turned off to see if
3  key would come out. I started vehicle again and placed
4  in park, turned off, wiggled key, and finally came out.
5  I assumed customer was aware of ignition problem and
6  didn't document it, but in the future I will document
7  everything no matter how minor it may be." Did I read
8  that correctly?
9      A.  Yes.
10     Q.  What's this situation about?
11     A.  The key wouldn't come out.
12     Q.  Okay. But once it finally came out, what was
13 the situation? What happened? Did the ignition break?
14     A.  No.
15     Q.  Okay. Well, do you know why the company had to
16 rent the customer a car from Budget?
17     A.  No.
18     Q.  Was there something to do with lost keys?
19     A.  I don't remember about that.
20     Q.  Okay. Well, why were you -- according to this,
21 it says after you did the work on it, the ignition on
22 the vehicle wouldn't turn on. Had you heard that after
23 you did what you wrote down here, that the customer
24 couldn't start the vehicle? Had you ever heard that?
25     A.  No. The only thing I know is that the keys

### Page 247

1  would not come out, and I wiggled it, and that was it.
2  Finally, the key came out. As far as a rental, I'm not
3  aware of it.
4          MR. ZAYAS:  Let me see the rental.
5      Q.  (By Mr. Oberti)  So you're saying as far as you
6  remember, all you know is that it was some minor little
7  thing where the keys didn't come out for a little while,
8  but then you got them out, and that's the end of it?
9      A.  Yes. And there were other vehicles and we had
10 the same problem, and we wiggled it. And some of them
11 we put lube in the ignition, and they would smooth out
12 the chamber.
13     Q.  But if that's the case, wouldn't you have been
14 curious as to why you were being written up?
15     A.  Again, explain what had happened according to
16 Mr. Ascevedo.
17     Q.  Right. But I mean, there's really nothing of
18 significance that happened if all that happened is it
19 took you a couple extra seconds or a minute to get the
20 keys out, right?
21     A.  Correct.
22     Q.  Did you ever go to Mr. Ascevedo, hey, what's
23 the big deal here?
24     A.  I wasn't aware that there was a rental
25 involved.

### Page 248

1      Q.  Right. But I'm saying since -- you're saying
2  your understanding was simply that it took you a couple
3  extra, what, seconds --
4      A.  Yes.
5      Q.  -- to get the keys out?
6      A.  Yes.
7      Q.  And so weren't you naturally curious when
8  Mr. Ascevedo came and gave you this performance --
9  improvement performance memo? Didn't you go, wait a
10 second, it took me two extra seconds to get the keys
11 out, and you're writing me up for that?
12     A.  I didn't see it that way. It was just
13 something that he wanted me to write.
14     Q.  Okay. Well, were you told that the ignition on
15 the vehicle would not turn on after you serviced the
16 car?
17     A.  No.
18     Q.  Well, when you wrote in your section for
19 associate's comments, was this part already filled out?
20     A.  No, I don't think so, because I know I would
21 have said something.
22     Q.  Okay. Well, the part where you said "I assumed
23 the customer was aware of the problem," what prompted
24 you to write that?
25     A.  The customer came in, and for some reason the

ORAL DEPOSITION OF AMALIA PEREZ

## Page 249

1 keys were in the ignition and -- when I got in the
2 vehicle, they were in the ignition.
3     Q.   Is this your statement as well, that you wrote
4 and signed off on?
5     A.   Yes.
6     Q.   So you never heard anything about that there
7 was anything more to this?
8     A.   No, sir.
9     Q.   Did you remember that the customer's name was
10 Ortega?
11     A.   No.
12     Q.   Let me show you what's been marked as Exhibit
13 No. 47 and ask you:  Is that your written witness
14 statement, and you signed off on July 27th, '02?
15     A.   Yes, I remember this.
16     Q.   Is that your written statement and signature?
17     A.   Yes, sir.
18     Q.   And could you read your statement into the
19 record?
20     A.   You want me to read it?
21     Q.   Yeah.
22     A.   "On Friday, July 26, I saw a vehicle in the
23 battery lane.  I approached the vehicle" --
24         MR. ZAYAS:  Can I take a break?  I have to
25 take this call.

## Page 250

1         MR. OBERTI:  Sure.  Stop reading.
2         (Off the record.)
3     Q.   (By Mr. Oberti)  Go ahead and read that
4 statement, Exhibit 47, into the record.
5     A.   Ready?
6     Q.   Yes.
7     A.   "On Friday, July 26, I saw a vehicle in the
8 battery lane.  I approached the vehicle and noticed that
9 the battery had been checked with the Saber machine and
10 a printout showed battery bad.  Joe, CSA, came and
11 informed me that Johnny Valenzuela had recommended two
12 terminals.  I disconnected the terminals from the
13 battery, cut the old terminals, and replaced them with
14 new ones.  I then installed new battery and proceeded to
15 check with the Saber, the electrical system.  And the
16 results were that the alternator was bad.  I then gave
17 Joe, CSA, the printout results and entered my tech time.
18         Shortly after, I noticed customer arguing
19 with Joe, CSA.  I approached them, and the customer
20 began accusing me of doing something to the alternator.
21 Customer said that the light inside panel was not on for
22 the battery.  I informed him that I really didn't know
23 on account I didn't drive the vehicle inside shop.  I
24 informed him of the things I did, terminals, battery
25 replaced and electrical checked.  Customer continued to

## Page 251

1 insist I was at fault, that I didn't know what I was
2 doing, asked if I was certified, and that he wanted to
3 talk to a manager.  I told him that I was not going to
4 argue with him, and he told me he wanted his alternator
5 fixed.  I informed him Richard Ascevedo, the manager,
6 would be in on Monday, and he could speak with him, and
7 customer got furious at this time.  I decided just to
8 walk away, and Joe stayed with the customer.  Joe
9 informed me he was -- customer real upset with me and
10 was going to get his attorney."
11     Q.   Okay.  Who asked you to provide that statement?
12     A.   Richard Ascevedo.
13     Q.   And do you agree that -- do you know how he
14 learned about this situation?
15     A.   Apparently the customer or the CSA informed
16 him.
17     Q.   Okay.  Do you agree that an irate customer,
18 even if they're not irate for a good reason, that's
19 something legitimate for Sears managers to investigate?
20     A.   Correct.
21     Q.   And did anything else come of this after you
22 provided this witness statement, as far as you know?
23     A.   The alternator was fixed.
24     Q.   But were you disciplined in any way for the
25 interaction with the customer?

## Page 252

1     A.   No.
2     Q.   The customer was yelling at you?
3     A.   Yes.
4     Q.   Angry?
5     A.   Yes.
6     Q.   And you don't think they had any reason to be?
7     A.   No, because in the first place I didn't do the
8 electrical check in the beginning.
9     Q.   Who did?
10     A.   Joe Valenzuela.
11     Q.   Okay.  Were there -- as far as -- did you
12 notice that when Sears submitted their information to
13 the Equal Employment Opportunity Commission, they didn't
14 mention the last two exhibits that we covered?
15     A.   Correct.
16     Q.   Did you ever wonder why not?
17     A.   Those were petty little stuff, you know,
18 something that --
19     Q.   I mean, prior to 2002, you had never received
20 Performance Plan For Improvement Performance Memo,
21 correct?
22     A.   Correct.
23     Q.   And you never had to give all these witness
24 statements, correct?
25     A.   Correct.

ORAL DEPOSITION OF AMALIA PÉREZ

## Page 253

1    Q.    So I mean, when all this started happening, it
2    happened to you four or five different times between May
3    of '02 and when you got terminated, correct?
4    A.    Correct.
5    Q.    Did you start realizing, whoa, something
6    serious is going on around here?
7    A.    Yes.
8    Q.    Did other people have similar write-ups in
9    2002; do you know?
10   A.    I believe Jesse Gracia had a write-up for
11   something that wasn't his fault.
12   Q.    What was that about?
13   A.    He was doing an oil change on a vehicle, and
14   the customer came and accused him of scratching his
15   vehicle.
16   Q.    With a --
17   A.    I don't know. There was -- the scratch looked
18   old.
19   Q.    Okay.
20   A.    But from what I gathered and heard Mr. Acevedo
21   telling Jesse, once a vehicle is in the automotive, it's
22   property of Sears, we have to fix it. So they paid for
23   the paint job.
24   Q.    And what was his name again, Gracias?
25   A.    Yes.

## Page 254

1    Q.    He got written up for some sort of write-up for
2    this?
3    A.    He told him to write something like me.
4    Q.    And he was pretty ticked about it, I imagine?
5    A.    He was very ticked.
6    Q.    Or upset about it?
7    A.    Yes.
8    Q.    Okay. But that's not unusual because there
9    are -- just about all your coworkers thought Ascevedo
10   was an ass?
11   A.    Correct.
12   Q.    And a hard ass?
13   A.    Yes, sir.
14   Q.    And --
15        MR. ZAYAS: Did you say hard ass?
16        MR. OBERTI: Yes.
17   Q.    (By Mr. Oberti) Back to the book there. Go to
18   just a few things there. Go to page 69.
19   A.    (Witness complies.)
20   Q.    Did you keep some sort of diary while you
21   worked at Sears?
22   A.    When Mr. Ascevedo was there, yes.
23   Q.    But before?
24   A.    Never.
25   Q.    When did you start keeping it?

## Page 255

1    A.    After he walked me to my vehicle.
2    Q.    He what?
3    A.    After he walked me to my vehicle.
4    Q.    And --
5    A.    Told me about maybe I should look for different
6    type of work in a different field.
7    Q.    Oh, like you put on that ethics call?
8    A.    Yes.
9    Q.    Okay. And didn't you just tell me you didn't
10   respond to that? Did I ask you about that already?
11   A.    I responded that as far as my work performance,
12   it didn't interfere with it. And if my back gave out
13   again, I would use my vacation.
14   Q.    Okay. But I mean, would you agree with me that
15   it's a legitimate thing for a manager to be concerned
16   about an employee who has as many workers' comp injuries
17   as you had?
18   A.    He didn't know about them.
19   Q.    How do you know he didn't know?
20   A.    Because he was surprised when I told him I had
21   a back injury.
22   Q.    Okay. So when did you tell him, before that
23   conversation at your car or after?
24   A.    After, I believe.
25   Q.    So how did he even --

## Page 256

1    A.    About my injury?
2    Q.    About your back problems, yeah. Was it after
3    the car walk to the car or before?
4    A.    It was during the walk to my vehicle.
5    Q.    Okay. So how would he have any basis to
6    even --
7    A.    He was inquiring about Gabriel and wanted to
8    know things he did. I told him that Gabriel was a brown
9    noser and --
10        MR. ZAYAS: Did you say brown noser?
11        THE WITNESS: Yes.
12   A.    He would try to win him over and --
13   Q.    Seduce him?
14   A.    I don't know about seduce him, but --
15   Q.    Okay.
16   A.    But, you know, if he could get away with stuff,
17   he would do it.
18   Q.    And then how is this leading to the part about
19   your back?
20   A.    It was a conversation -- I don't know how we
21   got into it, just like I hurt my back. And he told me,
22   "You have a bad back?" And I said, "Yeah. Juan
23   Rodriguez knew about it and so forth. And I told him,
24   "Don't worry, you know, I hardly ever miss work, only
25   when it gives out I use my vacation time." That's when

ORAL DEPOSITION OF AMALIA PEREZ

## Page 257

1  he told me. "Well, eventually that's going to run out."
2      Q.    Okay. And then did he say maybe you should
3  look for another type of job?
4      A.    Yes.
5      Q.    Okay. So he said that before he knew -- before
6  he knew you had ever even filed a workers' comp claim,
7  correct?
8      A.    Correct.
9      Q.    Did you and Mr. Ascevedo ever have a
10 conversation about workers' compensation insurance or
11 workers' compensation claims?
12     A.    No.
13     Q.    Did you have access to a copier at work?
14     A.    They had one, but I hardly ever used it.
15     Q.    You're saying you kept tickets. Did you keep
16 the actual original tickets or did you keep copies? And
17 if copies, where did you make all these copies?
18     A.    At the library.
19     Q.    What library?
20     A.    Harlingen Library.
21     Q.    You took the original tickets with you to the
22 library?
23     A.    No. I took the carbon. A lot of the carbons
24 were -- I mean, not the carbons. The carbons were kept,
25 the others were thrown away if the customer didn't take

## Page 258

1  them.
2      Q.    All right. So you'd just keep the carbons?
3      A.    No. The carbons are kept by Sears.
4      Q.    But you'd make copies at the library?
5      A.    Yes, but I didn't take the copies from Sears.
6      Q.    And then you'd, what, return it back to Sears?
7      A.    No. My copies that I sent to the EEOC I made
8  at the Edinburg Library. Copies that I made from Sears,
9  I kept copies for me.
10     Q.    Right.
11     A.    On vehicles that I worked on.
12     Q.    On a regular basis?
13     A.    Yes.
14     Q.    Even before Ascevedo came on?
15     A.    No.
16     Q.    After?
17     A.    After.
18     Q.    Okay. To try and make sure your butt was
19 covered?
20     A.    Yeah. And some tickets I did keep that I, you
21 know, felt that I was going to get a good commission on,
22 and I wanted to know what I had done and so forth.
23     Q.    Well, that's what I want to know. The ones
24 that you kept from right there at the job, did you keep
25 the actual original tickets, a carbon copy, or a copy

## Page 259

1  from a copy machine?
2      A.    It was a copy from the copy machine.
3      Q.    And where was the copy machine?
4      A.    There was one in the office.
5      Q.    All right. But I mean, if you made -- did you
6  make copies of all your tickets?
7      A.    No, not all of them. I didn't take -- I didn't
8  keep copies of every ticket I did.
9      Q.    Well, how would you decide which tickets to
10 keep copies of?
11     A.    The ones that I did like alignments and shocks
12 or stuff like that.
13     Q.    Was it to make sure you got paid your proper
14 commission?
15     A.    Yes.
16     Q.    Okay. Did you always get paid your proper
17 commission?
18     A.    Yes. And sometimes there was a mistake that it
19 wasn't entered or whatever.
20     Q.    Would they --
21     A.    They fixed it.
22     Q.    Okay. All right. Back to this diary issue.
23 So at some point after Richard Ascevedo came on, you
24 started, what, keeping a diary?
25     A.    Uh-huh.

## Page 260

1      Q.    Yes?
2      A.    Basically notes here and there.
3      Q.    Okay. You submitted two pages here to the
4  EEOC, correct?
5      A.    Yes.
6      Q.    Are there more pages that you didn't submit to
7  the EEOC?
8      A.    Yes.
9      Q.    Have you given them to your lawyer?
10     A.    No.
11     Q.    Can you? Do they still exist for you to give
12 to Mr. Zayas?
13     A.    I have to look for the little book.
14     Q.    Okay. Do you think you have it?
15     A.    It should be somewhere.
16     Q.    I mean, is it stuff relating to your job?
17     A.    Stuff relating to my other coworkers like
18 Gabriel. I don't know about Mike.
19     Q.    All right. But I mean, you kept it while you
20 were working at Sears?
21     A.    Yes.
22     Q.    And it was about your job?
23     A.    Yes.
24     Q.    What was going on?
25     A.    Things that were going on, yes.

ORAL DEPOSITION OF AMALIA PEREZ

### Page 261

1    Q.   Did it include stuff away from the job, too,
2  like your personal life or whatever?
3    A.   No.
4         MR. ZAYAS:  Just Sears stuff?
5         THE WITNESS:  Yes.
6    Q.   (By Mr. Oberti)  I think that's responsive to
7  one or more of my requests for production, so if you can
8  give it to Mr. Zayas, he'll send it on to me.  Fair
9  enough?
10   A.   Yes.
11   Q.   Here it says, "October 10, 2002, Richard
12 approved me" --
13   A.   Approached.
14   Q.   -- "approached me while" --
15   A.   "While I was cleaning the batteries."
16   Q.   -- "to be put on sales floor, and he told me to
17 smile."
18   A.   Correct.
19   Q.   I told him, "For what?  And then he told me if
20 I didn't, he'd send me home.  I told him what was
21 important was that I was doing the job.  He walked off."
22   A.   Correct.
23   Q.   Is that what happened?
24   A.   Yes.
25   Q.   And that was October 10th, 2002?

### Page 262

1    A.   Yes.
2    Q.   Did he ever try to send you home?
3    A.   He sent me home.
4    Q.   That day?
5    A.   No.
6    Q.   Other days?
7    A.   But other days he would send me home.
8    Q.   For what?
9    A.   He said he had to cut hours.
10   Q.   But I'm talking about for refusing to smile?
11   A.   Oh, no.  I told him, "if you want, I'll leave."
12   Q.   Weren't you usually smiling at work, or were
13 you --
14   A.   I was cleaning batteries in the shop.
15   Q.   That's not a very smiling type of activity?
16   A.   I mean, if I go to the sales floor I'm going to
17 be smiling.
18   Q.   Right.
19   A.   But I'm looking at batteries.  What am I going
20 to do, smile at batteries?
21   Q.   So he was just being, what, a smart-aleck?
22   A.   Yes.
23   Q.   Did he do that a lot?
24   A.   Yes.  He would constantly throw his big words.
25   Q.   Did he literally have a dictionary at work and

### Page 263

1  was doing a new word every day and use it --
2    A.   He had it on his desk.
3    Q.   He would do that?
4    A.   Yes.
5    Q.   Did he torment everybody in the shop like that?
6    A.   Yes, until I told him, "you may throw your big
7  words.  These guys are just going to tell you yes even
8  though they don't know what you're saying."
9    Q.   And what did he say?
10   A.   He just turned red.
11   Q.   You were trying to help him out, but he didn't
12 realize it?
13   A.   Correct.
14   Q.   The next page, it says -- is this a different
15 date now?
16   A.   This is the day he told me to consider looking
17 for work in a different field.  I just wrote it real
18 quick.
19   Q.   "Richard walked to my" --
20   A.   "Walked me to my truck."
21   Q.   "Told him of my back being hurt, and he told me
22 maybe I should look for work in another field.  This guy
23 wants to get rid of me."
24   A.   Correct.
25   Q.   I see.  And this matches up with right before

### Page 264

1  you called or shortly before you called that 1-888
2  line -- 1-888 assist line in February 2002?
3    A.   Correct.
4    Q.   Okay.  You said you think you called them again
5  because there was no record of that.  You think you
6  called Sears 1-888 again between March 7th, '02 and your
7  termination.  I didn't see any record of that, and I'm
8  just trying to get -- are you fuzzy on that, or are you
9  real sure about that or what?
10   A.   I'm not sure if I called them on the 15th of
11 November.
12   Q.   I'm saying before, between March 7th of '02 and
13 November 14th, 2002, did you call?
14   A.   No.
15   Q.   The next page, is this a copy of the 1-888
16 ethics number --
17   A.   Yes.
18   Q.   -- that they gave you to call?
19   A.   Yes.
20   Q.   You've had that since '95?
21   A.   Yes.
22   Q.   But you never called it until --
23   A.   The case number is up there when I called.
24   Q.   Oh, you wrote down the case number the lady
25 gave you?

ORAL DEPOSITION OF AMALIA PEREZ

## Page 265

1    A.    Yes.
2    Q.    Okay. Do you have your 2001 federal tax
3 returns?
4    A.    2001, yes, up to '95.
5    Q.    It looks like you went through a series of test
6 programs when you first got to Sears?
7    A.    Yes, sir.
8    Q.    And you passed them all. And you were
9 certainly more than qualified to do your job, correct?
10    A.    Yes, sir.
11    Q.    This 103 talks about 401(k) eligibility earning
12 $778.18 at Jabil?
13    A.    Yes.
14    Q.    So are you eligible then for a 401(k)?
15    A.    Yes, sir, but I can't get into it because of my
16 bankruptcy.
17    Q.    So is Jabil there located in St. Petersburg,
18 Florida?
19    A.    That's the main office, and it's located in
20 McAllen, 5700 Parkway Drive.
21    Q.    What do they do there?
22    A.    We --
23          MR. ZAYAS: At Jabil?
24          MR. OBERTI: Yeah.
25    Q.    (By Mr. Oberti) What type of business are they

## Page 266

1 in?
2    A.    Drives for computers.
3    Q.    They make them?
4    A.    They make them in Reynosa, or they repair them,
5 and then they ship them to us. And from there we box
6 them and ship them to the customers.
7    Q.    So what's been the most stressful -- mentally
8 stressful thing to happen to you in your life?
9    A.    This.
10    Q.    What?
11    A.    Losing my job with Sears.
12    Q.    Do you consider yourself a strong person?
13    A.    I thought I was.
14    Q.    Have you performed well at your jobs that
15 you've had since Sears?
16    A.    Yes, sir.
17    Q.    At Giddyap when you were a delivery driver?
18    A.    Yes, sir.
19    Q.    Throughout the Valley?
20    A.    Throughout the Valley.
21    Q.    How did you do with that job?
22    A.    They didn't want to lose me.
23    Q.    And at Jabil, has anybody else won two Employee
24 of the Month awards in less than a year?
25    A.    No.

## Page 267

1    Q.    Only you?
2    A.    Yes, sir.
3    Q.    Okay. So obviously you've performed
4 exceedingly well there?
5    A.    Yes, sir.
6    Q.    Despite -- and what's your hours there, Monday
7 through Friday?
8    A.    Yes, sir.
9    Q.    So despite, like you say, the stress and
10 embarrassment, humiliation, and frustration and anger
11 and anxiety associated with losing your job at Sears,
12 have you been able to maintain a normal daily routine of
13 getting up in the morning, taking care of yourself and
14 getting off and doing what you need to do to try and
15 live a normal life?
16    A.    Yes.
17    Q.    Do you -- did anybody tell you at Sears any
18 reason for your termination other than Mr. Grebb saying
19 you're a liability?
20    A.    No.
21    Q.    And you've been threatened with termination
22 prior as early as May 29th, 2001 in that write-up,
23 correct?
24    A.    Yes, sir.
25    Q.    Did anybody threaten you with termination for

## Page 268

1 any reason that was connected to anything other than
2 your performance or what they thought your mistakes
3 were?
4    A.    No, sir.
5    Q.    Do you have any actual proof that you were
6 terminated because of your -- because of the workers'
7 compensation claims Sears filed on your behalf or your
8 on-the-job injuries? Do you have any proof that either
9 of those things was the reason for your termination?
10          MR. ZAYAS: Objection, form.
11    A.    The proof is just what I've submitted.
12    Q.    What? What have you submitted on that?
13    A.    Well, what was the question again?
14    Q.    Let me break it down in two things. Do you
15 have any proof that Sears fired you because of the
16 workers' compensation claims, the eight different ones
17 that they filed on your behalf?
18          MR. ZAYAS: Objection, form.
19    Q.    (By Mr. Oberti) In other words, that they got
20 upset that they had filed all these claims on your
21 behalf and decided to fire you for that reason? Do you
22 have any proof that that's the reason they fired you?
23          MR. ZAYAS: Objection, form.
24    A.    I don't know.
25    Q.    Okay.

## ORAL DEPOSITION OF AMALIA PEREZ

### Page 269

1   A.  I can't answer that honestly.

2   Q.  You don't know, correct?

3   A.  Correct.

4   Q.  Then the second question is:  Do you have any

5 proof that you were terminated due to any of your

6 on-the-job injuries?

7          MR. ZAYAS:  Objection, form.  It's

8 basically the same question, no?

9          MR. OBERTI:  Yeah.

10   Q.  (By Mr. Oberti)  The same answer?

11   A.  The same answer.

12   Q.  I don't know?

13   A.  I don't know.

14   Q.  Correct?

15   A.  (Witness nods her head affirmatively.)

16   Q.  Yes?

17   A.  All I can tell you is that this last injury

18 that I had, I mean, everything was rush, rush, and I

19 feel they got rid of me because I'm a female and because

20 of that.

21   Q.  Okay.  So you're saying because there was a

22 close relationship between November 7th and the day you

23 got fired?

24   A.  Yes.

25   Q.  Anything else?

### Page 270

1   A.  No.

2   Q.  Any other proof that you were fired because of

3 your workers' comp claim?

4   A.  No.

5   Q.  Turn to 116.  Now, you admit that the injury on

6 November 7th, 2002, it says it was while you were

7 removing some nuts off some shocks at work, the car

8 trunk fell on top of your left shoulder, correct?

9   A.  Correct.

10   Q.  Who was working on this car?  Just you?

11   A.  Just me.

12   Q.  Was the car up on the alignment suspension or

13 just sitting on the ground?

14   A.  It was on the ground.

15   Q.  Okay.  And how -- I'm trying to understand

16 how -- while removing nuts off some shocks the car trunk

17 fell on your shoulder.  How did that happen?

18   A.  This was a Mustang, and you know how mustangs

19 are, kind of --

20          MR. ZAYAS:  With a hatchback?

21   A.  Right.

22   Q.  Okay.

23   A.  And we had -- I had to open the whole thing.

24   Q.  The whole hatchback?

25   A.  Right.

### Page 271

1   Q.  And then where were you?

2   A.  I was inside.  I was removing the bolts from

3 the shocks in the back.  And the hatchback has like a

4 spring or a shock, a little shock, and apparently it was

5 weak because that thing just came down and hit me with

6 the lock portion.

7   Q.  Did it hit you pretty hard?

8   A.  Yes.

9   Q.  Were there any witnesses to it?

10   A.  Gabriel Aranda was there.

11   Q.  Did Mike ever hurt himself at work while

12 working on a car while you were working there?

13   A.  He would hurt himself, but I don't know if he

14 reported it.

15   Q.  You always reported your injuries?

16   A.  Yes, sir.

17   Q.  Now, why is it that you reported this one

18 injury, though, from March 2001, you didn't report it

19 until April 2002?

20   A.  Because I got a ball here in my finger, and it

21 was hurting.  And it got to where every time I hit it on

22 something, it would -- it would hurt all the way to my

23 shoulder.

24   Q.  And how --

25   A.  So I went and reported it.

### Page 272

1   Q.  You're saying you didn't really notice that it

2 was going to be a real injury until almost -- over a

3 year?

4   A.  Well, I had smashed my finger, my middle

5 finger, and the nail fell off; but when the nail started

6 growing, this ball started coming out also.

7   Q.  Was that denied?

8   A.  It was tender and --

9   Q.  Was that claim denied because you filed it too

10 late?

11   A.  It was filed too late.

12   Q.  Has there been any other claim that was filed

13 before -- workers' comp claim that was made --

14   A.  That was the only one.

15   Q.  -- that was denied?

16   A.  That was the only one.

17   Q.  Correct?

18   A.  Yes.

19   Q.  All the other ones were approved?

20   A.  Yes.

21   Q.  All right.  What are these bills back here, if

22 you go to like page 263.  Do you know what these bills

23 are, these couple of pages here where they're sending

24 you bills for a few hours or whatever, $35?  What was

25 that for?

**ORAL DEPOSITION OF AMALIA PEREZ**

## Page 273

1    A.   (No response.)
2    Q.   Do you know?
3    A.   No, sir.
4    Q.   Then you've got a bunch of notes here from 267
5  all the way to 286.  Are these your notes?
6    A.   Yes.
7    Q.   Are these notes that you kept at work to help
8  you do your job?
9    A.   Yes.
10   Q.   When did you originally make them, when you
11 were going through training at Sears?
12   A.   Gabriel Aranda had a book, and it had a lot of
13 information, so I started writing down stuff.
14   Q.   When did you make all these notes, all at the
15 same year?
16   A.   At the beginning when I became a Tech II, I
17 started writing.
18   Q.   Okay.  In 2001?
19   A.   Yes.
20   Q.   Okay.  And then you would keep the notes with
21 you at work?
22   A.   Yes.
23   Q.   And then this next section, 287, this thing on
24 modern wheel alignment, is that some document that you
25 had there at the shop?

## Page 274

1    A.   Yes.
2    Q.   And would you -- it was there for everyone to
3  look at?
4    A.   Yes.
5    Q.   The whole time you worked there?
6    A.   Yes, sir.
7    Q.   And the rest of the documents, are these all
8  documents that were there available for you to look at
9  at Sears?
10   A.   Yes.
11   Q.   On different things on how to do your job?
12   A.   Yes, sir.
13   Q.   If you could go back and do it all over again
14 at Sears, is there anything you would do differently?
15   A.   I don't believe so.
16   Q.   Do you accept any responsibility at all for
17 making any mistakes that Sears seems to have blamed you
18 for?  Do you think any of the ones we've gone over, you
19 bear some responsibility for?
20   A.   Maybe the truck, the alignment that partially
21 fell off.
22   Q.   The write-up from May 29th?
23   A.   Yes.
24   Q.   What about any other ones?
25   A.   The one with the stripped bolts.

## Page 275

1    Q.   The November 2nd incident?
2    A.   Yes.
3    Q.   With the customer Lordon?
4    A.   Yes.  But that's it.
5    Q.   The other ones you say no?
6    A.   No, sir.
7    Q.   Okay.  Why are you willing to accept some
8  responsibility for those two?
9    A.   Because I did remove those bolts on
10 Mr. Lordon's vehicle.  And it was an accident.  It
11 wasn't done purposely.
12   Q.   On the what?
13   A.   On the bolt stripping.
14   Q.   You mean the reason there had to be replacement
15 bolts is because when you removed the original bolts,
16 you accidently stripped them?
17   A.   Correct.
18   Q.   And then on the truck from the May 29th
19 write-up, why do you accept some responsibility on that?
20   A.   Because I signed the paper.
21   Q.   The May 29th write-up?
22   A.   Yes.
23   Q.   On the customer Lordon, are you willing to
24 agree with me that in retrospect it was somewhat
25 negligent or reckless of you to let the customer drive

## Page 276

1  off with the vehicle in that condition even though they
2  knew full well what the situation was and that there was
3  some risk?  In hindsight sitting here today, do you
4  agree with me that that was somewhat reckless?
5    A.   In letting him go?
6    Q.   Yes.
7    A.   Yes, but I couldn't stop him.
8    Q.   Well, I mean, if you didn't put the tire back
9  on at all, he couldn't drive the truck, the vehicle out,
10 correct?
11   A.   Correct.
12   Q.   What type of Nissan was it?
13   A.   It was a -- I believe it was a Pathfinder.
14   Q.   All right.  Well, thank you very much for your
15 time here today.  I know it's been a long day.  I
16 appreciate it very much.
17        Even though we're on opposite sides, do
18 you feel as though I've treated you fairly generally?
19   A.   Yes.
20        MR. OBERTI:  Thank you very much.  I pass
21 the witness.
22        MR. ZAYAS:  I don't feel that way.
23        MR. OBERTI:  He's just joking.
24
25            * * * * * *

ORAL DEPOSITION OF AMALIA PEREZ

## Page 277

CHANGES AND SIGNATURE

1
2  WITNESS NAME:                    DATE OF DEPOSITION:
3  AMALIZ PEREZ                     OCTOBER 14, 2004
4  PAGE     LINE     CHANGE                    REASON
5  _____
6  _____
7  _____
8  _____
9  _____
10 _____
11 _____
12 _____
13 _____
14 _____
15 _____
16 _____
17 _____
18 _____
19 _____
20 _____
21 _____
22 _____
23 _____
24 _____
25 _____

## Page 278

1     I, AMALIA PEREZ, have read the foregoing deposition
2  and hereby affix my signature that same is true and
3  correct, except as noted above.
4
5
6     _____
7              AMALIA PEREZ
8              Job No. 47967
9  THE STATE OF TEXAS:
10 COUNTY OF CAMERON :
11
12    Before me,_____, on this day personally
13 appeared AMALIA PEREZ, known to me (or proved to me
14 under oath through _____) (description of
15 identity card or other document) to be the person whose
16 name is subscribed to the foregoing instrument and
17 acknowledged to me that they executed the same for the
18 purposes and consideration therein expressed.
19    Given under my hand and seal of office on this the
20 _____ day of _____, 2004.
21
22
23    _____
              Notary Public, State of Texas
              Commission Expires: _____
24
25

## Page 279

1
      IN THE UNITED STATES DISTRICT COURT
2     FOR THE SOUTHERN DISTRICT OF TEXAS
              BROWNSVILLE DIVISION
3
   AMALIA PEREZ                    *
4                                  *
   VS.                             * CASE NO. B-04-068
5                                  *
   SEARS, ROEBUCK AND              *
6  COMPANY                         *
7         REPORTER'S CERTIFICATION
          DEPOSITION OF AMALIA PEREZ
8         TAKEN ON OCTOBER 14, 2004
9     I, SYLVIA KERR, Certified Shorthand Reporter in and
10 for the State of Texas, hereby certify to the following:
11    That the witness, AMALIA PEREZ, was duly sworn by
12 the officer and that the transcript of the oral
13 deposition is a true record of the testimony given by
14 the witness;
15    That the deposition transcript was submitted on
16 _____, 2004 to the witness or to the attorney for
17 the witness for examination, signature and return to
18 Sunbelt Reporting & Litigation Services by
19 _____, 2004:
20    That the amount of time used by each party at the
21 deposition is as follows:
22    MR. MARK J. OBERTI - 5 hours, 42 minutes
23    That pursuant to information given to the deposition
24 officer at the time said testimony was taken, the
25 following includes counsel for all parties of record:

## Page 280

1
2     MR. RICHARD E. ZAYAS, Attorney for the Plaintiff
3     MR. MARK J. OBERTI, Attorney for the Defendant
4     That $_____ is the deposition officer's charges
5  to the Defendant for preparing the original deposition
6  transcript and any copies of exhibits;
7     I further certify that I am neither counsel for,
8  related to, nor employed by any of the parties or
9  attorneys in the action in which this proceeding was
10 taken, and further that I am not financially or
11 otherwise interested in the outcome of the action.
12    Certified to by me this 27th of October, 2004.
13
14
15    _____
              SYLVIA KERR, Texas CSR No. 4776
16            Expiration Date:  12/31/04
              Sunbelt Reporting & Litigation
17            Firm Registration No. 300
              4545 Bissonnet, Suite 100
18            Bellaire, Texas 77401
              (800) 666-0763
19
20
21
22
23
24
25

ORAL DEPOSITION OF AMALIA PEREZ

**Page 277**

CHANGES AND SIGNATURE

1
2  WITNESS NAME:                          DATE OF DEPOSITION:
3  AMALIZ PEREZ                           OCTOBER 14, 2004
4  PAGE    LINE    CHANGE                 REASON
5
6   _13_   _5_   _DIALS TO DIVIDES_   _SPELLED WRONG_
7   _161_  _23_  _TOW TO TOE_        _MISUNDERSTOOD_
8   _75_   _3_   _THE NEXT DAY_      _IT WAS THE SAME DAY_
9   _231_  _8_   _SAFETY NEVER MENTIONED_
10  _22_   _16_  _SAFE_              _I NEVER SAID SAFE_
11  _____
12  _____
13  _____
14  _____
15  _____
16  _____
17  _____
18  _____
19  _____
20  _____
21  _____
22  _____
23  _____
24  _____
25  _____

**Page 278**

1       I, AMALIA PEREZ, have read the foregoing deposition
2  and hereby affix my signature that same is true and
3  correct, except as noted above.
4
5
6
7               AMALIA PEREZ
8               Job No. 47967
9  THE STATE OF TEXAS:
10 COUNTY OF CAMERON :
11                    FONSECA
12    Before me, JOSEFINA        , on this day personally
13 appeared AMALIA PEREZ, known to me (or proved to me
14 under oath through TXDL 16161 description of
15 identity card or other document) to be the person whose
16 name is subscribed to the foregoing instrument and
17 acknowledged to me that they executed the same for the
18 purposes and consideration therein expressed.
19    Given under my hand and seal of office on this the
20  17th day of  NOVEMBER 2004.
21
22
23
24               Notary Public, State of Texas
                 Commission Expires: 06-12-2007
24
25

JOSEFINA FONSECA
Notary Public
State OF TEXAS
Com. Exp. 06-12-2007

**Page 279**

1
2       IN THE UNITED STATES DISTRICT COURT
        FOR THE SOUTHERN DISTRICT OF TEXAS
               BROWNSVILLE DIVISION
3
  AMALIA PEREZ                        *
4                                     *
  VS.                                 *
5                                     * CASE NO. B-04-068
                                      *
  SEARS, ROEBUCK AND                  *
6 COMPANY                             *
7          REPORTER'S CERTIFICATION
           DEPOSITION OF AMALIA PEREZ
8          TAKEN ON OCTOBER 14, 2004
9      I, SYLVIA KERR, Certified Shorthand Reporter in and
10 for the State of Texas, hereby certify to the following:
11     That the witness, AMALIA PEREZ, was duly sworn by
12 the officer and that the transcript of the oral
13 deposition is a true record of the testimony given by
14 the witness:
15     That the deposition transcript was submitted on
16 _____, 2004 to the witness or to the attorney for
17 the witness for examination, signature and return to
18 Sunbelt Reporting & Litigation Services by
19 _____, 2004;
20     That the amount of time used by each party at the
21 deposition is as follows:
22     MR. MARK J. OBERTI - 5 hours, 42 minutes
23     That pursuant to information given to the deposition
24 officer at the time said testimony was taken, the
25 following includes counsel for all parties of record:

**Page 280**

1
2    MR. RICHARD E. ZAYAS, Attorney for the Plaintiff
2
     MR. MARK J. OBERTI, Attorney for the Defendant
3
4    That $ _____ is the deposition officer's charges
5 to the Defendant for preparing the original deposition
6 transcript and any copies of exhibits;
7    I further certify that I am neither counsel for,
8 related to, nor employed by any of the parties or
9 attorneys in the action in which this proceeding was
10 taken, and further that I am not financially or
11 otherwise interested in the outcome of the action.
12    Certified to by me this 27th day of October, 2004.
13
14
15
     _____
16   SYLVIA KERR, Texas CSR No. 4776
     Expiration Date: 12/31/04
17   Sunbelt Reporting & Litigation
     Firm Registration No. 300
18   4545 Bissonnet, Suite 100
     Bellaire, Texas 77401
19   (800) 666-0763
20
21
22
23
24
25

ORAL DEPOSITION OF AMALIA PEREZ

1                        CHANGES AND SIGNATURE

2  WITNESS NAME:                        DATE OF DEPOSITION:

3  AMALIZ PEREZ                         OCTOBER 14, 2004

4  PAGE        LINE        CHANGE                        REASON

5  113          5          DIALS TO DIODES        MISUNDERSTOOD

6  161          23         TOW TO TOE             MISUNDERSTOOD

7  175          3          THE NEXT DAY           IT WAS THE SAME DAY

8  221          8          SAFETY                 SAFETY NEVER MENTIONED

9  221          16         SAFE                   I NEVER SAID SAFE

10  _____

11  _____

12  _____

13  _____

14  _____

15  _____

16  _____

17  _____

18  _____

19  _____

20  _____

21  _____

22  _____

23  _____

24  _____

25  _____

## ORAL DEPOSITION OF AMALIA PEREZ

1    I, AMALIA PEREZ, have read the foregoing deposition

2   and hereby affix my signature that same is true and

3   correct, except as noted above.

4

5

6

7                        AMALIA PEREZ

8                        Job No. 47967

9   THE STATE OF TEXAS:

10  **COUNTY OF CAMERON :**
    COUNTY OF HIDALGO

11

12     Before me, __JOSEFINA FONSECA__, on this day personally

13  appeared AMALIA PEREZ, known to me (or proved to me

14  under oath through TXDL#07607640 ) (description of

15  identity card or other document) to be the person whose

16  name is subscribed to the foregoing instrument and

17  acknowledged to me that they executed the same for the

18  purposes and consideration therein expressed.

19     Given under my hand and seal of office on this the

20  __17th__ day of __NOVEMBER__, 2004.

21

22

23  Notary Public, State of Texas
    Commission Expires: __06-12-2007__

24

25

JOSEFINA FONSECA
Notary Public
STATE OF TEXAS
My Comm. Exp. 06-12-2007